Exhibit 1

1

2

3                    OFFICE OF ADMINISTRATIVE HEARINGS

4                      FOR THE STATE OF CALIFORNIA

5

6    SARAH LOOF,                  )              DUE PROCESS COMPLAINT
                                  )
7          Petitioner,            )
                                  )
8          v.                     )
                                  )
9    UPLAND UNIFIED SCHOOL        )
     DISTRICT,                    )
10                                )
           Respondent.            )
11   _____)

12         Petitioner provides the Due Process Complaint below:

13   /////

14   /////

15   /////

16   /////

17   /////

18   Dated: September 11, 2020

19

20

21

22

23

24

25

26

27
                                   1
28

**DUE PROCESS COMPLAINT**

The relevant information concerning Sarah is as follows:

Student's Name:  Sarah M. Loof

Student's Date of Birth:  March 7, 1997

Parents' Names:  Rene and Rita Loof

Residence Address:  2324 W. Orange Drive, Upland CA 91784

District of Residence: Upland Unified School District

School of Attendance:  Private School

Grade Level in 2018/2019: 12th Grade

Petitioner alleges that during the 2018-2019 school year, the Upland Unified School District ("District") failed to offer and/or provide Sarah with a free appropriate public education (FAPE), in violation of the Individuals with Disabilities Education Act, 20 U.S.C. §§1400 et.seq. (IDEA), and concomitant provisions of the California Education Code, Cal. Educ. Code §§ 56000 et. seq. Petitioner seeks appropriate relief for the denial of FAPE under the IDEA, as well as any and all relief available for the LEA's violations of Section 504, the ADA, the California Constitution, the U.S. Constitution, and all other federal and state laws protecting the rights of children with disabilities, insofar as such relief is also available under the IDEA and under State and federal civil rights laws, to the same extent as if actions for violations of those statutes been brought pursuant to the procedures under subsections (f) and (g) of 20 U.S.C. § 1415.
/////
/////

**BACKGROUND**

Sarah is a twenty three-year-old resident and student in the Upland Unified School District ("District"). She has been a student in the District for many years.  For the past several years, as a prior due process matter was pending through the federal court, Sarah's  parents have provided private educational serviced and has received intensive reading instruction at Lindamood-Bell, private Speech Therapy, private Vision Therapy, Private Karate lessons, a one-to-one instructional aide, and transportation, all paid for by her parents.  Sarah's parents have long sought an offer of FAPE from UUSD for their daughter.

In a prior OAH matter, the ALJ found,

Because the Districts did not assess Student, they were unable to develop an IEP for her and make her an offer of FAPE for the 2007-2008 school year.

The ALJ further found that the parent's written consent to assessment by the District - in a settlement agreement - was more than sufficient to obligate the District to complete the proposed assessments, which it had never done.  The District's failure to assess Sarah, despite the written consent, was a violation of IDEA and State law and denied Sarah FAPE.

Sarah has faced a long and arduous struggle in trying to access an education.  She has been diagnosed with hypotonia (low muscle tone) and provided Occupational Therapy Department to enable her to walk.

Sarah was identified in 2001 as having Speech/Language delays

3

and began to receive speech therapy.  Sarah was first made eligible for special education as a student with mild mental retardation and Speech/Language delays in -pre-school.

Following pre-school Sarah was placed in an isolated county-operated special day class by the District, one filled with all boys save for one other girl.  Most of the students in the class had significant behavior problems; Sarah did not and was not appropriately placed in that class nor was the class the Least Restrictive Environment for her.

Sarah showed virtually no progress while enrolled in the SDC class.  Her parents, after a year, placed her in a private school, Our Lady of Assumption and, after the District failed to identify or offer any accommodations to Sarah for her IEP, placed in her at that school in a general education kindergarten class, with a private one-to-one aide.  Sarah did well in that environment. Sarah's parents allowed her to attend a District classroom in Kindergarten, at Valencia Elementary School.  The District had refused to address academics for Sarah and to include those into her IEP, and Sarah appeared to be regressing.  To address District's refusal to allow Sarah to access the general education curriculum, and address her already occurring regression, the parents notified the District, in 2004, that they would be placing Sarah at Our Lady of Assumption ("OLA") and seeking reimbursement. Soon after, the California Department of Education found, in

a compliance complaint investigation, that the District had
violated Sarah's IEP and not provided necessary academic
instruction as part of her educational program.

Sarah attended OLA for first through sixth grade, doing well
and participating in general education, with a parentally provided
one-to-one aide.

The parents filed a due process on or about June 29, 2005, in OAH
Case No. 2005070306, alleging violations of her rights to a free
appropriate public education (FAPE) between 2002 and 2006. On June
13, 2007.  On the first day of hearing, the parties reached a
settlement agreement which was later finalized June 20, 2007.  That
agreement, signed by the parent, included a term that the parents
consented to the assessment being proposed by the District.   The
District failed to conduct those assessments, claiming - in part -
that the parents had not signed the assessment plan provided by
District to them.

Petitioner returned to OAH, filing a complaint with OAH which
OAH dismissed on May 14, 2008, stating that it had no jurisdiction
to enforce a settlement agreement.  Upon appeal to the District
Court, in S.L. v. Upland Unified School District and West End
SELPA, Case No. CV 08-4936 GAF, on August 24, 2010, the District
Court held reversed OAH's dismissal and remanded the case to OAH
for hearing.

When the OAH case (2007120214), was finally heard, the ALJ
found that the parents had agreed to the assessments by signing the

settlement agreement, and District's refusal to proceed with those assessments was not supported by any authority.  The ALJ held that the parents were not required to sign an assessment plan when, in fact, they had given written consent otherwise to the proposed assessment. The parents challenged the district court's orders upholding the California Office of Administrative Hearing's ("OAH") partial denial of reimbursement for educational costs pursuant to the Individuals with Disabilities Education Act ("IDEA") (Case No. 12-55715). Ultimately, the Ninth Circuit Court of Appeals held that the District had failed to make an offer of FAPE to Sarah and ordered UUSD to reimburse the parents for private school tuition a one-to-one instructional aide was proper.

### RECENT HISTORY

In 2015-16, the District held several IEP team meetings, with the final meeting being held on October 31, 2016.  Following the 2015 meeting, the parent was not provided with a copy of that proposed IEP and the District's written offer of FAPE. Sarah's parent made a written request on October 8, 2015 for a copy of the final IEP.  In response, the District's administrator indicated that she would follow up with the parent.

The administrator, Rochelle Yatomi, did not provide any copy of the IEP for the 2015-16 school year nor did anyone in the District provide that IEP until September 30, 2016 - - almost a year later.

The parent filed a compliance complaint with the California

Department of Education, and District was found to be out of compliance for failing to timely provide Petitioner's parents with the IEP for the 2015-16 school year.  The District's written offer was part of that IEP document.

At the same time, the District provided an assessment plan to the parent for further assessment.  The parent was confused as to whether the District required additional assessment, especially in light of District's clear communications at the last IEP that it required no further assessments. The parent wrote to Ms. Yatomi, indicating her confusion and stating her prior agreement - in August 2015 - to the administration of the TOVA when she had attended the IEP.  Ms. Yatomi had stated at the August 2015 IEP that the District did not require any further assessments of Sarah. To add to the parent's confusion, the assessment plan provided to the parent in September 2016 indicated that it was for a "triennial" assessment.

Again on October 19, 2016, the District, through Geraldine Tamayo, sent an assessment plan to the parent.  In response the parent stated, "At this point, I am in disagreement with the district's assessments and am requesting independent evaluations for the TOVA with Dr. Timothy Gunn, an assistive technology evaluation with Cynthia Cottier and a central auditory processing assessment."  The parent's request was made because District had indicated some interest in conducting the TOVA in August 2015.

The District provided yet another letter to the parents, dated October 27, 2016, from Ms. Tamayo.  The letter acknowledged the parent's request for Independent Educational Evaluations in the

TOVA with Dr. Timothy Gunn, Assistive Technology with Cynthia Cottier, and in Central Auditory Processing, specifically denying those requests.  However, to date, the District has not pursued any due process complaint to prove its assessments in those areas to be appropriate or to establish that such were not required.  The District included a "supplemental" assessment plan, asking for parent's consent.

On October 31, 2016, the District held an IEP team meeting for Sarah - one that was overdue as the last annual IEP meeting had been held on August 12, 2015.  The District's IEP was not completed prior to the start of the school year, and the parents were left without an offer of FAPE for Sarah when she began school in August 2016.  At the 2016 annual IEP team meetings, the parent shared with the District Sarah's success in the Lindamood-Bell program and with a one-to-one aide and Kurzweil 3000 Assistive Technology.  The District did not take any steps to discuss those services at the annual IEP meeting.

The parents had had no choice but to continue to provide private educational services for Sarah at their expense.

At the October 2016 IEP team meeting, the parent repeated her prior requests for IEEs, but the District again provided the parent with an assessment plan for District assessment in many areas, ignoring Parent's request for IEEs.  At that meeting, District representatives repeatedly stated that they did not have Present Levels of Performance for Sarah.

At that time, Sarah was receiving services at Lindamood-Bell, and the parents provided written consent for District staff to observe Sarah there (as is noted on page 27 of that IEP).

As of the October 2016 annual IEP, the District made an offer to Sarah of 77% of time outside general education and 23% in general education.  Sadly, the time in general education was not for classroom time but, instead, included non-class time such as lunch and passing periods.

Following the last annual 2016 IEP team meeting, the parent, on November 10, 2016, sent an e-mail to Ms. Tamayo, letting the District know that further observation of Sarah could be arranged and offering several dates for that observation.  She also noted that if the District wished, Lindamood-Bell staff could be available to answer questions about the programs being provided to Sarah.  The parent provided updated progress reports for Sarah on November 10, 2016 and asked, as she had done at the IEP team meetings, for copies of observation notes taken by District staff and if District needed any additional information; she never received any such copies from the District.  With that email, the parent gave written consent to the proposed observations.

On November 14, 2016, Ms. Tamayo e-mailed the parent stating that District staff was not available to observe Sarah on November 16th (actually one date of many offered by the parent).

The parent and District continued to communicate regarding dates for additional observation, and the parent offered several additional dates.  Before that additional observation could be arranged, the District, on November 18, 2016 made a written offer

to Sarah and her parents, offering services (such as transition) which had <u>never</u> been discussed at the IEP team meeting. Without team discussion of the current services Sarah was receiving, the District's representative, Ms. Tamayo, unilaterally denied the parent's request for Lindamood-Bell services, a one-to-one aide, and a Kurzweil 3000 Assistive Technology services and made an offer of FAPE that no IEP team had ever discussed.

That same day, the District sent a letter with an attached assessment plan - from September 30, 2016 - to the parent.  The plan was again checked "triennial," although the triennial assess-ments had been concluded in 2015.

Three days later, in an email dated November 21, 2016, the District indicated it wanted to conduct more assessments of Sarah, including observations.  Another assessment plan was provided with that email, and the parent signed and timely returned that plan.

The parent and District continued to discuss dates for further District observation of Sarah.  On December 12, 2016, the parent emailed Ms. Tamayo, once again giving written consent to the further requested observation of Sarah at Lindamood-Bell.  In response, the next day, Ms. Tamayo informed the parent that observations would be conducted only after the parent had consented to the District's assessment plan form.  Although she had provided the District with an emailed consent to the observations, the parent signed the District's form on December 13th and faxed that document to the District.

On June 30, 2017, Mrs. Loof sent a letter to UUSD Director of

Student Services Rochelle Yatomi stating in part:

> "We are providing private educational services, not as a preference but, because the district has not presented any appropriate options for placement in the Upland Unified School District.  We continue to seek an offer of FAPE from your district and do not waive any of Sarah's rights as an individual with a disability under state or federal laws. Please note that we will continue to provide educational services for Sarah ESY and the 2017-2018 school year, until your district makes an offer of FAPE."

On July 21, 2017, Mrs. Loof requested reasonable accommodations for Sarah's assessments as follows: (1) Location of assessments at distraction free location such as the district office to accommodate Sarah's anxiety with the size and tumultuousness of the high school campus and (2) Allowance for her to stay in either the same room or in near proximity to Sarah, so as to minimize Sarah's separation anxiety.

On August 8, 2017, Mrs. Loof sent a letter to Rochelle Yatomi reiterating her interest in receiving an offer of Free Appropriate Public Education from the district and consenting to have her child assessed for special education. Mrs. Loof offered to make Sarah available to the district for assessments on August 11th and August 14th.  At no time did the District take steps to conduct the assessments and has not done so to this day.  Said letter also stated:

> "I would consent to any of the tests administered to my child by your district in the past.  If you should determine that additional assessments are needed, please inform me in writing.

Your letter does not include the additional information I requested
regarding the proposed assessments.  I reiterate my request to be
informed, prior to the assessments, about the specific tests the
district is proposing."

On August 17, 2019, in an effort to resolve the dispute with
the district, Mrs. Loof filed a request for "Mediation-Only" with
the Office of Administrative Hearings (OAH Case 2017080476).  The
District refused to participate in the Mediation and ultimately
moved to unilaterally cancel it.

On October 12, 2017, Mrs. Loof sent a letter to Ms. Yatomi
requesting an IEP meeting for Sarah and providing a copy of a
recent Vision Therapy Assessment by Dr. Doug Stephey. Mrs. Loof
offered the District two dates (10/17 and 10/18) for an IEP meeting
to consider Dr. Stephey's recommendations. She reiterated her
request for an offer of FAPE from the District.  The District never
convened an IEP meeting to consider Dr. Stephey's assessment nor to
propose and offer of FAPE to Sarah. Mrs. Loof informed the District
that due to its failure to offer FAPE, she had no other recourse
but to provide private educational services for Sarah.  The parent
also offered to provide any additional information the District
needed.

On November 28, 2017, Mrs. Loof sent an e-mail to Ms. Yatomi
informing her that she had faxed back an IEP invitation form and
made herself available Wednesday 11/29 at 10:30 a.m.  "I have not

seen a response from the district and just wanted to follow-up to clarify whether or not the district will hold the meeting.  Please let me know if you need me to provide additional dates and/or additional information."—the e-mail stated.

On November 29, 2017, Mrs. Loof sent another e-mail to Mr. Yatomi stating:  "I am sorry to hear this additional date did not work for the district either. I had already offered dates in October. Just to clarify, the e-mail I sent yesterday was a follow-up.  I had previously faxed the invitation form to your office. Thus far, the district has unilaterally generated the invitations and selected dates and times for the IEP meeting without checking my availability first.  Since I have business commitments and childcare responsibilities, the dates and times proposed were not convenient for me.  Please let me know when the district can be available at your earliest convenience."

On November 29, 2017, Ms. Yatomi responded to the e-mail informing Mrs. Loof that the district was not available to meet and requesting additional dates/times for the IEP meeting.

On December 5, 2017 Mrs. Loof I sent an e-mail to Ms. Yatomi stating:

"…..Thought to offer another date for the IEP meeting.  We are available on Monday December 11th from 9-11 a.m.  Please let me know if that works, if not, I can offer additional dates."

Subsequent to sending the e-mail to Ms. Yatomi, Mrs. Loof received a letter dated December 5, 2017 from Ms. Yatomi with

proposed IEP dates. Once again, Ms. Yatomi unilaterally set the dates without first checking to see if Mrs. Loof was available.

On December 6, 2017, Ms. Yatomi sent an e-mail which stated:

"Hi Rita,

Thank you for getting back to me so quickly! Does this mean the 12/11 date at 2:30, that was proposed in the meeting notice sent to you fifteen minutes prior to your proposal, doesn't work for you?  While I wait to hear back from you I will verify if the District team members can meet in the morning instead of the afternoon."

On December 6, 2017 Mrs. Loof responded to Ms. Yatomi via e-mail stating:

"I had not seen the e-mail from the district when I sent my e-mail offering an additional date for the IEP meeting.  Thus, I was not responding to the invitations which I subsequently received, but rather was reaching out once more since I had not heard a response to my e-mail of Tuesday 12/5/17 making myself available for the IEP meeting. I have included the e-mail I sent you at the bottom for quick reference.

My e-mail of 12/5/17 clearly indicated I would be available on Monday 12/11 from 9-11 a.m.  I never offered 12/11 at 2:30 as an option.  Thus, once again you have proposed a date/time which you knew or should have known would not work with my schedule.  Please let me know if Monday 12/11 9-11 am would work.  That is the only time I have available on 12/11; 2:30 p.m. would not work. "

On December 7, 2017 Ms. Yatomi sent an e-mail to Mrs. Loof stating, once again that the District would not be available for an IEP meetings on the dates offered by Mrs. Loof.  On December 11, 2017 Mrs. Loof sent an e-mail to Ms. Yatomi making herself available for December 14th from 11:00 am to 1:00 pm.  Ms. Yatomi had previously offered December 14th as an option for IEP meeting. Mrs. Loof also faxed the IEP invitation for December 14th back to the district, making herself available. The e-mail stated:

 "I disagree with various of the assertions in your letter dated December 5, 2017 as they are inaccurate and misconstrue the facts.

As indicated in the IEP invitation I faxed back to the district, we would be available on the 14th from 11a.m. to 1:00 p.m.  Please let us know if that is a possibility, otherwise I can offer new dates/times.

On December 11, 2017 Ms. Yatomi agreed to meet for the IEP meeting on December 14th from 12:00 – 1:00 acknowledging that District IEP tam members were available at that time.  She sent Mrs. Loof an e-mail stating:

"Hi Rita,

Thank you for getting back to me.  Based on your availability and that of the District IEP team members, it looks like **all of our calendars coincide from 12:00-1:00 on 12/14.    We will look forward to seeing you then!"** [emphasis added]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Based on Ms. Yatomi's e-mail and based on the fact that Mrs. Loof had already faxed the IEP invitation confirming her attendance, Mrs. Loof  believed the meeting was confirmed for December 14th, 2017 from 12:00 p.m to 1:00 p.m.

On December 13th, 2017 at 12:47 p.m. I sent an e-mail to Ms. Yatomi stating:

"Once again you misunderstood and misconstrued my statement. I never said I did not review the IEP dates.  As you may know, I take my child's education very seriously and diligently respond to correspondence from the district.

My e-mail clearly states that I sent the e-mail following up on the date I offered, prior to receiving your letter but at no time did I indicate I would not review the dates proposed by the district.  I'm glad to offer you any clarification of potential confusion."

On December 13th, 2017 at 5:07 p.m. Ms. Yatomi sent an e-mail to Mrs. Loof cancelling the IEP meeting that was scheduled for December 14th, 2017; erroneously claiming that Mrs. Loof had not responded to the proposal to hold the meeting on December 14, 2017. She committed to providing "additional dates/times for scheduling the annual IEP."

On December 13, 2017 at 6:57 PM, Mrs. Loof responded to Ms. Yatomi's e-mail stating:

"Dear Rochelle,

I had already previously informed you twice that we would be available tomorrow from 12-2 so the 12-1 timeframe you proposed was fine with us. I faxed you a confirmation. I only propose dates I plan to keep. Sorry to hear you are canceling the meeting. I have now taken it off my calendar."

On December 15th, 2017, Mrs. Loof once again offered an additional date of December 19, 2017 for an IEP meeting as well making herself available on additional dates/times if needed.  On December 18, 2017 Mrs. Loof received a response from Ms. Yatomi informing her that the district was not available on December 19th. Additionally, the e-mail stated:

"Considering this is the last week prior to Christmas break, with all District IEP team members' week ending on 12/21, I don't expect the IEP team members to be available.  Therefore, please try to provide your availability this week so the annual IEP meeting can be coordinated as early as the first week the IEP team members return from break.  School resumes on January 9th.  I look forward to hearing back from you."

Mrs. Loof made herself available to the District for an IEP meeting on the following dates:

- October 17th, 2017; 1:00 p.m. – 3:30 p.m
- October 18th, 2017; 11:00 a.m. –1:00 p.m.
- November 29th ,2017;  10:30 a.m.
- December 11th, 2017; 9:00 a.m. –11:00 a.m.

1
2
- December 14th, 2017; 11:00 a.m. – 1:00 p.m.
- December 19th, 2017; 1:00 p.m. – 3:00 p.m.

3      Mrs. Loof had set aside 12.5 hours of her time for the

4  district to hold the IEP meeting.  The District never convened the

5  IEP meeting requested by Mrs. Loof.

6
7
8                      **2018-2019, SCHOOL YEAR at ISSUE**
9
10      In the early parts of 2018, the district and Mrs. Loof engaged

11  in settlement discussions which resulted in two different

12  settlement agreements.  On March 13, 2018 the Upland School Board

13  unanimously (5-0 vote) approved the agreement.  The agreement

14  included provisions that would have provided Sarah with

15  compensatory education and transition services to enable her to

16  access postsecondary education.  But, district staff and their

17  legal counsel refused to comply with the settlement agreement

18  which, if implemented would have settled the issues raised in this

19  complaint.
20
21      On June 6, 2018, after months of not hearing from the District

22  regarding scheduling of Sarah's IEP and realizing that district

23  staff would not comply with its own board directives; Mrs. Loof

24  reached out again, this time to the new Director of Student

25  Services Anthony Farenga.  Mrs. Loof reiterated her interest in

26  receiving an offer of Free Appropriate Public Education from the

27
28

district. She reiterated her consent to have her child assessed for special education.  She indicated that Sarah would be in the twelfth (12th) grade in the fall of 2018 and that she had not received either a certificate of completion or a high school diploma and remained eligible for special education services and for services provided by the district to its residents.  "Since to date, I have not received an offer of FAPE from your district, I have had no other choice than to continue to provide educational services at my own expense….. In the interest of moving the process along, and based on my child's past assessment experience, I continue to consent to any of the tests administered to my child by your district in the past. "—stated the letter.  Mrs. Loof also made Sarah available to the District for assessments as follows:

- Monday June 11th, 2018; 11:30 p.m. to 1:30 p.m.
- Wednesday June 13th, 2018; 11:00 a.m. to 1:00 p.m.
- Friday June 15th, 1:00 p.m. to 3:00 p.m.

   She requested the following assessments:

   --Sensory Integration Praxis Test

   --Visual Motor Integration Test

   --Test of Visual Perceptual Skills

   --Vision Therapy Assessment

   --Interactive Metronome Assessment

--Magnocellular Assessment.

--Independent Neuropsychological Assessment by Dr. Timothy Gunn because I am in disagreement with the District's assessments.

Mrs. Loof requested that the district hold an IEP meeting for Sarah and made herself available for an IEP meeting as follows:

- Monday June 11th, 2018; 11:30 p.m. to 1:30 p.m.

- Monday June 11th, 2018; 2:30-4:30 p.m.

- Wednesday June 13th, 2018; 11:00 a.m. to 1:00 p.m.

- Wednesday June 13th, 2018; 2:00 p.m. to 3:30 p.m.

- Friday June 15th, 1:00 p.m. to 3:00 p.m.

She offered to provide additional dates for the IEP meeting of needed.

On June 7, 2018, Mr. Farenga sent an e-mail to Mrs. Loof, acknowledging receipt of her letter and committing to follow up on her requests.  But, Mr. Farenga did not follow through with his promise and did not take steps to convene an IEP meeting for Sarah, conduct assessments requested in Mrs. Loof's letter or grant the Independent Evaluation for a neuropsychological assessment. Instead, Mrs. Farenga responded on June 25, 2018 by claiming that the district would not assess Sarah because Mrs. Loof had imposed

conditions on the assessment plan. Mr. Farenga also stated the District's position that Sarah was not entitled to an offer of FAPE from the District.

On July 26, 2018, Mrs. Loof sent a letter to Mr. Farenga, once again consenting to special education assessments for Sarah and reiterating her request for an offer of FAPE from the district. "Sarah continues to reside in our home which is within the boundaries of the Upland Unified School District (UUSD).  Since to date, I have not received an offer of FAPE from your district, I have had no other choice than to continue to provide educational services at my own expense. Since UUSD continues its refusal to make an offer of FAPE for Sarah, I have had no opportunity to accept or reject any placement offer whatsoever since the last offer was made in 2016. At no time have I revoked my consent for the provision of special education and related services to Sarah and hereby reiterate my previous requests for the district to hold an IEP meeting and develop an offer of FAPE."—stated the letter.

Mrs. Loof disagreed with many of the assertions in Mr. Farenga's letter dated June 25, 2018 as factually inaccurate and misrepresenting of her position.  She clarified that she did not provide "conditional" consent.  She indicated that the assessment plan form she received did not provide sufficient information to allow her to meaningfully participate in the assessment process and

make informed decisions about her child's assessments.  "I remain open to any proposal the district would wish to make.  I am simply requesting to be informed.  I do not dispute the assessor's professional discretion.  I am only asking that they share the information so that I can have access to the same information that district staff has access to."—the letter stated.  Mrs. Loof reiterated consent to any of the tests administered to Sarah child by the district in the past and requested Prior Written Notice for any additional assessments needed.

She made Sarah available for assessments as follows:

- Monday July 30th, 2018; 12:00 p.m. to 2:00 p.m.
- Monday July 30th, 2018; 2:00 a.m. to 4:00 p.m.
- Wednesday August 1st, 2018; 1:00 p.m. to 3:00 p.m.
- Friday August 3rd, 2018; 11:00 a.m. to 1:00 p.m.
- Friday August 3rd, 2018; 1:00 p.m. to 3:00 p.m.

She offered to provide additional dates if those provided were not convenient for district staff. She reiterated her previous requests for assessments and Independent Evaluation.  She reiterated her previous requests for an IEP meeting and provided a copy of the most recent testing by Lindamood-Bell.  Mrs. Loof made herself available for an IEP meeting as follows:

- Monday July 30th, 2018; 12:00 p.m. to 2:00 p.m. (if assessments are not scheduled)

- Monday July 30th, 2018; 2:00 a.m. to 4:00 p.m. (if assessments are not scheduled)

- Wednesday August 1st, 2018; 1:00 p.m. to 3:00 p.m. (if assessments are not scheduled)

- Friday August 3rd, 2018; 11:00 a.m. to 1:00 p.m. (if assessments are not scheduled)

- Friday August 3rd , 2018; 1:00 p.m. to 3:00 p.m. (if assessments are not scheduled)

"Without an IEP meeting there is no process for me to ask questions and voice concerns based on current information, instead of relying on an IEP that is almost two years old."—stated Mrs. Loof's letter.

Petitioner incorporates by reference all prior paragraphs of this complaint as though fully set forth herein.

Issue No. 1—Failure to timely convene an annual IEP meeting for the 2018-2019 school year and Extended School Year.

Issue No. 2—Failure to have an annual FAPE offer in place for the 18-19 school year and Extended School Year.

Issue No. 3—Failure to timely fund or file pursuant to 34 C.F.R. 300.502 for the Independent Evaluation Request by parent.

Issue No. 4-- Whether the District failed to timely file a due process hearing complaint in 2018-19 when it believed the parent allegedly failed to consent to the proposed assessment plan for Sarah.

Issue No.6—Failure to convene an IEP meeting within 30 days of parent request.

Issue No. 7-- Failure to allow parent meaningful participation in the IEP process when it failed to provide to her District's written offer of FAPE and IEP for the 2018-19 school Year.

Issue No. 8—Failure to offer and/or provide appropriate Transition Assessments and Services.

    a) Failure to develop appropriate, measurable, post-secondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills.

    b) Failure to offer transition services to assist Sarah in reaching post-secondary goals, vocational education goals, integrated employment goals (including supported employment), continuing and adult education, adult

services, independent living, and community participation.

Issue No. 10— Whether the District failed to conduct assessments requested by parents and convene an IEP meeting within 60 days of parent request.

Issue No. 9-- Whether the District's denial of FAPE for Sarah resulted in denials of her rights under Section 504, ADA, California Government Code § 11135, the California Civil Code §§ 54 and 54.1,and the Unruh Act.

Petitioner incorporates by reference all prior paragraphs of this complaint as though fully set forth herein.

**REMEDIES SOUGHT:** Plaintiff asks that OAH find that

1) The District failed to timely conduct assessments of Sarah for the 2018-2019 annual IEP and failed to identify her present levels of performance so that appropriate goals could be written for her;

2) The District failed to timely make an offer of FAPE to Sarah for the 2018-19 school year and extended school year;

3) Sarah is entitled to compensatory education in the form of Lindamood-Bell Services or a Non Public Agency such as Stowell Learning Center.  Sarah's parents are entitled to transportation to and from the compensatory education location.

5) Sarah is entitled to Independent Evaluations at District expense in the areas of Transition, Assistive Technology, Central Auditory Processing Disorder, Vision Therapy, Neuropsychological evaluation and any other identified areas of need; with assessors chosen by parents.

6) The administrative law judge provide whatever remedies are appropriate and order such pursuant to his/her authority under IDEA and State law.

MEDIATION:    Petitioner is agreeable to participating in mediation with a trained mediator who is knowledgeable about special education.  To that end, Petitioner asks that OAH assign an experienced special education mediator, inform Petitioner of that assignment, and provide information about that individuals' training and experience in the field of special education.

HEARING DATES:   Petitioner requests that this matter be set for six (6) days of continuous hearing.

Dated: 9/11/20

Exhibit 2

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

CASE NO. 2019080542
CASE NO. 2020040245
CASE NO. 2020010465

THE CONSOLIDATED MATTERS INVOLVING

PARENT ON BEHALF OF STUDENT, AND

UPLAND UNIFIED SCHOOL DISTRICT.

# DECISION

## NOVEMBER 24, 2020

On August 13, 2019, Student filed with the Office of Administrative Hearings, referred to as OAH, a Request for Due Process Hearing in OAH Case No. 2019080542, Student's First Case, naming Upland Unified School District.  OAH granted Student's request to amend the complaint in Student's First Case on December 4, 2019.

On January 14, 2020, Upland filed a Request for Due Process Hearing in OAH Case No. 2020010465, Upland's Case, naming Student.  On January 16, 2020, OAH granted Upland's Motion to Consolidate Upland's Case with Student's First Case and to continue the due process hearing dates in the consolidated matters, Consolidated Case, to the dates set in Upland's Case.

On February 3, 2020, OAH continued the hearing to April 21, 2020, and on April 8, 2020 OAH continued the hearing to May 12, 2020.

On April 2, 2020, Student filed with OAH a Request for Due Process Hearing in OAH Case No. 2020040245, Student's Second Case, naming Upland.  On April 30, 2020, Upland filed a Motion to Consolidate Student's Second Case and the Consolidated Case.

On May 1, 2020, Student filed a second motion to amend the complaint in Student's First Case.  OAH granted Student's second request to amend the complaint in Student's First Case on May 4, 2020.  OAH rescheduled the due process hearing in the Consolidated Case to begin on June 23, 2020.

On May 4, 2020, OAH granted Upland's Motion to Consolidate Student's Second Case with the Consolidated Case.

On June 17, June 26, July 24, and July 31, 2020, OAH granted Student's requests for continuance.

Administrative Law Judge Kara Hatfield heard this matter by video conference on August 25, 26, and 27, and September 1, 2, 3, 15, 17, 22, 24, and 25, 2020.

Attorney Tania Whiteleather represented Student.  Mother attended all hearing days on Student's behalf.  Student did not attend except while she testified.  Attorneys Christopher Fernandes and Joshua Walton represented Upland.  Anthony Farenga, Upland's Director of Special Education, attended all hearing days on Upland's behalf. Dr. Royal Lord, Program Manager of the West End Special Education Local Plan Area, also attended.

At the parties' request, OAH continued the matter to October 26, 2020, for written closing argument.  OAH granted Student's two additional requests for continuance and ordered the parties to submit written closing arguments by November 9, 2020.  The record was closed, and the matter was submitted on November 9, 2020.

## ISSUES

### STUDENT'S ISSUES

1. Did Upland significantly impede Parent's opportunity to participate in the educational decisionmaking process by failing to explain to Parent why Upland wanted to do additional assessments under an October 19, 2016 assessment plan after having conducted a triennial reassessment in 2015?

2. Did Upland deny Student a free appropriate public education, called a FAPE, by failing to provide Parent prior written notice in response to Parent's October 19, 2016 request for independent educational evaluations?

3. Did Upland deny Student a FAPE in the October 31, 2016 individualized education program, called an IEP, by:

   a. Failing to consider areas of need in which Student had not been assessed, specifically post-secondary transition, central auditory processing, attention, and the need for assistive technology;

   b. Failing to include present levels of performance in all areas of unique need;

   c. Failing to develop appropriate goals based on present levels of performance;

   d. Significantly impeding Parent's opportunity to participate in the educational decisionmaking process by failing to discuss or consider

3

      private services Student was receiving from Lindamood-Bell, tutoring, and

      speech therapy;

    e. Failing to place Student in the appropriate grade level;

    f. Failing to offer appropriate placement, the least restrictive environment, for the 2016-2017 regular school year and 2017 extended school year; and

    g. Failing to develop an appropriate post-secondary transition plan?

4. Did Upland deny Student a FAPE by failing to provide Parent prior written notice in response to Parent's October 31, 2016 request for independent educational evaluations?

5. Did Upland deny Student a FAPE by failing to timely respond to Parent's October 31, 2016 request for independent educational evaluations, either by funding them or filing to establish Upland's own assessments were appropriate, in the areas of:

    a. Neuropsychology;

    b. Assistive technology; and

    c. Central auditory processing?

6. Did Upland deny Student a FAPE by failing to timely assess Student, after Parent's October 31, 2016 request, in all areas of suspected disability, specifically:

    a. Sensory integration praxis;

    b. Visual motor integration;

    c. Visual perceptual skills;

    d. Magnocellular needs;

    e. The need for vision therapy;

    f. The need for an interactive metronome; and

    g. The need for assistive technology?

7.  Did Upland deny Student a FAPE by failing to provide Parent legally compliant prior written notice of Upland's November 18, 2016 decision not to provide Student Kurzweil as assistive technology after Upland offered it to Student in the October 31, 2016 IEP?

8.  Did Upland deny Student a FAPE by failing until January 2020 to file a request for a due process hearing to obtain a determination from OAH that the October 31, 2016 IEP offered Student a FAPE, after Parent did not consent?

9.  Did Upland deny Student a FAPE by failing, before August 21, 2017, and thereafter, to convene an annual meeting to develop an IEP for the 2017-2018 school year and 2018 extended school year?

10. Did Upland deny Student a FAPE by failing to convene an IEP team meeting before August 21, 2017, and thereafter, to review independent assessments by Dr. Stephey and Lindamood-Bell?

11. Did Upland deny Student a FAPE by failing to timely complete assessments to which Parent consented on December 13, 2017?

12. Did Upland deny Student a FAPE by failing to file a request for a due process hearing to obtain OAH authorization to conduct assessments to which Upland contended Parents did not provide consent in December 2017?

13. Did Upland deny Student a FAPE by failing to provide Parent prior written notice in response to Parent's June 6, 2018 request for independent educational evaluations?

14. Did Upland deny Student a FAPE by failing to provide Parent prior written notice in response to Parent's July 26, 2018 request for independent educational evaluations?

15. Did Upland deny Student a FAPE by failing to timely assess Student, after Parent's July 26, 2018 request, in all areas of suspected disability, specifically:

   a.   Sensory integration praxis;

   b.   Visual motor integration;

   c.   Visual perceptual skills;

   d.   Magnocellular needs;

   e.   The need for vision therapy;

   f.   The need for an interactive metronome; and

   g.   The need for assistive technology?

## UPLAND'S ISSUES

16. Was Student a parentally placed private school student for the 2017-2018 and 2018-2019 school years and, therefore, not entitled to a FAPE from Upland?

17. Was Student entitled to a FAPE from Upland during the 2017-2018 and 2018-2019 school years after Parents refused to consent to the September 30, 2016, and October 24, 2016 assessment plans?

18. If Upland was obligated to have an IEP in place for Student during the 2017-2018 and 2018-2019 school years, did the October 31, 2016 IEP constitute a FAPE, and continue to be in effect/available to Student through the final date of Student's eligibility for special education and related services?

## JURISDICTION

This hearing was held under the Individuals with Disabilities Education Act, its regulations, and California statutes and regulations.  (20 U.S.C. § 1400 et. seq.; 34 C.F.R. § 300.1 (2006) et seq.; Ed. Code, § 56000 et seq.; Cal. Code Regs., tit. 5, § 3000 et seq.)  All future references to the Code of Federal Regulations are to the 2006 version.  The main purposes of the Individuals with Disabilities Education Act, referred to as the IDEA, are to ensure:

- all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment and independent living, and

- the rights of children with disabilities and their parents are protected.

(20 U.S.C. § 1400(d)(1); see Ed. Code, § 56000, subd. (a).)

The IDEA affords parents and local educational agencies the procedural protection of an impartial due process hearing with respect to any matter relating to the identification, assessment, or educational placement of the child, or the provision of FAPE, to the child.  (20 U.S.C. § 1415(b)(6) & (f); 34 C.F.R. § 300.511; Ed. Code, §§ 56501, 56502, and 56505; Cal. Code Regs., tit. 5, § 3082.)  The party requesting the hearing is limited to the issues alleged in the complaint, unless the other party consents, and has the burden of proof by a preponderance of the evidence.  (20 U.S.C. § 1415(f)(3)(B); Ed. Code, § 56502, subd. (i); *Schaffer v. Weast* (2005) 546 U.S. 49, 57-58, 62 [126 S.Ct. 528, 163 L.Ed.2d 387]; and see 20 U.S.C. § 1415(i)(2)(C)(iii).)  In this consolidated matter, Student bore the burden of proof on Student's claims, and Upland bore the burden of proof on Upland's claims.  The factual statements in this Decision constitute the written findings of fact required by the IDEA and state law.  (20 U.S.C. § 1415(h)(4); Ed. Code, § 56505, subd. (e)(5).)

Student was 23 years old at the time of hearing.  Student resided within Upland's geographic boundaries at all relevant times.  Student was initially found eligible for special education in 2000, and in approximately 2001 was found eligible under the

currently defined categories of intellectual disability and speech or language impairment.  As explained in more detail in Issue 1, below, after Student's last triennial evaluation in 2014 and an IEP team meeting in 2015, she was eligible under the categories of specific learning disability and speech or language impairment.

Student turned 18 years old in March 2015.  On July 13, 2015, Mother gave Upland a form Student signed on that date appointing Mother as the holder of Student's educational rights.

## TIMELINESS OF STUDENT'S CLAIMS REGARDING THE 2016-2017 SCHOOL YEAR

Subject to limited exceptions, a request for a due process hearing must be filed within two years from the date the party initiating the request knew or had reason to know of the facts underlying the basis for the request.  (20 U.S.C. § 1415(f)(3)(C), (D); Ed. Code, § 56505(*l*).)

### STUDENT'S FIRST CASE

Student's First Case, as originally filed on August 13, 2019, did not contain any claims regarding the 2016-2017 school year.  By her second amended complaint filed on May 4, 2020, Student added claims to Student's First Case related to the 2016-2017 school year.

### STUDENT'S SECOND CASE WAS BASED ON A PRIOR 2018 CASE AND A TOLLING AGREEMENT

On October 30, 2018, Student filed a complaint in OAH Case No. 2018110087, the Prior 2018 Case, naming Upland.  On May 6, 2019, the parties entered a tolling agreement in which Upland agreed to allow Student to refile with OAH the claims stated

in the Prior 2018 Case within 30 days of the conclusion of a pending case Student filed in the United States District Court.  The same day, Student withdrew the Prior 2018 Case without prejudice.

Student's Second Case, filed on April 2, 2020, pursues claims commencing October 31, 2016, based upon the May 2019 tolling agreement with Upland.  The complaint in Student's Second Case was identical to the complaint in the Prior 2018 Case.

## UPLAND'S MOTIONS TO DISMISS

On or about April 24, 2020, Upland moved "to Determine the Relevant Timeframe of the Issues for Due Process Hearing," effectively a motion to dismiss all claims in Student's Second Case.  Upland asserted the two-year statute of limitations prohibited Student from pursuing in April 2020 claims relating to events in the 2016-2017 school year, including Upland's offer of placement and services in the October 31, 2016 IEP.  Upland argued only that tolling agreements should not be recognized by OAH.

On or about May 8, 2020, Upland moved "to Dismiss [enumerated issues] and Limit the Timeframe of [other enumerated issues]" regarding the claims in the second amended complaint in Student's First Case concerning the 2016-2017 school year, effectively a motion to dismiss the claims in Student's First Case regarding the 2016-2017 school year.

On May 18, 2020, OAH denied Upland's two motions to dismiss, without prejudice to raising the statute of limitations as a defense at the due process hearing on the consolidated cases.

In its written closing argument, Upland renewed its assertion Student's claims regarding events before August 12, 2019, were barred by the statute of limitations, notwithstanding the May 2019 tolling agreement.  Upland argued only the two statutory exceptions to the two-year statute of limitations stated in title 20 United States Code section 1415(f)(3)(D) allow claims beyond the two-year statute of limitations, and Student failed to allege any facts supporting either exception in her complaints, and further, failed to prove that either statutory exception applies.

There is no explicit prohibition on tolling agreements for claims arising under the IDEA or related sections of the California Education Code.  Therefore, the hearing proceeded on Student's claims as agreed to by the parties on or about May 6, 2019, and this Decision addresses Student's claims regarding the 2016-2017 school year, but only those claims stated in Student's Second Case.  (*Student v. Savanna School Dist.* (November 16, 2017) OAH Case No. 2017100226 (Order Granting in Part and Denying in Part District's Partial Motion to Dismiss); but see *Student v. Long Beach Unified School Dist.* (2019) OAH Case No. 2018050736; orders and decisions rendered in special education due process hearing proceedings may be cited as persuasive but not binding authority in subsequent proceedings (Cal. Code Regs., tit. 5, § 3085).)

Student's May 2020 second amended complaint added new claims to Student's First Case.  Some of those new claims were duplicative of those stated in Student's Second Case regarding the 2016-2017 school year, but some of the new claims were entirely different claims regarding the 2016-2017 school year, which Student had never before alleged.  Through the second amended complaint in Student's First Case, Student attempted to smuggle in claims related to the October 31, 2016 IEP and 2016-2017 school year that were not in the Prior 2018 Case, refiled in Student's Second Case.  Specifically, only Issues 1, 3a, 3d, 3f, and 5 were in the Prior 2018 Case, refiled in

10

Student's Second Case.  However, Issues 2, 3b, 3c, 3e, 3g, 4, 6, 7, and 8 were not in the Prior 2018 Case, refiled as Student's Second Case.  Those claims, related to the 2016-2017 school year, were stated for the first time in the second amended complaint in Student's First Case.

The May 2019 tolling agreement specifically stated "the issues, claims, complaints, contentions, causes of action, remedies, damages, liabilities, and/or rights, of any kind or nature that may be raised in the Re-Filed OAH Complaint are limited to those cited in the original OAH Complaint filed on October 31, 2018 [*sic*], and which remain unresolved after final resolution of the District Court Complaint."  Student cannot bootstrap onto preserved claims additional claims from generally the same time period that were not previously asserted.  Therefore, while OAH will decide the specific claims regarding the 2016-2017 school year Student and Upland contracted to preserve by the May 2019 tolling agreement, Student's attempt to expand her claims beyond the specific claims stated in Student's Second Case was improper.

Student's claims in Issues 2, 3b, 3c, 3e, 3g, 4, 6, 7, and 8 are untimely.  They are not covered by the May 2019 tolling agreement, and therefore are barred by the two-year statute of limitations.  Although Student's new claims in the second amended complaint in Student's First Case might "relate back" to the original filing date of Student's First Case, August 13, 2019, the new claims concerning the 2016-2017 school year are all based on alleged acts or omissions of which Mother was aware prior to August 13, 2017, and as such, are outside the two-year statute of limitations.  (*M.M. & E.M. v. Lafayette School Dist.* (N.D. Cal., Feb. 7, 2012 Nos. CV 09– 4624, 10–04223 SI) 2012 WL 398773, ** 17–19), affd. in part & revd. in part (9th Cir. 2014) 767 F.3d 842, 858-859; *Alexopulous v. San Francisco Unified School Dist.* (9th Cir. 1987) 817 F.2d 551, 555.)

11

Therefore, Student's Issues 2, 3b, 3c, 3e, 3g, 4, 6, 7, and 8 are dismissed because they are barred by the statute of limitations and unpreserved by the May 2019 tolling agreement.

## ISSUE 1:  SUFFICIENT INFORMATION PROVIDED TO PARENT REGARDING ADDITIONAL ASSESSMENTS UNDER SEPTEMBER 30, 2016 AND OCTOBER 19, 2016 ASSESSMENT PLAN

Student contends Upland failed to provide Mother sufficient information to consent to Upland's triennial evaluation assessment plan, thereby significantly impeding her opportunity to participate in the educational decisionmaking process.

Upland contends it did not significantly impede Mother's opportunity to participate in the educational decisionmaking process because it provided her legally sufficient information regarding the purpose and types of assessments it proposed to conduct.

A FAPE means special education and related services that are available to an eligible child that meets state educational standards at no charge to the parent or guardian.  (20 U.S.C. § 1401(9); 34 C.F.R. § 300.17.)  Parents and school personnel develop an IEP for an eligible student based upon state law and the IDEA.  (20 U.S.C. §§ 1401(14), 1414(d)(1); and see Ed. Code, §§ 56031,56032, 56341, 56345, subd. (a), and 56363 subd. (a); 34 C.F.R. §§ 300.320, 300.321, and 300.501.)

In general, a child eligible for special education must be provided access to specialized instruction and related services which are individually designed to provide educational benefit through an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.  (*Board of Education of the Hendrick Hudson Central School Dist. v. Rowley* (1982) 458 U.S. 176, 201-204; *Endrew F. v. Douglas County School Dist. RE-1* (2017) 580 U.S. ___ [137 S.Ct. 988, 1000].)

Assessments are required to determine eligibility for special education, and what type, frequency, and duration of specialized instruction and related services are required.  (20 U.S.C. § 1414(a); 34 C.F.R. § 300.303; Ed. Code, §§ 56043(k), 56381, subd. (a).)  A local educational agency must conduct a reassessment at least once every three years, called a triennial reassessment, unless the parent and the agency agree that it is unnecessary.  (20 U.S.C. § 1414(a)(2)(B)(ii); 34 C.F.R. § 300.303(b)(2); Ed. Code, §§ 56043, subd. (k), 56381, subd. (a)(2).)  The agency must also conduct a reassessment if it determines the educational or related service needs of the child, including improved academic achievement and functional performance, warrant a reassessment.  (20 U.S.C. § 1414(a)(2)(A)(i); 34 C.F.R. § 300.303(a)(1); Ed. Code, § 56381, subd. (a)(1).)

To assess or reassess a student, a school district must provide proper notice to the student and his or her parents.  (20 U.S.C. § 1414(b)(1); Ed. Code, § 56321(a).)  Parental consent for an assessment is generally required before a school district can assess a student.  (20 U.S.C. § 1414(c)(3); 34 C.F.R. § 300.300(c)(1); Ed. Code,

§ 56381, subd. (f).)  Parental consent is not required before reviewing existing data as part of an assessment or reassessment, or before administering a test or other assessment that is administered to all children, unless before administration of that test or assessment, consent is required of the parent of all the children.  (34 C.F.R. § 300.300(d)(1); Ed. Code, § 56321, subd. (e).)

A school district must provide parents with prior written notice when it proposes or refuses to initiate or change the identification, evaluation, or educational placement of a child or the provision of a FAPE to the child.  (20 U.S.C. § 1415(b)(3); 34 C.F.R. § 300.503; Ed. Code, § 56500.4.)

When a student is referred for assessment, the school district must provide the student's parent with a written proposed assessment plan within 15 days of the referral, with limited exceptions not applicable in this case.  (Ed. Code, § 56321, subd. (a).)  The parent shall have at least 15 days from the receipt of the proposed assessment plan to arrive at a decision, and the assessment may begin immediately upon receipt of the parent's consent.  (Ed. Code, § 56321, subd. (c)(4).)

The school district has 60 days from the date it receives the parent's written consent for assessment, excluding vacation and days when school is not in session in excess of five schooldays, to complete the assessments and develop an IEP, unless the parent agrees in writing to an extension.  (20 U.S.C. § 1414(a)(1)(C); Ed. Code, §§ 56043, subds. (c) & (f), 56302.1, subd. (a), 56381, subd. (a).)

Each public agency must ensure that assessments and other evaluation materials used to assess a child are, among other things, administered by trained and knowledgeable personnel and administered in accordance with any instructions provided by the producer of such assessments.  (20 U.S.C. § 1414(b) & (c); 34 C.F.R. § 300.304; Ed. Code, §§ 56320, 56322, 56381, subd. (e).)  The personnel who assess the student shall prepare a written report.  (Ed. Code, § 56327.)

The assessment must be conducted in a way that:

- uses a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent;
- does not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability; and
- uses technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors.

(20 U.S.C. § 1414(b)(2)(A)-(C); 34 C.F.R. §300.304(b); see Ed. Code, § 56320.)

The assessments used must be:

- selected and administered so as not to be discriminatory on a racial, cultural, or sex basis;
- provided in a language and form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally;
- used for purposes for which the assessments are valid and reliable;
- administered by trained and knowledgeable personnel; and
- administered in accordance with any instructions provided by the producer of such assessments.

(Ed. Code, §§ 56320, subds. (a) & (b), 56381, subd. (e); see 20 U.S.C. § 1414(b) & (c); 34 C.F.R. § 300.304(c).)

The determination of what tests are required is made based on information known at the time.  (See *Vasheresse v. Laguna Salada Union School Dist.* (N.D. Cal. 2001) 211 F.Supp.2d 1150, 1157-1158 [assessment adequate despite not including speech/language testing where the concern prompting the assessment was reading skills deficit].)  No single measure, such as a single intelligence quotient, shall be used to determine eligibility or services.  (Ed. Code, § 56320, subds. (c) & (e).)  Assessors must be knowledgeable about the student's suspected disability and must pay attention to student's unique educational needs such as the need for specialized services, materials, and equipment.  (Ed. Code, § 56320, subd. (g).)

A procedural violation results in a denial of a FAPE only if the violation:

- impeded the child's right to a FAPE;
- significantly impeded the parent's opportunity to participate in the decisionmaking process; or
- caused a deprivation of educational benefits.

(20 U.S.C. § 1415(f)(3)(E)(ii); 34 C.F.R. § 300.513(a)(2); Ed. Code, § 56505, subd. (f)(2) and (j); *W.G., et al. v. Board of Trustees of Target Range School District* (9th Cir. 1992) 960 F.2d 1479, 1484 (*Target Range*); see *N.B. v. Hellgate Elementary School Dist., ex rel. Board of Directors, Missoula County, Mont.* (9th Cir. 2008) 541 F.3d 1202, 1208, quoting *Amanda J. ex rel. Annette J. v. Clark County School Dist.* (9th Cir. 2001) 267 F.3d 877, 892.)

STUDENT'S EDUCATIONAL AND DEVELOPMENTAL HISTORY

Student has a lengthy history of disagreement with Upland regarding Student's educational needs.  However, the last time Student attended an Upland school was during kindergarten in the 2004-2005 school year.  For first through sixth grades, Student attended a traditional, independently operated, parochial school called Our Lady of the Assumption School.  For the 2010-2011 and 2011-2012 school years, seventh and eighth grades, Student was enrolled at California Virtual Academy, an online charter school.  After dissatisfaction with the charter school, Mother created a homeschool program for Student.  On October 6, 2011, Mother registered what she named Resurrection Academy as a private religious school through the California Department of Education online Private School Affidavit Form process.  Mother renewed the registrations annually from the 2011-2012 through 2018-2019 school years.

During the time frame relevant to this consolidated case, Mother never disclosed to Upland that Student was a homeschool student.  Mother always told Upland Student attended a private school, and referred to Student as attending Resurrection Academy.  Student received services at Lindamood-Bell Learning Center in Rancho Cucamonga for some periods of time at Mother's expense, and immediately before the disputed October 31, 2016 IEP, Student received services at Lindamood-Bell at Upland's expense under a prior settlement agreement.  Upland staff were never aware Resurrection Academy was not an independently operated parochial school, like Our Lady of the Assumption.  Upland staff never knew Mother was the director, principal, and custodian of records for the private school Student attended.

Student's developmental history was marked by difficulty feeding in the first two years, low muscle tone called hypotonia, and gross motor delays.  During an assessment by San Bernardino County when she was almost five years old, she had a

full scale intelligence quotient of 66 and adaptive behavioral skills composite score of 64, both significantly below average.  She was identified as having intellectual disability. In an assessment by the Inland Regional Center when she was six years old, Student had a full scale IQ of 67, and an adaptive behavioral skills composite score of 63, both significantly below average, again in the intellectually disabled range.  Upland conducted a psychoeducational assessment when Student was seven years old, and her full scale IQ was 63.  Upland conducted another assessment when Student was almost nine years old, and her Language score was 71, and her scores in Attention/Executive Function, Sensorimotor Functions, Visuospatial Processing, and Memory and Learning were all in the 50s and 60s, described as "significantly below average."  Claremont Unified School District conducted a psychoeducational assessment of Student in 2008 when she was 11 years old.  Similar to all prior testing, her full scale IQ was 64, and her adaptive behavior skills composite score was 68, significantly below average.

Student had a triennial reassessment in 2011.  At that time, Student was eligible for special education and related services under the category of intellectual disability, with a secondary eligibility of speech or language impairment.

## 2014 UPLAND TRIENNIAL EVALUATION

Upland conducted a triennial evaluation beginning in February 2014, when Student was 16 years and 11 months old.  The Revised Psychoeducational Assessment Report bore a grid on the front page with some information that was not consistent with other information on the grid, in the report, or documented during later IEP team meetings, and appeared to reflect the revision process the report had undergone between the time the triennial assessment began or some version of a report was first created, and later revisions.  For example, when Upland administered academic achievement testing in April 2014, Student's standard scores were calculated based on

18

her age of 17 years and one month, and Upland's estimation that, by her age and the year she should have started school, she was in grade 11.8.  However, the report grid stated Student was in 10th grade.  The Revised Psychoeducational Assessment Report was dated on the first page September 30, 2014, but was signed by school psychologist Ron Davis on January 29, 2015, and there was evidence some earlier version of the report existed, possibly in June 2014.

## MOTHER'S INTERFERENCE WITH THE 2014 TRIENNIAL EVALUATION

Davis reported that during testing, Student demonstrated an adequate attention span and concentration on assessment tasks, and worked well within time constraints on each task.  Davis noted the results of the testing and evaluation procedures appeared valid for the purpose of determining if Student continued to qualify for special education and related services and the appropriate placement to meet her educational needs in the least restrictive environment.  However, Davis remarked the test results were not properly standardized because Mother was in the testing room during evaluation and the tests were normed without a parent in the room.

Beyond any uncertain effect of Mother's presence in the testing room based on standardization norms, Mother's presence during testing directly and adversely affected the Woodcock-Johnson Tests of Achievement, Third Edition.  Credentialed special education teacher Adam Stites administered that instrument on April 28, 2014.  The areas the Woodcock-Johnson Tests of Achievement assessed included reading, mathematics, written language, and academic knowledge.  Stites could not administer the Letter-Word Identification subtest because Mother stopped the testing before that subtest was administered.  Therefore, there were no scores for that subtest.  The absence of that subtest also meant there were no broad scores for the areas of Reading, Academic Skills, or Total Achievement, which all depended on and included the

Letter-Word Identification subtest Mother prevented Upland from administering.  For all the areas of achievement that could be reported, Student's scores were reported as in the "significantly below average range" and below the first percentile.

At hearing, Upland school psychologist Christy Bock testified regarding the 2014 psychoeducational assessment report and the consequences of Mother preventing Stites from administering the Letter-Word Identification subtest.  Letter-Word Identification is involved in reading, which was a known area of need for Student.  Mother stopping the testing prevented Upland from assessing Student in a known area of need.  After Bock, Mother was the next witness.  Student's attorney called Mother's attention to the part of the 2014 triennial psychoeducational assessment report that said Mother was present in the room during the academic achievement testing and interfered.  Student's attorney asked Mother to explain what happened.  Mother's response was evasive and not about the special education teacher and the Letter-Word Identification subtest documented in the report.  Mother attempted to shift blame for her conduct to Upland and did not answer the question Student's attorney asked.  Mother's response was intended to suggest that her presence and interference in testing was somehow justified and even required.  Rather than explain why she interrupted the testing done by the special education teacher, Mother responded that when the speech-language pathologist was assessing Student, Mother observed the assessor using the wrong pictures for the questions and she spoke up to tell the assessor there was a problem so the assessor would correct it and Student would not score a zero.  This testimony established Mother had, by her presence in the testing room, twice interfered with Upland's assessment, preventing full administration of not only the academic achievement evaluation, but also disrupting the language development/communication evaluation.

20

QUESTIONS ABOUT INTELLECTUAL DISABILITY ELIGIBILITY

In 2014, based upon Student's performance on the Weschler Intelligence Scale for Children, Fourth Edition, Student had a full scale IQ of 57, with a 90 percent chance her true IQ was somewhere between 54 and 62, all within the significantly below average range, below the first percentile.  Overall her cognitive ability was commensurate with her previous assessment results.

However, in determining Student's category of eligibility for special education and related services, school psychologist Davis stated in the psychoeducational assessment report that it was unclear whether or not Student continued to meet special education eligibility criteria as a student with intellectual disability.  Davis stated there were inconsistencies in her cognitive and academic scores.  He concluded her disability was not the result of environmental disadvantage, economic disadvantage, cultural differences, motor disability, visual impairment, or hearing impairment.  However, Davis stated intellectual disability, limited school experience, and poor school attendance could not be ruled out as possible contributing factors.  Davis' caveats meant, in other words, the clandestine homeschool program Mother provided Student for the three years before the triennial assessment might have been a cause of Student's poor scores on standardized testing.  In the 2014 triennial psychoeducational assessment report, Davis recommended a comprehensive re-assessment of Student's overall cognitive and academic functioning as well as other areas of suspected disability.

The 2014 triennial psychoeducational assessment report noted there was no doubt Student's significant deficits in her receptive and expressive language as well as difficulty with specific areas of language continued to qualify her for special education and related services in the category of speech or language impairment.

21

HEALTH ASSESSMENT

The 2014 triennial reassessment included a health assessment by a school nurse. Some information in the Health Update report was obtained in March 2014, and other health and medical information from Mother dribbled in over the next year.  The school nurse, who was a registered nurse, reported the information in a final document reflecting it had been revised March 16, 2015.  Mother did not make Student available for any hearing or vision screenings, and all information to prepare the report was through health assessments/reports of other medical providers "provided by mother of student and a completed parent questionnaire."

2014 INDEPENDENT EDUCATIONAL EVALUATION

Mother disagreed with Upland's 2014 psychoeducational assessment and requested an independent educational evaluation by clinical neuropsychologist Nancy Ellen Markel, Ph.D.  Upland funded the independent evaluation and Dr. Markel evaluated Student on October 6 and 7, 2014.  Dr. Markel's Neuropsychological Evaluation Report included some information Dr. Markel reported she received from Mother on January 15, 2015.

Dr. Markel defined the purpose of her evaluation as "to have an understanding of [Student's] neurocognitive status."  Dr. Markel related several events evidencing Student's low level of functioning despite being 17 years old and having "attended Resurrection Academy where she receive[d] 1:1 individualized instruction" since she was 14 years old.  Dr. Markel asked Student her date of birth and Student responded, "I don't know."  Student could only state how old she was.  The next day, Dr. Markel gave Student a form to complete as part of the Behavior Assessment Scales for Children, Second Edition, Self-Report.  Where the form called for "birth date," Student wrote 1997.

Dr. Markel reported, "The examiner had to explain [to Student] she had put the year of her birth and it became clear that she did not understand what 'Birth Date' meant." When completing the forms, Student announced she was done after completing only page 1, and had to be instructed to go on to pages 2, 3, and 4.  Student was not able to read and understand the instructions for the behavior assessment rating scale and Dr. Markel had to explain them to her.

Dr. Markel's summary of standardized instruments she administered reported Student's full scale IQ score on the Wechsler Adult Intelligence Scale, Third Edition, was 66, at "an extremely low level (1st Percentile)."  Her General Ability Index, an optional composite summary score that was less sensitive to the influence of working memory and processing speed, was 68, in the second percentile.  Due to Student's known language and motor problems, Dr. Markel also administered the Comprehensive Test of Nonverbal Intelligence, Second Edition, a non-verbal measure of intelligence that has no speeded tests and very little motor requirements.  Student's Full Scale Composite was 71, in the third percentile.  Despite these low overall scores, Student had scores in some areas that were in the average or low average ranges, among other areas that were in the severely impaired range.

In terms of academic functioning, Dr. Markel reported Student's relative strength was in decoding, with scores in Word Reading and Pseudoword Reading of 84 and 89 respectively, described as at the below average level.  Despite Student's relative strength in pronouncing aloud words displayed on a page or screen, her comprehension was severely impaired.  Student's scores in reading comprehension were in the first and second percentiles, and below the first percentile, on three different standardized tests to assess reading comprehension.  In written expression, Student performed at a very

low level with her strength in Spelling at a score of 72, in the third percentile, and her Sentence Composition score at 59, at the 0.3 percentile.

Student also showed a relative mathematical strength in Math Fluency-Addition, in which she scored 81, in the 10th percentile.  In contrast, in both Math Fluency-Subtraction and Multiplication, she scored 66, in the first percentile.  Her Math Problem Solving score of 61 was in the 0.5 percentile, and her Numerical Operations score of 62 was in the first percentile.

Many tests of Student's executive functioning were notable for poor performance on the basic, fundamental skills measured.  Her executive functioning on these tasks fell at the same low level as the fundamental skills or sometimes a bit higher.

Dr. Markel did not include any conclusions or diagnoses in her report.  She only opined Student required "intensive educational and language therapy."  She stated it was essential that Student have a transition plan with "an emphasis on functional goals that will help determine if [Student] will be able to be independent as a young adult or will require structured assistance.  . . . [S]he will need to be monitored to determine her ability to use good judgment and to recognize how to function safely in the community. Whether [Student] will be able to be competitively employable or will required [sic] supportive employment is yet to be determined."  Dr. Markel's summary and recommendations indicated she did not believe Student was cognitively capable of pursuing a regular high school diploma, college, and an independent career, but instead required a functional curriculum to assure her safety in the community.  Dr. Markel doubted Student's ability to be employed outside of a supervised, supported position designed to enable a disabled person to work.

CONTINUATION TRIENNIAL IEP TEAM MEETINGS AND ADDITIONAL ASSESSMENT PLAN PROVIDED TO MOTHER

Based on its 2014 triennial assessment, Upland identified attention as an area that warranted additional assessment to give insight whether attention issues adversely impacted Student's processing speed.  Upland recommended administration of the Test of Variables of Attention and gave Mother an assessment plan in March 2015 for further testing in the areas of attention and social-emotional functioning.  Upland gave Mother a second copy of the assessment plan in April 2015.

The IEP team met to review Dr. Markel's independent neuropsychological evaluation on July 13 and 27, 2015.  The July 2015 IEP team meetings were a continuation of a triennial IEP team meeting in early April 2015.  Dr. Markel could not attend the July 13, 2015 IEP team meeting, which was convened at very short notice due to Mother's scheduling difficulties.  Therefore, Upland school psychologist Bock presented the first 13 pages of the results of the independent evaluation for the IEP team's review and consideration.  There was not enough time to review the whole report.  Bock noted areas of similarity and difference between the results of the independent evaluation and Upland's triennial assessment.  One significant difference was in the area of math problem solving, on which Student scored 61 on the instrument Dr. Markel used and 36 on the instrument Upland used.

At the July 13, 2015 IEP team meeting, Bock stated Dr. Markel's evaluation did not provide the IEP team additional insight into Student's attention.  Upland therefore continued to recommend administration of the Test of Variables of Attention.  Mother verbally consented for Upland to administer the Test of Variables of Attention, and Upland stated it would provide Mother a written assessment plan to obtain her written consent.

25

At a further continuation of the triennial IEP team meeting on July 27, 2015, Dr. Markel attended and reviewed, from the beginning, her entire report. Dr. Markel agreed some variability in Student's test scores could not be explained aside from the nature of the tests or Student's "attentional capacity." Upland then gave Mother a revised written assessment plan to obtain her consent to administer the Test of Variables of Attention. Despite Mother's prior verbal consent, Mother never signed written consent to Upland administering the Test of Variables of Attention.

Mother later complained to the California Department of Education that Upland had not timely held an IEP team meeting to review results of the Test of Variables of Attention, which it had never administered due to lack of written parental consent. Mother asserted it was unnecessary to sign the assessment plan because she had verbally consented to the assessment during an IEP team meeting. The California Department of Education concluded, and informed Mother, Upland was in compliance because "the student's parent never provided the requisite written consent to assess."

## MOTHER'S DISAGREEMENT WITH INTELLECTUAL DISABILITY ELIGIBILITY

A preponderance of the evidence established that in 2015, Mother objected to Student's eligibility category continuing to be intellectual disability. Mother rejected the conclusion that Student's low IQ coupled with low adaptive functioning skills meant she met the criteria for being intellectually disabled. Upland's 2014 triennial reassessment report fueled Mother's denial by questioning Student's continuing eligibility under the category of intellectual disability and pointing to the possibility of a specific learning

disability due to inconsistency in Student's broad range of cognitive and academic scores. Significantly, Davis recommended Upland conduct a comprehensive reassessment of Student's overall cognitive and academic functioning to determine whether intellectual disability, limited school experience, or poor school attendance contributed to the variable scores obtained.

As low as Student's cognitive ability scores were, her academic achievement scores were, in some areas, so much lower as to appear to possibly be a significant discrepancy between ability and achievement, one definition of the eligibility category of specific learning disability. This unusual result was caused by Upland calculating results on the Woodcock-Johnson Tests of Achievement in the available areas of academic achievement based on the estimate, related to Student's age of just over 17 years when Upland administered the Tests of Achievement, that Student was in grade 11.8. The ability to characterize Student's disability as relating to a substantial gap between ability and achievement seemed to serve Mother's desire to not describe Student as having intellectual disability. But curiously, Mother also resisted accepting Student's extremely low academic achievement standard scores by claiming they were erroneously low because they were calculated by comparing her against neurotypical students in the 11th grade. In July 2015, Mother asserted that at the time of testing late in the 2013-2014 school year, Student was only in 8th grade. Mother believed if Student's performance had been compared to other 8th graders, her standard scores would have been higher. Mother's argument undermined her own preference for Student's eligibility category to be something other than intellectual disability, because an increase in Student's standard scores in academic achievement due to reducing the level of the peer group against which her performance was compared would have closed the gap between ability and achievement and removed the specific learning disability eligibility category from consideration. This episode was another example of

Mother's unreasonable conduct.  In response to Mother's concerns, Upland agreed to report Student's academic achievement scores based on an age equivalency and grade level equivalency for reported areas.  For example, in the area of the area of applied problems, specifically with money calculations as identified by her performance on questions specific to money, Student had a grade equivalency of 1.2.

In the face of Mother's rejection of the eligibility category of intellectual disability and Upland's questioning of it, the IEP team agreed to change Student's primary eligibility category to specific learning disability, and her secondary eligibility category remained speech or language impairment.  The designation was changed before the July 13, 2015 IEP team meeting and reflected on the cover page of the IEP of that date.  But full explanation of the manner in which Student's supposed visual and auditory processing deficits adversely impacted the speed with which she processed information did not get documented on the cover page of Student's IEP until July 27, 2015.  The July 27, 2015 IEP noted Student's weaknesses in memory made her recall and retrieval slow, her cognitive abilities in conceptualization and expression were areas of weakness that adversely impacted her ability to comprehend, generalize, and express herself, and she had mild to moderate receptive language deficits and moderate to severe expressive language deficits.

Based on Upland's calculation that Student would have been in the 10th grade during the 2013-2014 school year, when it had begun Student's 2014 triennial reassessment, Upland documented on the July 13, 2015 IEP that Student was in 12th grade for the 2015-2016 school year.  However, at the July 27, 2015 IEP team meeting, Mother stated Student was in 10th grade for the 2015-2016 school year.  Not having any other information on the topic from Student's private school, Upland took Mother's word for it and changed the July 27, 2015 IEP document to indicate Student

was in 10th grade.  The July 27, 2015 IEP also identified Student's last triennial evaluation date as June 30, 2014, and stated Student was due for her next triennial evaluation by June 30, 2017.

## SEPTEMBER 30 AND OCTOBER 19, 2016 ASSESSMENT PLAN

On September 30, 2016, Upland sent Mother an Assessment Plan for Student's triennial evaluation.  Upland proposed:

- to have a special education teacher assess Student's academic achievement, measuring her reading, spelling, arithmetic, oral and written language skills, and/or general knowledge;

- to have a school nurse gather health information and testing to determine how Student's health affected school performance;

- to have a school psychologist assess Student's intellectual development, by measuring how well Student thought, remembered, and solved problems;

- to have a speech-language pathologist assess Student's language/speech communication development, measuring Student's ability to understand and use language to speak clearly and appropriately;

- to have an occupational therapist and a school psychologist assess Student's motor development, measuring how well Student coordinated body movements in small and large muscle activities, and possibly also measuring perceptual skills;

- to have a school psychologist assess Student's social/emotional functioning, indicating how Student felt about herself, got along with others, took care of personal needs at home, school, and in the community;

- to have a school psychologist assess Student's adaptive/behavior functioning, also indicating how Student took care of personal needs at home, school, and in the community; and

29

- to have a special education teacher assess Student's needs in the area of post-secondary transition, related to training, education, employment, and where appropriate, independent living skills.

The assessment plan informed Mother that the tests and procedures conducted for the assessments could include but were not limited to classroom observations, rating scales, interviews, record review, one-on-one testing, or some other types or combination of tests.  The assessment plan informed Mother she would be invited to an IEP team meeting to discuss the results of the assessments, and in fact included invitations to an IEP team meeting to be held on either October 21 or 31, 2016, whichever Mother would confirm.  Along with the September 30, 2016 assessment plan and IEP team meeting invitations for October 21 and 31, 2016, Upland sent Mother a form to sign to authorize the release of information between Upland and Student's private school.  Mother did not respond or return the assessment plan and release.

Upland followed up with Mother by email on the morning of October 19, 2016, regarding the assessment plan, IEP team meeting invitations, and release of information form.  Upland included a Prior Written Notice form regarding the proposal to initiate the evaluation of Student, which explained that Upland would conduct the triennial evaluation by reviewing records, administering standardized testing, conducting interviews, and through observations.  Upland explained additional data was needed to determine whether Student continued to meet eligibility criteria and continued to need special education and related services, her present levels of performance, and whether any modifications to special education and related services were needed to enable Student to meet the annual goals in her IEP and to participate, as appropriate, in the general curriculum.  Upland stated a records review alone could

30

not provide information about her current functioning.  Upland included another triennial assessment plan, identical to the one sent to Mother on September 30, 2016, but dated October 19, 2016.

On the afternoon of October 20, 2016, Mother wrote to Upland that she disagreed with Upland's assessments and requested independent evaluations for the Test of Variables of Attention by Dr. Timothy Gunn, an assistive technology evaluation by Cynthia Cottier, and a central auditory processing assessment.

On October 27, 2016, Upland sent Mother a written response to her request for independent evaluations.  Upland explained it was denying Mother's request for independent evaluations at public expense because Upland was not obligated to fund independent evaluations unless and until a parent disagreed with an assessment the school district had done.  Mother had not signed the triennial assessment plan and Upland had not performed any assessments.  Upland had not assessed Student with the Test of Variables of Attention because Mother had not signed consent to the March 2015, April 2015, or July 27, 2015 assessment plans that would have authorized Upland to administer that instrument.  There was no evidence Upland had assessed Student's central auditory processing or purported need for assistive technology as part of the 2014 triennial reassessment, or that Parent requested Upland to assess Student in these areas in 2014.  Therefore, Student had no right to independent evaluations at public expense until Upland had the opportunity to assess Student in these areas Mother requested.

Upland's October 27, 2016 correspondence to Mother included another copy of the September 30, 2016 triennial assessment plan.  In response to Mother's request for assessments for central auditory processing disorder and assistive technology needs, Upland also sent Mother a separate assessment plan dated October 27, 2016, for

31

"CAPD and AT assessment," offering to have an audiologist assess Student for central auditory processing disorder, and to have a speech-language pathologist assess Student's need for assistive technology.  Upland requested Mother sign the two assessment plans, and also sign the release of information authorization form to allow exchange information with the private school Student attended.

Upland convened an annual IEP team meeting for Student on October 31, 2016.  Mother had not consented to the September 30 and October 19, 2016 triennial reassessment plan, the supplemental October 27, 2016 assessment plan, or the release and exchange of information between Upland and the private school Student attended.  Mother continued to conceal the fact that Resurrection Academy was a homeschool operated by Mother and that she was the director, principal, and custodian of records who could provide all information and records Upland sought.

During the IEP team meeting, Upland attempted to obtain Mother's written consent to the triennial reassessment and additional assessments Mother requested. Upland gave Mother a fourth copy of the assessment plan for the triennial reassessment due by June 30, 2017, a second copy of the supplemental assessment plan for the central auditory processing disorder and assistive technology assessments Mother requested, and a third copy of the release of information form for Mother to consent to Upland communicating with the private school.  Mother did not consent to any of these.

During the following months, Mother and Upland had many more communications in which Upland unsuccessfully attempted to obtain Mother's consent to the triennial reassessment proposed in the September 30 and October 19, 2016 assessment plan.  In the remainder of the 2016-2017 school year, Mother never inquired, as stated in Student's Issue 1, "why Upland wanted to do additional assessments" after the 2014 triennial reassessment.

The reasons for Upland proposing a triennial evaluation were quite obvious.  Most importantly, Upland was required to comprehensively reassess Student by June 30, 2017, for a statutorily mandated triennial evaluation.  Upland prudently began pursuing consent for that mandatory reassessment in fall 2016.  Mother had previously been difficult to work with to obtain consent, and Upland needed information to determine Student's continuing eligibility for special education and related services by June 30, 2017.  Student's characterization of the last triennial as having been completed in 2015 does not change the prior history in which Student had triennial evaluations in 2011 and 2014.

Additionally, the results of the last triennial evaluation were debated and, in part because Mother interfered with the administration of some instruments, did not provide a complete picture of Student's abilities and deficits when they were administered.  Even at the time Upland conducted the 2014 psychoeducational assessment, it recommended a comprehensive reevaluation.  Upland attempted to acquire additional information in areas of suspected disability such as attention and social-emotional functioning as it related to attention, but Mother did not provide written consent to further assessment.

And finally, in fall 2016, Upland required information regarding Student's present levels of performance to develop an appropriate offer of goals, placement, and related services for Student.  Student was 19 years old and had not attended an Upland school

since kindergarten.  Upland did not have the daily opportunity to observe Student to document her performance and track her progress.  Upland required current information to fulfill its obligation to offer Student a FAPE for the 2016-2017 school year.

All the uncertainty and confusion Mother alleged in Student's multiple complaints and feigned at hearing were not credible.  The evidence established that rather than being confused as to the reasons why Upland wanted to the assessments, Mother simply did not want Upland to assess Student.  The evidence established Mother's claimed confusion was merely an after-the-fact attempt justify her prior refusal to consent to the assessments sought by Upland.  At hearing, Mother claimed her background gave her a strong distrust of government, including the school district.  However, she concocted implausible fears about the health assessment by a school nurse devolving into a strip search, or a pelvic exam by a doctor who specialized in obstetrics and gynecology.  Whether her testimony on this point was honest or only invented to rationalize her supposed uncertainty about the need for a triennial evaluation and her failure to consent, Mother's conduct was unreasonable.

Student attempted to characterize the 2014 triennial evaluation, which Upland began in February 2014, as not being complete until August 2015 and alleged the triennial assessment Upland proposed on September 30, 2016, "would have been a second triennial assessment, as one had already been conducted."  The extensive and explicit history made clear Student's self-serving miscalculation of the 2014 triennial evaluation, and the several appropriate reasons Upland sought to timely reassess Student before June 30, 2017.  The evidence established that Mother did not lack adequate information about in what areas of suspected disability Upland proposed to

assess Student and why Upland sought to conduct those assessments.  Rather, she only lacked a willingness to allow Upland to conduct a comprehensive triennial evaluation.

The information Upland provided on the September 30 and October 19, 2016 assessment plans itself was sufficient to inform Mother of the areas of suspected disability Upland intended to assess, the methods it would use to assess Student, and the category of personnel who would assess each area.  Upland also provided Mother a prior written notice explaining that Upland would conduct the triennial evaluation by reviewing records, administering standardized testing, conducting interviews, and through observations.  Upland explained additional data was needed to determine whether Student continued to meet eligibility criteria and continued to need special education and related services, her present levels of performance, and whether Student needed any modifications to special education and related services to meet the annual goals in her IEP and to participate, as appropriate, in the general curriculum.  Mother had received the 2014 triennial psychoeducational assessment report, which immediately recommended a comprehensive reevaluation because the results were not clear.  Mother was familiar with testing procedures and types.  Student had been repeatedly assessed by Upland, and others, in 2001, 2003, 2004, 2005, 2008, 2011, and 2014.  Also, Student's older sibling had undergone repeated psychoeducational evaluations as part of determining eligibility for special education and related services and developing appropriate programs for that sibling.  Mother was very familiar with the process.  Therefore, Mother was adequately informed, and Student did not establish Mother required any additional information to decide whether or not to sign the triennial reassessment plan.

Upland did not fail to provide Mother any information regarding assessments to which she was entitled.  And information Mother wanted but either did not request or

35

obtain did not significantly impede Parent's opportunity to participate in the educational decisionmaking process.  Mother had sufficient information to consent to the triennial reassessment Upland proposed to conduct pursuant to the September 30 and October 19, 2016 assessment plan.

Student did not meet her burden of proof with respect to Issue 1.

## ISSUE 2:  PRIOR WRITTEN NOTICE IN RESPONSE TO PARENT'S OCTOBER 19, 2016 REQUEST FOR INDEPENDENT EDUCATIONAL EVALUATIONS

Student contends Upland failed to provide Mother prior written notice and Mother had no information as to the basis of Upland's denial of Mother's October 19, 2016 request for independent educational evaluations in the areas of the Test of Variables of Attention by Dr. Gunn, assistive technology by Cottier, and central auditory processing disorder.

Upland contends Student's Issue 2 is barred by the applicable statute of limitations, and further, on October 27, 2016, Upland provided legally sufficient prior written notice of its decision to deny Mother's request for independent educational evaluations.

As discussed above, Student failed to timely state her claim in Issue 2.  This claim was not stated in the Prior 2018 Case, refiled as Student's Second Case.  The claim was first stated in the second amended complaint in Student's First Case, filed on May 4, 2020.  Even if the claim relates back to the original filing date of Student's First Case, August 13, 2019, Student's claim is untimely.

36

The documentary evidence established Mother emailed a request for independent evaluations to Upland on the afternoon of October 20, 2016. On October 27, 2016, Upland replied to Mother's email requesting independent evaluations. Upland's letter expressly stated it was provided under title 34 Code of Federal Regulations part 300.503 as a notice of Upland's "proposed and/or refused actions . . . as it relates to" Mother's request for independent educational evaluations.

Any challenge to the adequacy of Upland's response, denying Mother's request, was required to be filed within two years of Upland's response, October 27, 2018. Student failed to timely file a claim regarding the sufficiency of Upland's response to Mother's October 20, 2016 request for independent educational evaluations. Therefore, as stated above, Issue 2 is dismissed as outside the statute of limitations and not preserved by the parties' May 2019 tolling agreement.

## ISSUE 3:  OCTOBER 31, 2016 IEP

Student contends the October 31, 2016 IEP did not offer her a FAPE for a variety of specific reasons, stated and addressed below. Upland contends the October 31, 2016 IEP was reasonably calculated to confer educational benefit based on the information available to Upland at the time of the IEP team meeting.

In developing the IEP, the IEP team must consider the strengths of the child, the concerns of the parents for enhancing the child's education, the results of the most recent evaluations of the child, and the academic, developmental, and functional needs of the child.  (20 U.S.C. § 1414(d)(3)(A); 34 C.F.R. § 300.324(a).)

THE OCTOBER 31, 2016 IEP

PRESENT LEVELS OF PERFORMANCE

At the IEP team meeting on October 31, 2016, Upland attempted to obtain from Mother information about Student's present levels of performance because Mother had not consented to Upland learning that information through a triennial reassessment or directly from Resurrection Academy.  The most recent information Upland had after the 2014 triennial evaluation was based on Mother's reports from August 12, 2015.

In October 2016, Mother reported Student received instruction at Lindamood-Bell and some speech therapy.  The IEP team reviewed existing data and considered additional information Mother provided, and documented what little information it had available.

In the area of communication development, Upland reviewed information from 2014 assessments by both Upland and independent evaluator Abby Rozenberg. Student's oral-peripheral structures were within functional limits, and fluency, voice, articulation, and phonology were normal.  However, Student had lower than average receptive and expressive language abilities, as well as pragmatic language difficulties.  In the past, Upland had recommended Student receive services in both pull-out and push-in models to best benefit her language development in the least restrictive environment.  In October 2016, Mother only reported that with speech therapy and Lindamood-Bell services, Student had "made great progress."  Mother did not provide details of Student's present levels of performance in her previously known areas of need in pragmatics, inferences, oral expression, non-literal language, listening comprehension, and idiomatic language.

38

In gross and fine motor development, Upland reviewed information from 2014 assessments reflecting below average fine manual control and motor coordination except for upper limb coordination.  Student held a writing tool in a lateral tripod grasp, and although she had some difficulties with letter size and spacing between words when writing a sentence, her handwriting overall was legible and her scissors skills were good.  She had some sensory processing difficulties, specifically low registration.  She exhibited functional mobility skills for accessing the high school environment.  In October 2016, Mother, through her advocate, reported Student "made progress" in these areas by participating in martial arts, vision therapy, and reflex integration therapy.  Mother did not provide details of Student's present levels of performance in her previously known area of need in sensory processing.

In social-emotional and behavioral functioning, Upland reviewed information from 2014 assessments reflecting Student's self-report that she felt she often did not get things correct.  Dr. Markel had noted Student's perseverance with tasks.  In August 2015, Mother reported Student had anxiety when presented with new tasks or new people, transitions, and being in large groups with which she was not familiar. Mother reported Student followed directions, was compliant, hard-working, well-behaved at home and at school, and said teachers reported Student had a cooperative spirit.  In October 2016, Mother reported Student's anxiety level had decreased.  Student was more social at school and home.  Student also was more independent, in that Mother could drop her off at Lindamood-Bell for her session and pick her up when she was finished.

In the area of adaptive and daily living skills, Upland reviewed information from
August 2015 reflecting Mother reported Student was independent in taking care of her
personal needs.  In October 2016, Mother reported Student improved her independence
by feeding the pets and being able to stay home alone.

In the area of health, Upland reviewed information from the 2014 triennial
evaluation, and Mother provided a review and update of Student's health history.
Mother reported Student was managing her health concerns well.  Due to a diagnosis of
mild scoliosis in 2014, Student continued to follow up with physical therapy every two to
three months, did exercises at home, and did not require a back brace.  Mother reported
after an evaluation by optometrist Dr. Douglas Stephey in April 2015, Student received
reflex integration therapy from him.  While Student had a hearing screening by her
primary care provider in 2015 and was within normal limits, on October 20, 2016,
Mother had requested an independent evaluation by an audiologist for auditory
processing disorder.  The health information Mother provided did not suggest Student
had school-based medical needs and Mother did not request Upland provide services to
address any educational impact of Student's health or medical conditions.

In the area of academic and functional skills, in mathematics, Upland learned in
April 2014 Student's scores on the Woodcock Johnson Tests of Achievement reflected
she performed at the 3.5 grade level on Math Calculations, adding and subtracting
single- and multiple-digit numbers independently.  On August 12, 2015, Mother
reported Student completed one-digit-by-three-digits and two-digits-by-two-digits
multiplication math problems independently with 90 percent accuracy, and took what
appeared to Mother to be an appropriate amount of time to complete these tasks.  In
October 2016, Mother reported Student was working on the Cloud Nine mathematics
program at Lindamood-Bell, and working on two-digits-by-three-digits multiplication,

40

long division, and word problems.  Mother did not provide details of Student's present levels of performance in her previously known areas of need in math reasoning and math calculation.

In English language arts, Upland learned in April 2014 Student's scores on the Woodcock Johnson Tests of Achievement reflected she performed at the 3.4 grade level on Passage Comprehension, able to comprehend and fill in the blank to a question after reading one to two sentences.  On the Writing Samples subtest, Student was able to produce written work in the form of a sentence with a noun and verb with appropriate simple grammar and syntax.  In July 2015, Mother reported that Lindamood-Bell thought Student was not yet at the point to participate in writing instruction and therefore no writing samples were available.  In October 2016, Mother claimed Student's comprehension was at 10th grade level by a Lindamood-Bell progress report.  Mother did not provide details of Student's present levels of performance in her previously known areas of need in reading decoding, reading comprehension, and written expression.

In vocational skills, the IEP team reviewed that as Mother reported in 2015, her goal was for Student "to be college bound after graduating high school with a diploma." In October 2016, Mother did not provide any additional information.

The IEP team determined for Student to receive educational benefit, she needed goals in the following areas of need: written expression, reading decoding, reading comprehension, math reasoning, math calculation, sensory processing, pragmatics/social communication, inferences, oral expression/narration, non-literal language, listening comprehension, and idiomatic language.

Mother had reported at the July 27, 2015 IEP team meeting that Student had been in ninth grade for the 2014-2015 school year.  Upland accepted Mother's representation and documented Student would be in 10th grade for the 2015-2016 school year.  At the October 31, 2016 IEP team meeting, Mother reported that based on information provided by Lindamood-Bell, Student was in 10th grade.  Upland informed Mother that the school district determined a student's grade level in high school based on the number of credits the student has earned.  Upland suggested an Upland High School counselor meet with Student's current teacher to update Student's transcript.  Mother responded she would provide Upland with the data they required because she did not feel comfortable signing an authorization for release of information.  Mother asked Upland what specific information staff needed, and Upland requested a copy of Student's most updated transcript.  Mother never provided Upland with a copy of Student's transcript.

The problem, and what Mother continued to conceal from Upland, was Student had no transcript because she did not attend an independently operated private school and Mother did not create a transcript until, at the earliest, August 2019 when Mother, as the principal of Resurrection Academy, gave Student a high school diploma.  Quite possibly, the so-called transcript introduced into evidence at hearing was not even created until Upland subpoenaed documents from Parents for the August 2020 due process hearing.  The document Mother produced in response to the subpoena bore no months, years, semesters, trimesters, or other indicia of when Student allegedly completed the listed courses, or when the document itself was created, modified, or finalized.  Not until September 2020 did Mother provide to Upland a copy of the transcript Upland requested in October 2016 to enable it to determine Student's progress toward completing a regular high school diploma.

42

GOALS

In the absence of current assessment data and information from Student's private school due to Mother's failure to consent to the triennial reassessment and exchange of information, the IEP team reviewed existing data and listened to input from Mother to estimate baselines in each of Student's goal areas.

In the area of need of written expression in paragraph writing, the last data Upland had was based on the 2014 administration of the Woodcock-Johnson Tests of Achievement.  Student had a grade equivalence of 1.6 on the writing sample subtest, and 2.8 in written expression, significantly below average.  Sample work showed she was able to write a sentence with a subject and predicate, in the form of a noun and a verb, with appropriate simple grammar and syntax.  Mother did not allow Upland to obtain, and Mother did not provide, concrete information to determine Student's present level of performance in writing as of October 2016.  Although the last information Upland had suggested Student was functioning in the elementary school range for writing, Mother insisted Student was in 10th grade and making progress in the general education curriculum toward earning a regular high school diploma with a goal of attending college.

Upland proposed a goal for Student to produce written work at a much higher level than her last-documented baseline.  The goal was for Student to be provided with targeted vocabulary familiar to her by vocabulary review and student mastery, and for Student to incorporate the learned vocabulary into a narrative with a minimum of five sentences containing a simple but identifiable beginning, middle, and end with an identifiable subject, basic supportive details, and an end with proper capitalization and punctuation, with 80 percent accuracy and minimal assistance, supported by a graphic organizer.

Although reading decoding remained on the list of areas in which Student would have a goal, none was included in the October 31, 2016 IEP.  Dr. Markel's neuropsychological evaluation in October 2014 identified decoding as a relative strength for Student, with standard scores on the Wechsler Individual Achievement Test in Word Reading at 84, Pseudoword Reading at 89, and Basic Reading at 86, far above her Reading Comprehension standard score of 66.  Student was able to read words aloud, but failed to understand their meaning.

In the area of need of reading comprehension, the last data Upland had was based on the 2014 administration of the Woodcock-Johnson Tests of Achievement.  Student had a grade equivalence of 3.4 in passage comprehension.  She could fill in the blank for a question after reading one or two sentences.  Mother did not allow Upland to obtain, and Mother did not provide, concrete information to determine Student's present level of performance in reading comprehension as of October 2016.  Mother asserted Lindamood-Bell reported Student's reading comprehension level was at the 10th grade.  Although the last information Upland had suggested Student was functioning in the elementary school range for reading comprehension, Mother insisted Student was in 10th grade and making progress in the general education curriculum toward earning a regular high school diploma with a goal of attending college.

Upland proposed a goal for Student to demonstrate reading comprehension by teaching Student strategies to aid in reading comprehension such as using graphic organizers, the "5W-how model," outlining reading passages, and identifying context clues, and for Student to apply the learned strategies to aid in reading comprehension so she could answer who, what, when, where, why, and how questions about a five-sentence paragraph with 80 percent accuracy, supported by minimal prompting.

44

In the area of need of math reasoning, the last data Upland had was based on the 2014 administration of the Woodcock-Johnson Tests of Achievement.  Student had a grade equivalence of 1.2 on the Applied Problems subtest.  She could call some coins by their names.  Mother did not allow Upland to obtain, and Mother did not provide, concrete information to determine Student's present level of performance in math reasoning as of October 2016.  Although the last information Upland had suggested Student was functioning in the elementary school range for math reasoning, Mother insisted Student was in 10th grade and making progress in the general education curriculum toward earning a regular high school diploma with a goal of attending college.

Upland proposed an applied problems in math goal for Student to be presented with classroom scenarios of real-life situations where money is used, such as shopping and budgeting, and for Student to use previously modeled strategies like touching money, coin combinations, a number line, and manipulatives, to show combinations of coins up to 99 cents with 80 percent accuracy.

In the area of need of math calculation, the last data Upland had was based on the 2014 administration of the Woodcock-Johnson Tests of Achievement.  Student had a grade equivalence of 3.8 in Math Calculations Skills.  She was able to add and subtract single digits, and could add and subtract double digits with minimal success.  She struggled with math calculations when the calculation tasks were mixed on an assignment, such as single-digit addition and subtraction with single-digit multiplication, and double-digit addition and subtraction and double-digit multiplication all on one page of calculation.  Mother did not allow Upland to obtain, and Mother did not provide, concrete information to determine Student's present level of performance in math calculation as of October 2016.  Mother asserted Student was

45

performing multi-digit multiplication with 90 percent accuracy, and long division and word problems.  Although the last information Upland had suggested Student was functioning in the elementary school range for math calculation, Mother insisted Student was in 10th grade and making progress in the general education curriculum toward earning a regular high school diploma with a goal of attending college.

Upland proposed a goal for Student to perform calculations using multiplication by teaching her the steps in multiple-digit problem solving for addition, subtraction, and multiplication, carrying and borrowing in multiple-digit problems, how to use a multiplication chart, and how to multiply using double digits, then having Student demonstrate the ability to use a multiplication chart as a visual aid when given 15 multiplication problems of single-by-multiple-digit numbers and compute correct answers with 80 percent accuracy.

In the area of need of sensory processing, the last data Upland had was based on the 2014 triennial evaluation.  Student exhibited some sensory processing difficulties, specifically with low registration, which interfered with her ability to complete classroom work and activities.  Mother did not allow Upland to obtain, and Mother did not provide, concrete information to determine Student's present level of performance in sensory processing as of October 2016.  Mother asserted participation in martial arts and integrated reflex therapy prescribed by an optometrist helped Student improve.

Upland proposed a goal for Student's sensory motor processing to train Student in sensory processing strategies designed to assist low registration such as enhancing task and context features, brighter contrast in materials, increased tactile stimulation, movement exercises, strong flavor oral motor experience, and alternating passive and active learning.  Then, when Student demonstrated symptoms of low registration such as missing directions, being slow to respond, or having difficulty organizing work and/or

supplies, for staff to cue Student with visual prompting to a list of strategies and for Student to use sensory processing strategies designed to assist low registration to actively participate in class activities such as written work.

In the area of need of pragmatics/social communication, the last data Upland had was based on the 2014 triennial assessment and independent speech and language evaluation by Rozenberg.  Student demonstrated decreased turn-taking during informal conversation.  She was cooperative and provided answers when asked, but rarely initiated a topic of conversation or provided additional information to an existing topic to continue a conversation.  During informal observation by Upland, Student only participated in one-turn communication, meaning one comment by the speaker followed by one comment by the listener.  Mother did not allow Upland to obtain, and Mother did not provide, concrete information to determine Student's present level of performance in pragmatic/social communication as of October 2016.  Mother asserted Student received speech therapy one hour per week.

Upland proposed a goal to teach Student social rules of group conversation, and for Student to demonstrate the ability to orally express herself by commenting or asking questions during a structured three-turn conversation, with one to two minimal indirect or direct verbal prompts, in eight out of ten opportunities.

In the area of need of inferences, the last data Upland had was based on the 2014 triennial evaluation administration of the Comprehensive Assessment of Spoken Language by Upland's speech-language pathologist.  Student had a standard score of 62 on the Inferences subtest, significantly below average.  Mother did not allow Upland to obtain, and Mother did not provide, concrete information to determine Student's present level of performance in inferences as of October 2016.  Mother asserted Student received speech therapy one hour per week.

47

Upland proposed a goal to present Student with hypothetical situations in either written or verbal form, and for Student to demonstrate the ability to answer inference questions such as the feelings of others, predictions, or cause and effect, with 80 percent accuracy, supported by visual aids and one to two minimal indirect or direct verbal prompts.

In the area of need of oral expression in narration, the last data Upland had was based on the 2014 independent speech and language evaluation by Rozenberg, who administered the Test of Narrative Language.  In oral narration, Student achieved a total raw score of 35, the age equivalent of 6.7 years.  Mother did not allow Upland to obtain, and Mother did not provide, concrete information to determine Student's present level of performance in oral expression in narration as of October 2016.

Upland proposed a goal to provide Student five sequential pictures and for Student to demonstrate the ability to orally present one grammatically and syntactically correct sentence per picture, using associated vocabulary, creating a simple yet cohesive story with one to two minimal indirect or direct verbal prompts.

In the area of need of non-literal language, the last data Upland had was based on the 2014 triennial evaluation and independent speech and language evaluation by Rozenberg, each assessment including the Comprehensive Assessment of Spoken Language.  Student scored 50 and 40, respectively, on the non-literal portion of the test. Both scores, which addressed Student's ability to answer questions based on non-literal information, were in the severely below average range.  Mother did not allow Upland to obtain, and Mother did not provide, concrete information to determine Student's present level of performance in non-literal language as of October 2016.

Upland proposed a goal to present Student with hypothetical situations in oral or written format that contained non-literal language, such as simile, metaphor, and sarcasm, and for Student to identify the correct message being communicated with 80 percent accuracy with one to two minimal indirect or direct verbal prompts.

In the area of need of listening comprehension, the last data Upland had was based on the 2014 triennial evaluation administration of the Test of Auditory Processing Skills.  Student had a scaled score of 2 in Auditory Comprehension, which was significantly below average.  Mother did not allow Upland to obtain, and Mother did not provide, concrete information to determine Student's present level of performance in listening comprehension as of October 2016.

Upland proposed a goal to teach Student strategies for improved listening comprehension such as listening for a main idea and specific details, summarizing, and recognizing word-order patterns, and for Student to demonstrate appropriate listening skills during classroom discussions by waiting her turn to talk and using sentences that were linked to what was previously stated in the discussion or writing down answers that drew upon information provided in the discussion, supported with minimal verbal prompting, in eight out of ten opportunities.

In the area of need of idiomatic language, the last data Upland had was based on the 2014 triennial evaluation administration of the Comprehensive Assessment of Spoken Language by Upland's speech-language pathologist.  Student had a standard score of 75 on the Idiomatic Language subtest, in the significantly below average range. Mother did not allow Upland to obtain, and Mother did not provide, concrete information to determine Student's present level of performance in idiomatic language as of October 2016.  Mother asserted Student received speech therapy one hour per week.

49

Upland proposed a goal to present Student with idiomatic phrases with associated visual aids, and for Student to identify the meaning of 25 therapy-targeted idioms with 80 percent accuracy, with one to two minimal indirect or direct verbal cues.

TRANSITION PLAN

The IEP team also developed an individualized transition plan that included post-secondary goals in training/education, employment, and independent living, specifying activities and community experiences supported by the related service of transition service involving Student's special education case carrier.

OFFER OF SPECIAL EDUCATION AND RELATED SERVICES

Upland was aware of Student's low cognitive and adaptive skills profile, and prior academic testing indicating Student functioned in the early elementary school grade range.  Upland considered the information Mother provided, asserting Student was in 10th grade following the general education high school curriculum, and was successfully completing the requirements for a regular high school diploma at a private school. Based on Mother's representations that were subject to confirmation by the private school transcript Mother agreed to obtain and provide to Upland, the IEP team considered the statutory continuum of placement options and determined the least restrictive environment in which Student was reasonably likely to make progress on the eleven IEP goals and three individualized transition plan goals.  The least restrictive environment was a blend of general education classes, collaboratively taught general education classes with specialized academic instruction, and special day program classes with specialized academic instruction.

Upland offered specialized academic instruction in a separate classroom at Upland High School, a public integrated facility, for three class periods a day for math

intervention, reading intervention, and a skills enhancement course.  The skills enhancement course was to focus on access to the core curriculum in the general education classes, through pre-teaching, re-teaching, and support with classwork completion from general education and collaboratively taught courses, but also to work on IEP goals and transition plan activities.  Upland offered specialized academic instruction in a regular general education classroom at Upland High co-taught by a general education teacher and a special education teacher, with a classroom aide, two periods a day for English and for science.  Upland offered the remainder of Student's classes, which could have included physical education, social science, and elective courses, in a general education classroom at Upland High.

Upland could not inform Mother on October 31, 2016, specifically which courses Student would be placed into because Upland needed to see Student's private school transcript to know which courses she had already completed.  For example, if Student had already taken Algebra, Student could be placed in Geometry.  But if she had not taken Algebra, she would have required that course before being placed into a course typical 10th graders take.  Also, if Student had already taken Biology, she could be placed in Chemistry.  But if she had not yet taken Biology, she would have required that course before being placed into other sciences.  Because Mother did not inform Upland what courses she provided Student at her homeschool and pretended she would obtain a transcript from Resurrection Academy, Upland did the best it could on October 31, 2016, to describe the placement environment it proposed for Student while still needing additional information Mother refused to share.  Had Upland been able to administer academic achievement tests to Student as part of the required triennial reassessment, or had Upland received truthful information of which Mother was personally aware, Upland could have developed a more specific course schedule proposal.

51

Upland offered related services to support Student obtaining educational benefit from her special education.  Upland offered Student 60 one-hour sessions of individual, pull-out speech therapy for the year, and 30 one-hour sessions of speech therapy in her classrooms for the year.  Upland offered 30 ten-minute occupational therapy consultation sessions with Student's classroom and school staff for the year.  Upland offered Student one 30-minute session of transition service on an individual basis.  Upland also offered transportation for Student, and Mother requested Upland reimburse her for transporting Student to school.

## ISSUE 3A: CONSIDERATION OF AREAS OF NEED IN WHICH STUDENT HAD NOT BEEN ASSESSED, SPECIFICALLY POST-SECONDARY TRANSITION, CENTRAL AUDITORY PROCESSING, ATTENTION, AND THE NEED FOR ASSISTIVE TECHNOLOGY

Student complains Upland did not consider areas of need in which Student had not been assessed, specifically post-secondary transition, central auditory processing, attention, and assistive technology.  Upland denies it denied Student a FAPE.

The lack of assessment in each of these areas was due to Mother's conduct.  On September 30 and October 19, 2016, Upland provided Mother a triennial assessment plan that included post-secondary transition needs as an area for evaluation, but Mother had not consented.  Therefore, Upland had been unable to assess Student's current needs in post-secondary transition.  Upland developed a reasonable individual transition plan based on the information available to it as of October 31, 2016.

Upland attempted since March 2015 to obtain Mother's consent to assess Student's attention using the Test of Variables of Attention, and Mother repeatedly failed to sign written consent to Upland administering that assessment.  Had Mother

52

signed the September 30 or October 19, 2016 triennial evaluation assessment plan, Upland could have assessed Student's attention during its triennial reassessment. Instead, on October 20, 2016, Mother claimed she disagreed with unspecified assessments by Upland and requested an independent evaluation for the Test of Variables of Attention by Dr. Timothy Gunn.  The fact that attention as a suspected area of disability had not been assessed by Upland was due to Mother's lack of written consent on assessment plans Upland gave her in March, April, and July 2015, as well as the September 30 and October 19, 2016 triennial evaluation assessment plan. Therefore, Upland was unable to assess Student's attention.

Mother requested assessment for central auditory processing disorder and evaluation of Student's need for assistive technology on October 20, 2016.  She requested independent evaluations, but Upland had not previously assessed Student in these areas.  Accordingly, there was no assessment Mother disagreed with as the basis for obtaining independent evaluations at public expense.  (*T.P. v. Bryan County School Dist.* (11th Cir. 2015) 792 F.3d 1284, 1293 ["The parental right to an IEE is not an end in itself; rather it serves the purpose of furnishing parents with the independent expertise and information they need to confirm or disagree with an extant, school-district-conducted evaluation."]; see also *Schaffer v. Weast*, *supra*, 546 U.S. at p. 61 [stating that an IEE following parental disagreement with the school's evaluation is necessary to ensure that parents have a "realistic opportunity to access the necessary evidence" and are not left "without an expert with the firepower to match the opposition"].)

53

Upland immediately offered to have an audiologist assess Student for central auditory processing disorder and to have a speech-language pathologist assess Student's need for assistive technology.  Upland sent Mother an assessment plan for these two evaluations on October 27, 2016.  Mother did not consent to these assessments, and even if she had, there was not enough time before the October 31, 2016 IEP team meeting to conduct the assessments Mother requested 11 days before the IEP team meeting.

Despite the lack of assessment for assistive technology, Upland offered Student assistive technology in the October 31, 2016 IEP.  Mother requested a text-to-speech program called Kurzweil 3000 to read aloud to Student written information.  Upland offered Student that program as an aid, service, or support.  Upland also offered Student access to a computer, laptop, or iPad at school for written assignments, and the ability to dictate for written assignments.  Upland offered to allow Student to use an audio recorder and/or written instructions for information presented verbally.  Upland also offered Student a scribe to transfer answers when required, dictation, help with typing, and a speech-to-text program for classroom, district, and statewide testing.  Therefore, Upland considered and addressed Student's need for assistive technology based upon Mother's request and the information available to it as of October 31, 2016.

Student did not meet her burden of proving Upland denied Student a FAPE in the October 31, 2016 IEP by failing to consider the specified areas of need in which Student had not been assessed.

## ISSUE 3B: INCLUSION OF PRESENT LEVELS OF PERFORMANCE IN ALL AREAS OF UNIQUE NEED

As stated above, Student's claim that Upland denied her a FAPE in the October 31, 2016 IEP by failing to include present levels of performance in all areas of unique need is untimely and dismissed.  Student did not state this claim in the Prior 2018 Case refiled as Student's Second Case, so it was not preserved by the May 2019 tolling agreement.  Student first asserted this claim in the second amended complaint in Student's First Case in May 2020.  Any challenge to the development or content of the October 31, 2016 IEP was required to be filed within two years of the IEP team meeting at which it was developed.  Student failed to timely file a claim regarding inclusion of present levels of performance in all areas of unique need in the October 31, 2016 IEP.  Even assuming this issue relates back to the August 13, 2019 original filing date of Student's First Case, this claim is untimely because it was not filed within the two-year statute of limitations, by October 31, 2018.  Therefore, as stated above, Issue 3b is dismissed as outside the statute of limitations and not preserved by the parties' May 2019 tolling agreement.

## ISSUE 3C: DEVELOPMENT OF APPROPRIATE GOALS BASED ON PRESENT LEVELS OF PERFORMANCE

As stated above, Student's claim that Upland denied her a FAPE in the October 31, 2016 IEP by failing to develop appropriate goals based on present levels of performance is untimely and dismissed.  Student did not state this claim in the Prior 2018 Case refiled as Student's Second Case, so it was not preserved by the May 2019 tolling agreement.  Student first asserted this claim in the second amended complaint in Student's First Case in May 2020.  Any challenge to the development or

content of the October 31, 2016 IEP was required to be filed within two years of the IEP team meeting at which it was developed, by October 31, 2018.  Student failed to timely file a claim regarding development of appropriate goals based on present levels of performance in the October 31, 2016 IEP.  Even assuming this issue relates back to the August 13, 2019 original filing date of Student's First Case, this claim is untimely because it was not filed within the two-year statute of limitations, by October 31, 2018. Therefore, as stated above, Issue 3c is dismissed as outside the statute of limitations and not preserved by the parties' May 2019 tolling agreement.

## ISSUE 3D: DISCUSSION OR CONSIDERATION OF PRIVATE SERVICES STUDENT WAS RECEIVING FROM LINDAMOOD-BELL, TUTORING, AND SPEECH THERAPY

To fulfill the goal of parental participation in the IEP process, the school district is required to conduct a meaningful IEP meeting.  (*Target Range, supra,* 960 F.2d at p. 1485.)  A parent has meaningfully participated in the development of an IEP when he or she is informed of the child's problems, attends the IEP meeting, expresses disagreement regarding the IEP team's conclusions, and requests revisions in the IEP. (*N.L. v. Knox County Schools* (6th Cir. 2003) 315 F.3d 688, 693; *Fuhrmann v. East Hanover Board of Education* (3d Cir. 1993) 993 F.2d 1031, 1036 [parent who has an opportunity to discuss a proposed IEP and whose concerns are considered by the IEP team has participated in the IEP process in a meaningful way].)

LINDAMOOD-BELL

At the time of the October 31, 2016 IEP team meeting, Student was receiving services at Lindamood-Bell at Upland's expense under a prior settlement agreement. During the October 31, 2016 IEP team meeting, Mother told Upland Student was

regularly going to Lindamood-Bell.  Upland inquired if Student could or would receive a high school diploma from Lindamood-Bell.  Mother reported Lindamood-Bell did not confer high school diplomas but some of the work or "classes" Student did at Lindamood-Bell could "transfer out," meaning Student would get credit for them at the private school.  Mother shared that Lindamood-Bell provided Student one-to-one support online when Student was not able to go to the Lindamood-Bell center in person.

Mother merely asserted to the IEP team Student made progress with Lindamood-Bell.  She but did not provide any specific information regarding what that progress looked like, how it reflected in Student's test scores, abilities, or progress in the general education curriculum toward earning a high school diploma.  Mother did not provide the IEP team with information that indicated the Lindamood-Bell services in any way raised Student's present levels of performance other than Mother's claim Lindamood-Bell said Student's comprehension was at the 10th grade level.

Mother told the IEP team the remaining funding on the Lindamood-Bell contract under the prior settlement agreement with Upland would provide Student only two more weeks of services.  Mother requested Upland offer Student continuing services at Lindamood-Bell.  After the IEP team discussed and proposed goals, the least restrictive environment in which Student could work on those goals and make progress toward her overall goal to earn a regular high school diploma, and related services necessary to enable Student to work on her goals and benefit from her special education, Upland determined Student did not require continuing services at Lindamood-Bell to receive educational benefit appropriate in light of her circumstances. Therefore, Upland did not offer Student ongoing services at Lindamood-Bell.

Mother did not want Student to attend a public school program and receive related services from Upland.  She rejected Upland's offer of placement and services and told the IEP team Student would remain enrolled in private school at Mother's expense. Upland informed Mother of Student's right as a private school student to receive a proportional share of services through an individual services plan.  Mother stated she was not interested in an individual services plan for Student.

There was no evidence to support Student's assertion Upland failed, refused, or avoided discussion or consideration of Student continuing to receive services at Lindamood-Bell as part of her October 31, 2016 IEP.  Mother did not want Student to attend a public school program and receive from public providers any services designed to enable her to access her education.  Mother instead preferred Student to receive services from individuals and entities with whom Mother could privately contract.  The fact that Mother asked Upland to pay for services to Student by a private business did not require Upland to agree to pay for those private, outside services on top of the comprehensive public school and related services educational program Upland proposed.  In not offering what Mother wanted, Upland did not significantly impede Mother's opportunity to participate in the educational decisionmaking process.

TUTORING

With regard to failing to discuss or consider tutoring, Student's First Case alleged that during the IEP team meeting on October 31, 2016, Upland did not "hold a discussion" of "other related services [Student] was receiving" "provided by District." During the June 15, 2020 prehearing conference, Student clarified the related services she meant were tutoring and speech therapy.  The evidence did not establish that as of October 31, 2016, Student was receiving "tutoring" from or paid for by Upland, whether directly or on a reimbursement basis.

58

The preponderance of the evidence established that the person from whom Student received "tutoring," Sydney Pacheco, was claimed by Mother as a "teacher" at Resurrection Academy in Mother's filing with the California Department of Education Private School Affidavit for the 2015-2016 and 2016-2017 school years and extended school years.  In October 2016, Pacheco was approximately 22 years old and had no teaching credential, training, or experience apart from spending time with Student.  Pacheco never worked in a school in any manner, and never provided services to someone at a school.  At the time of hearing, she worked as a cashier at a crafting store and as an enumerator for the Census Bureau.  Although Pacheco claimed to have some college education, there was no evidence she had that education when she began tutoring Student or before she stopped tutoring Student in August 2018.  Starting in April 2014, Mother paid Pacheco $15.00 per hour to do activities with Student including stretching, worksheets, reading, and incorporating prayer into every topic.  Pacheco supervised Student inside Student's home approximately four hours per day, four to five days per week, sometimes on a weekend day, but averaging a total of 16 hours per week over four days.

At hearing, Pacheco claimed she was trained by Lindamood-Bell in some of their programs by video and in a three-day in-person course, about how to speak to a student, going over grammar, reading, English, and briefly on how to approach it by visualizing.  Pacheco used what she learned during her activities with Student to complete academic activities she and Mother agreed to have Student work on.  When shown Student's transcript at hearing, Pacheco had not seen it before.  She agreed she had worked with Student on topics listed on the transcript, like English, history, science, and math.  However, Pacheco admitted she was not aware of the grades Student received in those subjects, as stated on the transcript, because she did not determine Student's grades; Mother did.  Pacheco generically described specific content she

59

"tutored" Student in, such as history involving the dinosaur era, and the development of
the United States started with colonies.  The science she taught covered weather, the
atmosphere, earth overall, other planets, and the galaxy.  She did not know what
Integrated Math 9, a course on Student's transcript, meant.  Pacheco claimed she taught
Student math tailored to her.  She was unable to describe Student's specific levels of
ability or achievement in any topic during any of the years she "tutored" Student, apart
from Student's writing.  Pacheco testified Student's writing expanded from sentences
with four words to writing ten words using commas and apostrophes, and turning those
into short paragraphs, five sentences long.  Pacheco did not think instruction was
tailored to any particular grade level, but instead was tailored to Student's academic
level and for her advancement.  Pacheco believed the textbooks she used to work with
Student were not tailored to a grade level but to Student.  Pacheco said she did not
teach religion, listed as a course several times on the transcript, but incorporated it
through praying with Student.

The IEP team did not discuss Student receiving or continuing to receive tutoring
during the October 31, 2016 IEP team meeting because Mother did not reveal that
Student was receiving "tutoring," or instruction of any type from an individual inside
Mother's home.  Mother did not disclose that Student's instruction at
Resurrection Academy was provided by person with no educational qualifications to
whom Mother gave some books and materials to use.  Upland believed Student
attended Resurrection Academy as a traditional, independently operated, private school
outside Mother's home and Mother did not tell Upland Student received any tutoring
separate and apart from her private school program.  In fact, Mother could not say that,
because the "tutoring" itself constituted the private school program.

60

There was no evidence to support Student's assertion Upland failed, refused, or
avoided discussion of Student continuing to receive tutoring as part of her
October 31, 2016 IEP.  It was not discussed because Upland was never aware it was a
consideration to be discussed.  Unlike continued Lindamood-Bell services, Mother did
not ask Upland to provide or pay for continued "tutoring."  Only Mother knew about the
"tutoring," and Upland did not significantly impede Mother's opportunity to participate
in the educational decisionmaking process by failing to discuss or consider a support it
had no idea Student received, or wanted in addition to the full day of school on a public
campus, as Upland offered.

SPEECH THERAPY

With regard to failing to discuss speech therapy, Student's First Case alleged the
related services at issue were being "provided by District."  The evidence did not
establish that as of October 31, 2016, Student was receiving speech therapy from or
paid for by Upland, whether directly or on a reimbursement basis.

Mother told the IEP team Student was receiving speech therapy for one hour per
week.  The IEP team was aware of Student's speech-language impairment, as it was her
original as well as ongoing category of eligibility for special education and related
services.  After developing goals, including in the areas of speech and
language/communication, and after considering the least restrictive environment in
which Student could receive educational benefit, Upland offered Student related
services of speech therapy both on an individual, pull-out basis, and in a group inside
her classrooms.  Upland offered Student 60 one-hour sessions of individual speech
therapy per year during the regular school year, which was 180 school days, or
36 weeks.  This averaged almost two hours per week of individual speech therapy.
Upland also offered Student 30 one-hour sessions of speech therapy in a group setting

during the regular school year, which was almost one hour per week.  Upland also
offered Student services during the four-week extended school year of two hours per
week of individual speech therapy and two hours per week of group speech therapy.

Unlike Mother's request for continuing Lindamood-Bell services, Mother did not
request continuing speech therapy from Rozenberg or another outside provider during
the October 31, 2016 IEP team meeting.  There was no evidence to support Student's
assertion Upland failed, refused, or avoided discussion of Student continuing to receive
speech therapy as part of her October 31, 2016 IEP.  Student's need for speech therapy
was discussed and Upland offered ample services to support Student in achieving her
speech-language/communication goals and benefitting from special education while
making progress in the general education curriculum.  Upland did not significantly
impede Mother's opportunity to participate in the educational decisionmaking process
by failing to discuss or consider speech therapy.

## ISSUE 3E: PLACEMENT OF STUDENT IN THE APPROPRIATE GRADE LEVEL

As stated above, Student's claim that Upland denied her a FAPE in the
October 31, 2016 IEP by failing to place her in the appropriate grade level is untimely
and dismissed.  Student did not state this claim in the Prior 2018 Case refiled as
Student's Second Case, so it was not preserved by the May 2019 tolling agreement.
Student first asserted this claim in the second amended complaint in Student's First
Case in May 2020.  Any challenge to the development or content of the
October 31, 2016 IEP was required to be filed within two years of the IEP team meeting
at which it was developed, by October 31, 2018.  Student failed to timely file a claim
regarding placing Student in the appropriate grade level in the October 31, 2016 IEP.
Even assuming this issue relates back to the August 13, 2019 original filing date of
Student's First Case, this claim is untimely because it was not filed within the two-year

statute of limitations, by October 31, 2018.  Therefore, as stated above, Issue 3e is dismissed as outside the statute of limitations and not preserved by the parties' May 2019 tolling agreement.

## ISSUE 3F: PLACEMENT IN THE LEAST RESTRICTIVE ENVIRONMENT FOR 2016-2017 REGULAR SCHOOL YEAR AND 2017 EXTENDED SCHOOL YEAR

Student generally contends Upland did not offer Student placement in the least restrictive environment.  Student did not specify what she believed the least restrictive placement was in October 2016, but insinuated intensive 1:1 instruction was required, and also that attendance in regular education classes with a one-to-one aide was appropriate.

Upland contends it offered Student appropriate placement in the least restrictive environment through a combination of specialized academic instruction reasonably calculated to enable Student to make progress on her goals and general education classes to support her progress toward earning a regular high school diploma and being integrated with typical peers.

School districts are required to provide each special education student with a program in the least restrictive environment.  To provide the least restrictive environment, school districts must ensure, to the maximum extent appropriate, that children with disabilities are educated with non-disabled peers; and that special classes or separate schooling occur only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.  (20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. § 300.114(a); Ed. Code, § 56031.)

The continuum of program options includes, but is "not necessarily" limited to, in increasing order of restrictiveness:

- regular education;

- resource specialist programs;

- designated instruction and services;

- special classes;

- nonpublic, nonsectarian schools;

- state special schools;

- specially designed instruction in settings other than classrooms;

- itinerant instruction in settings other than classrooms; and

- instruction using telecommunication, and instruction in the home, in hospitals, or other institutions.

(Ed. Code, § 56361.)

In determining the educational placement of a child with a disability, a school district must ensure that:

- the placement decision is made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options, and takes into account the requirement that children be educated in the least restrictive environment;

- placement is determined annually, is based on the child's IEP, and is as close as possible to the child's home;

- unless the IEP specifies otherwise, the child attends the school that he or she would if non-disabled;

- in selecting the least restrictive environment, consideration is given to any potential harmful effect on the child or on the quality of services that he or she needs; and

- a child with a disability is not removed from education in age-appropriate regular classrooms solely because of needed modifications in the general education curriculum.

(34 C.F.R. § 300.116.)

To determine whether a special education student could be satisfactorily educated in a regular education environment, the Ninth Circuit has balanced the following factors:

1. the educational benefits of placement full-time in a regular class;
2. the non-academic benefits of such placement;
3. the effect the student has on the teacher and children in the regular class; and
4. the costs of mainstreaming the student.

(*Sacramento City Unified School Dist. v. Rachel H.* (9th Cir. 1994) 14 F.3d 1398, 1404 (*Rachel H.*) [adopting factors identified in *Daniel R.R. v. State Board of Education* (5th Cir. 1989) 874 F.2d 1036, 1048-1050 (*Daniel R.R.*)].)

While the law requires the IEP team to consider the specific school campus a student will attend with attention to how close the campus is to the child's home and what school the child would attend if he or she was non-disabled, the law does not require that a school district place a child at his neighborhood school if there is no program available there to meet his needs.  (See, e.g. *McLaughlin v. Holt Public School Board of Education* (6th Cir. 2003) 320 F.3d 663, 672 [least restrictive environment provisions and regulations do not mandate placement in neighborhood school];

*Hudson v. Bloomfield Hills Public School* (6th Cir.1997) 108 F.3d 112 [IDEA does not require placement in neighborhood school]; *Urban v. Jefferson County School Dist.* (10th Cir. 1996) 89 F.3d 720, 727 [IDEA does not give student a right to placement at a neighborhood school]; *Wilson v. Marana Unified School District No. 6 of Pima County* (9th Cir. 1984) 735 F.2d 1178 [school district may assign the child to a school 30 minutes away because the teacher certified in the child's disability was assigned there, rather than move the service to the neighborhood school].)  No one factor is determinative in placement, and parental preference cannot be either the sole or predominant factor in placement decisions.  (See, e.g., *Letter to Burton* (OSERS March 20, 1991); *Letter to Anonymous* (OSEP April 20, 1994); *Letter to Bina* (OSERS November 5, 1991).)

An IEP must state whether extended school year services are offered.  (Ed. Code, § 56345, subd. (b)(3).)

In resolving the question of whether a school district has offered a FAPE, the focus is on the adequacy of the school district's proposed program.  (*Gregory K. v. Longview School Dist.* (9th Cir. 1987) 811 F.2d 1307, 1314.)  For a school district's offer of special education services to a disabled pupil to constitute a FAPE under the IDEA, a school district's offer must be designed to meet the student's unique needs, comport with the student's IEP, and be reasonably calculated to provide the student with educational benefit appropriate in light of the student's circumstances, in the least restrictive environment.  (*Ibid.*; *Endrew F.*, *supra*, 580 U.S. ___ [137 S.Ct. at p. 1000].)  Whether a student was offered or denied a FAPE is determined by looking to what was reasonable at the time the IEP was developed, not in hindsight.  (*Adams v. State of Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149, citing *Fuhrman v. East Hanover Board of Education* (3d Cir. 1993) 993 F.2d 1031, 1041.)

An IEP need not conform to a parent's wishes to be sufficient or appropriate. (*Shaw v. District of Columbia* (D.D.C. 2002) 238 F.Supp.2d 127, 139 [IDEA did not provide for an "education . . . designed according to the parent's desires."].)  A school district is not required to place a student in a program preferred by a parent, even if that program will result in greater educational benefit to the student.  (*Ibid.*)  A school district has the right to select the program offered, if the program is able to meet the student's needs, and the district is ultimately responsible for ensuring a FAPE is offered.  (*Letter to Richards* (OSEP January 7, 2010).)  The Ninth Circuit has held that while the school district must allow for meaningful parental participation, it has no obligation to grant the parent a veto over any individual IEP provision.  (*Ms. S. ex rel G. v. Vashon Island School District* (9th Cir. 2003) 337 F.3d 1115, 1131.)

California Code of Regulations, title 5, section 3043, provides that extended school year services shall be provided for each individual with exceptional needs who requires special education and related services in excess of the regular academic year. Students to whom extended programming must be offered under section 3043:

> . . . shall have disabilities which are likely to continue indefinitely or for a prolonged period, and interruption of the pupil's educational programming may cause regression, when coupled with limited recoupment capacity, rendering it impossible or unlikely that the pupil will attain the level of self-sufficiency and independence that would otherwise be expected in view of his or her disabling condition.

The purpose of extended school year placement and services is to prevent regression and recoupment difficulties during the summer break.  Therefore, a student's placement and services for the extended school year may differ from placement and services during the regular school year.  (*Letter to Myers* (OSEP December 18,1989).)

67

Based on the only information Mother afforded Upland, Upland accepted Mother's representations that Student was successfully completing the general education curriculum at Resurrection Academy and making slow but actual progress toward earning a regular high school diploma.

In determining Student's needs and the appropriate placement on the continuum of placement options, it was telling that Mother's reporting of Student's grade level stalled leading up to the October 31, 2016 IEP team meeting.  Student was not making typical progress.  At the July 27, 2015 IEP team meeting, when Mother questioned the results of the April 2014 triennial evaluation academic achievement assessment, she told Upland that Student had been in eighth grade in spring 2014.  Mother stated Student was in ninth grade in the 2014-2015 school year, and relying on that information Upland changed Student's July 27, 2015 IEP to state Student would be in 10th grade for the 2015-2016 school year.  The information Mother told Upland in July 2015 conflicted with what Mother had told the California Department of Education in her private school affidavit for the 2012-2013 school year, in which she reported Student was in ninth grade, and again reported to the Department of Education two years later, for the 2014-2015 school year, Student was still in ninth grade.  Student did not produce information regarding Mother's reports to the Department of Education for the 2013-2014 or 2015-2016 school years.

During the October 31, 2016 IEP team meeting, Mother again claimed Student was in 10th grade, at 19-and-a-half years old.  Student did not produce information regarding Mother's reports to the Department of Education for the 2016-2017 school year.

If it was true Student was making progress toward earning a regular high school diploma at Resurrection Academy, it was also clear she required significant support to

68

make progress in the general education curriculum.  Student's reported history of advancement from grade to grade had been suspicious, as well as far slower than is typical for students who are properly on the diploma track.  Upland considered the persistent information it had about Student's cognitive abilities being significantly below average, and the last reliable information it had about Student's academic achievement being at the elementary school level when she was 17 years old.  It also considered Mother's claims that Student was, in October 2016, adequately completing general education curriculum to earn a high school diploma.

Upland offered Student placement at her local high school, Upland High, in courses required to earn a regular high school diploma.  Upland offered placement in self-contained, specialized academic instruction classes for three periods a day to support Student's development in math, reading, and organization/academic skills.  These three periods counted as time Student would be outside the general education environment.  They were necessary to provide Student instruction by a credentialed special education teacher in a small group environment supported by a classroom instructional aide to remediate Student's learning challenges in her areas of unique need.

Upland also offered Student placement for two periods a day in general education courses required to earn a regular high school diploma, collaboratively taught by a general education teacher and a special education teacher in an environment that included typical peers as well as other students with disabilities.  During the IEP team meeting, Upland categorized time in collaborative classes as time outside the general education environment.  Because Student was going to receive specialized academic instruction for five periods per day, Upland calculated Student's time outside the general education environment at 77 percent of her day.

69

Upland offered Student placement in courses required to earn a regular high school diploma in the general education environment for all other periods. These would have included social studies, physical education, and electives. These courses plus passing periods and lunch were calculated during the IEP team meeting to provide Student 23 percent of her day in the general education environment.

At hearing, Upland witnesses testified that Upland calculates time in collaboratively taught classes as time in the general education environment because of the presence of typical peers. Therefore, Upland offered Student three periods per day outside the special education environment, and the remainder of her day in the general education environment. Regardless of the percentage calculation, Mother was informed Upland's placement offer was for Student to be in special education three periods per day and to be included with typical peers the remainder of the day.

Upland was unable to specify exactly which courses into which it would place Student because it required Student's transcript from Resurrection Academy to determine which high school courses Student had completed and what the appropriate level of courses were for her. But the question of placement concerns the environment along the continuum of placement options in which a student receives instruction, not the specific name or level of general education high school course a student attends.

Upland's October 31, 2016 placement offer struck a reasonable balance, given the very limited information Mother made available to it at the time, between the specialized academic instruction Student needed in view of her many cognitive, academic, and communication deficits, and the opportunity to be educated with typical

peers.  Upland's placement offer of some special classes, some regular classes
integrating typical and disabled peers, and some regular classes that did not include
specialized academic instruction for students with IEPs was reasonably calculated to
enable Student to receive educational benefit appropriate in light of her circumstances
in the least restrictive environment.

Upland's placement offer adequately fulfilled the requirements of *Rachel H.*
Student required significant support to make progress in academic content.  Full-time
placement only in general education courses would not have been reasonable.
Student's challenges appeared to be cognitive and/or related to processing delays, and
therefore Student required academic support from a credentialed special education
teacher to enable her to make adequate academic progress.  Student did not have
behavior, health, or mobility concerns that would have required an aide to support her
participation in the general education environment.  Student did not have extreme
behaviors that would have been disruptive to a teacher or other students in a regular
class.  Student would have benefitted from social interaction with same-aged,
neurotypical peers.  The cost of mainstreaming Student was not a consideration.
Upland fairly balanced Student's academic and social interaction needs and offered
Student placement in the least restrictive environment in which she could receive
educational benefit appropriate in light of her circumstances.

Apart from disagreeing with Upland's placement offer, Mother did not make clear
at the October 31, 2016 IEP team meeting what she thought would be an appropriate
public school placement for Student.  Mother only requested that if Student attended a
public school, Upland provide her a one-to-one instructional aide.  Upland asked
Mother if she wanted to suggest any placement alternatives for the IEP team to

consider.  Mother told the IEP team Student would remain enrolled in private school at Mother's expense.

The last day of the 2016-2017 regular school year was on June 8, 2017, and the first day of the 2017-2018 school year was August 21, 2017.  Sandwiched between the two school years was a summer break, during which extended school year services were provided.  The specific dates for Upland's 2017 extended school year services was not established by Upland's school year calendars.  The October 31, 2016 IEP offer of extended school year services stated the offer applied to the period June 5, 2017, through June 30, 2017, with the notation that "dates are approximate dates but it totals 60 hours."

For the 2017 extended school year, Upland offered Student placement in group specialized academic instruction a total of five hours per day, divided between 2.5 hours of math and 2.5 hours of reading.  The placement was a separate classroom in a public school, meaning a class without typical students, only students with IEPs.

Given Student's cognitive challenges and academic deficits in math reasoning, math calculation, and reading comprehension, there was no dispute Student qualified for extended school year services.  Student only challenges the appropriateness of Upland's offer of placement for extended school year 2017 as constituting placement in the least restrictive environment.  Student offered no evidence that refuted the adequacy of Upland's placement offer for extended school year.  Student offered no evidence of additional placement options that would have been appropriate for Student to prevent regression or reduce the period of time required for recoupment.

Student failed to prove Upland failed to offer Student appropriate placement, in the least restrictive environment, for the 2016-2017 regular school year.  Student failed

to prove Upland failed to offer Student appropriate placement, in the least restrictive environment, for extended school year 2017.

### ISSUE 3G: POST-SECONDARY TRANSITION PLAN

As stated above, Student's claim that Upland denied her a FAPE in the October 31, 2016 IEP by failing to develop an appropriate post-secondary transition plan is untimely and dismissed.  Student did not state this claim in the Prior 2018 Case refiled as Student's Second Case, so it was not preserved by the May 2019 tolling agreement.  Student first asserted this claim in the second amended complaint in Student's First Case in May 2020.  Any challenge to the development or content of the October 31, 2016 IEP was required to be filed within two years of the IEP team meeting at which it was developed, by October 31, 2018.  Student failed to timely file a claim regarding the post-secondary transition plan in the October 31, 2016 IEP.  Even assuming this issue relates back to the August 13, 2019 original filing date of Student's First Case, this claim is untimely because it was not filed within the two-year statute of limitations, by October 31, 2018.  Therefore, as stated above, Issue 3g is dismissed as outside the statute of limitations and not preserved by the parties' May 2019 tolling agreement.

### ISSUE 4:  PRIOR WRITTEN NOTICE IN RESPONSE TO PARENT'S OCTOBER 31, 2016 REQUEST FOR INDEPENDENT EDUCATIONAL EVALUATIONS

As stated above, Student's claim regarding failing to provide Mother prior written notice in responses to Mother's October 31, 2016 request for independent evaluations is

untimely and dismissed.  This claim was not stated in the Prior 2018 Case, refiled as Student's Second Case.  The claim was first stated in the second amended complaint in Student's First Case, filed on May 4, 2020.  Even if the claim relates back to the original filing date of Student's First Case, August 13, 2019, Student's claim is untimely.

The documentary evidence established Mother emailed a request for independent evaluations to Upland on the afternoon of October 20, 2016.  The request Mother made orally at the October 31, 2016 IEP team meeting was identical to and only duplicative of her October 20, 2016 emailed request.  On October 27, 2016, Upland replied to Mother's emailed request for independent evaluations.  Upland's letter expressly stated it was provided under title 34 Code of Federal Regulations part 300.503 as a notice of Upland's "proposed and/or refused actions . . . as it relates to" Mother's request for independent educational evaluations.

Any challenge to the adequacy or existence of Upland's response was required to be filed within two years of Upland's response, by October 27, 2018.  Mother repeating the same request on October 31, 2016, did not create a new obligation for Upland to respond.  Even if it did, still, Student failed to timely file by October 31, 2018, a claim regarding Upland's alleged lack of prior written notice in response to Mother's October 31, 2016 redundant request for independent educational evaluations.  Therefore, as stated above, Issue 4 is dismissed as outside the statute of limitations and not preserved by the parties' May 2019 tolling agreement.

ISSUE 5:  RESPONSE TO PARENT'S OCTOBER 31, 2016 REQUEST FOR INDEPENDENT EDUCATIONAL EVALUATIONS WITHOUT FUNDING THEM OR FILING TO ESTABLISH UPLAND'S OWN ASSESSMENTS WERE APPROPRIATE

Student contends Mother requested independent educational evaluations in the Test of Variables of Attention by Dr. Gunn, Student's need for assistive technology by Cottier, and central auditory processing at the October 31, 2016 IEP team meeting, and Upland failed to either provide the independent evaluations she requested or file a request for due process hearing to prove the legal sufficiency of the assessments it had conducted.

Upland contends Mother previously disagreed with Upland's 2014 psychoeducational assessment and Upland had funded an independent evaluation in neuropsychology by Dr. Markel.  Student therefore was not entitled to an additional independent educational evaluation related to psychoeducation, and Upland was not required to again "fund or file" in response to Mother's request.  Further, Upland had not conducted any assessments in the two years prior to October 31, 2016, with which Mother could disagree.  Upland additionally contends because it had not assessed Student to determine her need for assistive technology, or for central auditory processing disorder, there were no district assessments with which Mother could disagree, and that Upland promptly offered to conduct its own assessments in these additional assessment areas Mother requested.

The procedural safeguards of the IDEA provide that under certain conditions, a parent is entitled to obtain an independent evaluation of a child at public expense. (20 U.S.C. §1415(b)(1).)  An independent evaluation is an evaluation conducted by a

qualified examiner not employed by the school district.  (34 C.F.R. § 300.502(a)(3)(i).)  A parent has the right to request an independent evaluation at public expense if the parent disagrees with an evaluation obtained by the school district, and only has the right to one independent educational evaluation at public expense each time the school district conducts an evaluation with which the parent disagrees.  (34 C.F.R. § 300.502(b)(1); Ed. Code, § 56329, subd. (b).)  When a parent requests an independent evaluation at public expense, the school district must, "without unnecessary delay," either initiate a due process hearing to show that its evaluation is appropriate, or provide the independent evaluation at public expense, unless the school demonstrates at a due process hearing that an independent evaluation already obtained by the parent does not meet its criteria.  (34 C.F.R. §300.502(b)(4); Ed. Code, § 56329, subd. (c).)

As an initial matter, Student's claim in Issue 5 is untimely.  Mother first claimed to disagree with Upland's assessments and requested independent evaluations in an email to Upland on October 20, 2016.  Mother's email requested independent evaluations, specifically that the Test of Variables of Attention be administered by Dr. Gunn, an assistive technology assessment be done by Cottier, and that someone assess Student for central auditory processing disorder.

If Upland had any duty to fund the requested independent evaluations or file for due process to prove the legal sufficiency of its own assessment(s), that duty began on October 20, 2016.  Student had to challenge any alleged failure by Upland to "fund or file" within two years, by October 20, 2018.  Student's Prior 2018 Case challenging Upland's failure to "fund or file" was filed on October 30, 2018.  Student's complaint on this issue was untimely from the outset.  Student's Second Case, filed in April 2020 pursuant to the May 2019 tolling agreement, could not resuscitate Student's expired claim.

76

Student attempted to plead around the statute of limitations by alleging in her complaint in the Prior 2018 Case, refiled as Student's Second Case, that she "repeatedly requested Independent Educational Evaluations in a number of areas, with her first request being made at the October 2016 IEP." This allegation ignores the other admissions to the contrary in the same complaint, and was disproved by the evidence at hearing. Mother first requested the independent evaluations of administration of the Test of Variables of Attention by Dr. Gunn, assistive technology by Cottier, and central auditory processing on October 20, 2016. The facts of this case prove Student's claim in Issue 5 was untimely filed.

Furthermore, Upland responded to Mother on October 27, 2016, denying Mother's requests because there was no basis in law to support independent evaluations. There was no assessment Upland had conducted within two years prior to October 20, 2016, with which Mother could disagree and have any potential right to independent educational evaluations. Upland's last psychoeducational assessment was conducted before October 2014, more than two years before Mother's "disagreement." And Upland's 2014 triennial assessments did not assess Student's need for assistive technology or evaluate Student for central auditory processing disorder. Based on Mother's requests for assessment in new areas, Upland gave Mother an assessment plan seeking Mother's consent to Upland evaluating Student's need for assistive technology and to determine if Student had central auditory processing disorder.

Additionally, Mother had already disagreed with Upland's 2014 psychoeducational assessment and requested an independent evaluation. By October 6, 2014, Upland had agreed to fund that independent evaluation and entered into a contract with Student's chosen assessor Dr. Markel, and Dr. Markel met with Student to administer evaluation instruments for a neuropsychological evaluation.

Therefore, in the area of psychoeducation, Student had already received the one independent educational evaluation at public expense to which she was entitled in October 2014.  Mother's October 20, 2016 request for Dr. Gunn to administer the Test of Variables of Attention was in the domain of a psychoeducational assessment.  In October 2014 Upland "funded" the independent educational evaluation Mother requested after disagreeing with Upland's psychoeducational assessment and, consequently, Upland had no obligation later to "file" a request for due process hearing to prove the legal adequacy of its own assessment.

Upland had not yet assessed Student's need for assistive technology or to determine if she had central auditory processing disorder.  Upland therefore did not yet have to fund independent evaluations and certainly could not file to obtain a determination of the legal sufficiency of assessments it had not conducted.  (*F.C. v. Montgomery County Public Schools* (D. MD June 27, 2016, No. CV TDC-14-2562) 2016 WL 3570604, at *5 (school district "was not obligated to file a due process to defend a nonexistent evaluation").)  Further, Upland tried to comply with its duty to assess Student in these areas when it was made aware of a possible need for such assessments, but Mother rebuffed Upland's attempts by failing to sign Upland's October 27, 2016 supplemental assessment plan.  (Cf. *M.S. v. Lake Elsinore Unified School District* (9th Cir. 2017) 678 Fed.Appx. 543, 544; school district had no duty to assess because not made aware of facts that reevaluation was required.)

On October 31, 2016, Mother made the same independent educational evaluation requests during the IEP team meeting that she made 11 days earlier.  However, Mother could not revive a right she never had merely by restating her improper request at the IEP team meeting on October 31, 2016, to then bring a claim by October 31, 2018, alleging Upland failed to timely fund the independent evaluations or

file a request for due process hearing to obtain a determination from OAH that its assessments had been legally sufficient.

Beyond Student's claim in Issue 5 being barred by the statute of limitations, Student failed to prove she ever was entitled to independent educational evaluations based on Mother's disagreement with any of Upland's 2014 triennial evaluation assessments beginning on October 20, 2016. Student failed to meet her burden to prove Upland denied her a FAPE by failing to timely respond to Mother's October 31, 2016 request for independent educational evaluations by either funding them or filing to establish Upland's own assessments were appropriate.

## ISSUE 6:  TIMELY ASSESSMENT IN RESPONSE TO PARENT'S OCTOBER 31, 2016 REQUEST FOR ASSESSMENTS

Student contends on October 31, 2016, Mother requested Upland assess Student's "sensory integration praxis, visual motor integration, visual perceptual skills, vision therapy, interactive metronome, and magnocellular needs, assistive technology [*sic*]."  Student alleges Upland failed to assess Student in these areas. Upland contends Mother did not request assessments in these areas on October 31, 2016.  Upland further argues it proposed assessing Student's visual motor integration, visual perceptual skills, and need for assistive technology in its September 30, 2016 triennial evaluation assessment plan and October 27, 2016 supplemental assessment plan, and Mother refused to consent.

As stated above, Student's claim that Upland denied her a FAPE by failing to assess Student in seven specified areas after Mother allegedly requested assessments in those areas on October 31, 2016 is untimely and dismissed.  Student did not state this claim in the Prior 2018 Case, refiled as Student's Second Case, so it was not preserved by

79

the May 2019 tolling agreement.  Student first asserted this claim in the second amended complaint in Student's First Case in May 2020.  Any claim regarding failure to timely assess after Mother's alleged October 31, 2016 request had to be filed within two years of the date of the request, by October 31, 2018.  Student failed to timely file a claim regarding Upland's alleged failure to assess Student in response to Mother's October 31, 2016 request.  Even assuming Issue 6 relates back to the August 13, 2019 original filing date of Student's First Case, this claim is untimely because it was not filed within the two-year statute of limitations, by October 31, 2018.  Therefore, as stated above, Issue 6 is dismissed as outside the statute of limitations and not preserved by the parties' May 2019 tolling agreement.

Additionally, the evidence did not establish that on October 31, 2016, Mother requested, as alleged in Student's second amended complaint in Student's First Case, assessments in "sensory integration praxis, visual motor integration, visual perceptual skills, vision therapy, interactive metronome, and magnocellular needs."  On October 31, 2016, Mother did request an independent evaluation of Student's assistive technology needs by Cottier, duplicative of her first request on October 20, 2016, and Student's claims related to that request are resolved by this Decision in Issue 6.

## ISSUE 7:  PRIOR WRITTEN NOTICE OF UPLAND'S NOVEMBER 18, 2016 DECISION NOT TO PROVIDE STUDENT KURZWEIL AS ASSISTIVE TECHNOLOGY AFTER UPLAND OFFERED IT TO STUDENT IN THE OCTOBER 31, 2016 IEP

As stated above, Student's claim that Upland denied her a FAPE by failing to provide prior written notice of a decision Upland allegedly made on November 18, 2016, not to provide Student Kurzweil 3000 is untimely and dismissed.  Student did not state

this claim in the Prior 2018 Case, refiled as Student's Second Case, so it was not
preserved by the May 2019 tolling agreement.  Student first asserted this claim in the
second amended complaint in Student's First Case in May 2020.  Any challenge to a
decision Upland allegedly made as documented in a letter dated November 18, 2016,
had to be filed within two years of date Mother/Student was aware of the decision, by
November 18, 2018.  Student failed to timely file a claim regarding Upland failing to
provide prior written notice of a decision it allegedly made on November 18, 2016, not
to provide Student Kurzweil 3000.  Even assuming Issue 7 relates back to the
August 13, 2019 original filing date of Student's First Case, this claim is untimely
because it was not filed within the two-year statute of limitations, by
November 18, 2018.  Therefore, as stated above, Issue 7 is dismissed as outside the
statute of limitations and not preserved by the parties' May 2019 tolling agreement.

## ISSUE 8:  UPLAND'S DELAY UNTIL JANUARY 2020 TO FILE A REQUEST FOR DUE PROCESS HEARING TO OBTAIN A DETERMINATION FROM OAH THAT THE OCTOBER 31, 2016 IEP OFFERED STUDENT A FAPE, AFTER PARENT DID NOT CONSENT

As stated above, Student's claim that Upland denied her a FAPE by failing to file
to obtain a determination from OAH that the October 31, 2016 IEP offered Student a
FAPE is untimely and dismissed.  Student did not state this claim in the Prior 2018 Case
refiled as Student's Second Case, so it was not preserved by the May 2019 tolling
agreement.  Student first asserted this claim in the second amended complaint in
Student's First Case in May 2020.  Any challenge to Upland's acts or omissions regarding
the October 31, 2016 IEP had to be filed within two years of the IEP team meeting at
which it was developed, by October 31, 2018.  Student failed to timely file a claim
regarding Upland's failure to file to obtain a determination from OAH that the

81

October 31, 2016 IEP offered Student a FAPE.  Even assuming Issue 8 relates back to the August 13, 2019 original filing date of Student's First Case, this claim is untimely because it was not filed within the two-year statute of limitations, by October 31, 2018. Therefore, as stated above, Issue 8 is dismissed as outside the statute of limitations and not preserved by the parties' May 2019 tolling agreement.

During the June 15, 2020 prehearing conference, Student contended she could not have filed this claim sooner because Upland did not file a request for a due process hearing to obtain a determination from OAH that the October 31, 2016 IEP offered Student a FAPE until January 14, 2020.  But Student's right to complain under Education Code section 56346, subdivision (f), and *I.R. ex rel. E.N. v. L.A. Unified School Dist.* (9th Cir. 2015) 805 F.3d 1164, was not contingent on Upland actually filing a request for a due process hearing.  A student's right to sue under this authority is entirely predicated on the ground that a school district has <u>not</u> filed a request for a due process hearing to obtain authorization to implement a component of an IEP to which a parent does not consent but which the school district determines is necessary to provide the student a FAPE.  If Student sought to assert a denial of FAPE by Upland not filing a request for due process hearing to obtain a determination from OAH that the October 31, 2016 IEP offered Student a FAPE, she was constrained by the same two-year statute of limitations applicable to Upland for any claim it might have brought for a determination from OAH that the October 31, 2016 IEP offered Student a FAPE.

## ISSUE 9:  LACK OF ANNUAL IEP TEAM MEETING BEFORE AUGUST 21, 2017, AND THEREAFTER, TO DEVELOP IEP FOR 2017 2018 SCHOOL YEAR AND 2018 EXTENDED SCHOOL YEAR

Student contends Upland denied her a FAPE by failing to hold an IEP team meeting by and after August 21, 2017, to develop an IEP for the 2017-2018 school year and 2018 extended school year.

Upland contends it made repeated and reasonable efforts to convene an IEP team meeting and Mother rejected all dates and times Upland proposed, and Mother offered unreasonably short notice of her available dates such that Upland could not coordinate and clear the schedules of the many Upland IEP team members to accommodate Mother's requests.

As explained in Issue 17, below, Parents refused to consent to Upland conducting a triennial reassessment before Student's triennial evaluation was due on June 30, 2017. As a result, Student was no longer eligible for special education and related services after June 30, 2017.  Further, Upland was no longer obligated to offer or provide Student a FAPE, to convene IEP team meetings, or otherwise afford Student most rights available to students with disabilities under the IDEA and related state law.  Based on Parents' failure to consent to Upland's proposed triennial evaluation, Student was not entitled to a FAPE from Upland after June 30, 2017, and in the 2017-2018 school year or thereafter.  Parent's failure to consent operated as a complete defense to Student's claims that Upland denied her a FAPE after June 30, 2017, and in the 2017-2018 school year or thereafter.

On this basis alone, Student did not prove Upland denied her a FAPE by failing, before August 21, 2017, and thereafter, to convene an annual IEP team meeting to develop an IEP for the 2017-2018 school year and 2018 extended school year.

Additionally, Student asserted a similar allegation in her January 18, 2018 compliance complaint filed with the California Department of Education.  There, Student asserted Upland failed to comply with IDEA requirements by failing to convene an annual IEP team meeting to review Student's annual progress and goals.  Upland and Mother provided the Department of Education information related to the situation. Upland attempted to convene an IEP team meeting for Student on eight dates.  Mother provided the name of a private school, a grade level, and an expected graduation date for Student to receive a high school diploma.  But even with a declaration Mother provided the Department of Education and a telephone contact between Mother and the Department of Education, Mother did not provide the Department of Education "documentation to substantiate that the student has been, or is currently, enrolled in a curriculum-based private or public school and earning credits toward a certificate or diploma."  The Department of Education concluded the documentation Student provided "did not substantiate whether the student is currently enrolled in a credit earning private school, or any school.  Therefore, the District is not obligated to convene an annual IEP team meeting to review and revise an IEP offer; regardless, the District made sufficient efforts to convene an annual IEP team meeting."  The Department of Education determined Upland was in compliance with the law.

The evidence at hearing reinforced the Department of Education's conclusions. At hearing, Student did not prove that during the 2016-2017 school year, or the 2017-2018 school year, she was working on a curriculum-based program and earning credits toward a high school diploma, or even a certificate of completion.  The evidence

at hearing established that Upland made sufficient efforts to convene an IEP team meeting.  Upland offered eight dates adequately in advance of the proposed dates, between October 12, 2017, and when Upland went on winter break.  Mother rejected all of them.

For these additional reasons, Student did not prove Upland denied her a FAPE by failing, before August 21, 2017, and thereafter, to convene an annual IEP team meeting to develop an IEP for the 2017-2018 school year and 2018 extended school year.

## ISSUE 10:  LACK OF IEP TEAM MEETING BEFORE AUGUST 21, 2017, AND THEREAFTER, TO REVIEW INDEPENDENT ASSESSMENTS BY DR. STEPHEY AND LINDAMOOD-BELL

Student contends Mother gave Upland an evaluation report from optometrist Douglas Stephey on October 12, 2017, and Upland failed to convene an IEP team meeting to review it.  Student also contends Mother gave Upland information about Student from Lindamood-Bell July 21, 2017,and Upland failed to convene an IEP team meeting to review it.

Upland contends it made repeated and reasonable efforts to convene an IEP team meeting and Mother rejected all dates and times Upland proposed.  Upland asserts Mother offered unreasonably short notice of her available dates such that Upland could not coordinate and clear the schedules of the many Upland IEP team members necessary to accommodate Mother's requested meeting dates/times.

On July 21, 2017, during Upland's summer break, Mother sent Upland a copy of a "Learning Ability Evaluation Summary" from Lindamood-Bell, reflecting testing dates in 2013, 2014, 2015, and June 6, 2017.  Evidence at hearing showed various reasons the

information in the document should be viewed with caution.  At the time of "evaluation," in June 2017, Student was one day shy of being 20 years and three months old and Student's test scores in different categories reflected a "mental age" of nine years and zero to three months, 10 years and six months, 11 years and three to six months, and at most, 12 years and six months.  Her grade equivalent scores ranged from 0.5, meaning kindergarten, fourth, fifth, and sixth grades, and a few scores in the eighth grade level.

Mother provided Upland a copy of Dr. Stephey's September 23, 2017 Functional Vision Report on Thursday, October 12, 2017, and asked for an IEP team meeting to be held the following Tuesday.  On October 13, 2017, Upland sent Mother IEP team meeting invitations for two dates later in October, adequately in advance of the proposed dates.  And when Mother rejected those, Upland offered six more dates, adequately in advance of the additional proposed dates, before Upland went on winter break.

As explained in Issue 17, below, Parents refused to consent to Upland conducting a triennial reassessment before Student's triennial evaluation was due on June 30, 2017. As a result, Student was no longer eligible for special education and related services after June 30, 2017.  Upland was no longer obligated to offer or provide Student a FAPE, to convene IEP team meetings, or otherwise afford Student most of the rights available to students with disabilities under the IDEA and related state law.  Based on Parents' failure to consent to Upland's proposed triennial evaluation, Student was not entitled to a FAPE from Upland after June 30, 2017, and in the 2017-2018 school year and thereafter.  Parents' failure to consent operated as a complete defense to Student's claims that Upland denied her a FAPE after June 30, 2017, and in the 2017-2018 school year or thereafter.

Student did not prove Upland denied her a FAPE by failing, before August 21, 2017, and thereafter, to review the information provided by independent assessments by optometrist Dr. Stephey and Lindamood-Bell.  Because Student was no longer eligible for special education and related services, Upland had no responsibility to convene an IEP team meeting to review the Lindamood-Bell information Mother gave Upland in July 2017.  Also, because Student was no longer eligible for special education and related services, Upland had no responsibility to convene an IEP team meeting to review the assessment information from Dr. Stephey that Mother gave Upland in October 2017.

Student asserted an allegation similar to the claim in Issue 10 in her January 18, 2018 compliance complaint filed with the California Department of Education.  There, Student asserted Upland failed to comply with IDEA requirements by failing to convene an IEP team meeting within 30 days of Mother's request to review Dr. Stephey's report.  Upland and Mother provided the Department of Education information related to the situation, consisting of the correspondence between Upland and Mother in which Upland immediately attempted to convene an IEP team meeting for Student and through a series of invitations rejected by Mother, offered an IEP team meeting on eight dates.  The Department of Education concluded the documentation reflected that "the District worked with the parent to find a mutually agreeable date and time, and made sufficient efforts to convene an IEP meeting."  The Department of Education determined Upland was in compliance with the law.

The evidence produced at hearing reinforced the Department of Education conclusions.  The evidence at hearing established that Upland made sufficient efforts to convene a meeting, offering eight dates between October 12, 2017, and when Upland went on winter break, and that Mother rejected all of them.  Upland sent Mother

multiple IEP team meeting invitations that all noted the purpose of the noticed IEP team meeting included "Review of Vision Therapy Assessment."  Therefore, Student's allegation in her second amended complaint in Student's First Case that "District never noticed any IEP team meeting for [Student] to review [Dr. Stephey's] report" was false.

For this additional reason, Upland's adequate attempts to convene an IEP team meeting, Student did not prove Upland denied her a FAPE by failing, before August 21, 2017, and thereafter, to convene an IEP team meeting to review the private assessment from Dr. Stephey and information from Lindamood-Bell.

## ISSUE 11:  COMPLETION OF ASSESSMENTS TO WHICH PARENT PURPORTEDLY CONSENTED ON DECEMBER 13, 2017

Student contends Mother provided Upland consent to assess on December 13, 2017, but Upland did not conduct assessments.

Upland contends Student failed to produce documentary evidence or testimony that any Parent consented to Upland assessing Student on December 13, 2017.

Student alleged in her second amended complaint in Student's First Case:

On or about December 13, 2017, [Student]'s Mother gave a written consent to an assessment plan presented to her by the District.  In her written consent, the parent asked to be given information about any assessment tools not previously given to [Student] so that she might understand what tools were being used.  She indicated she would agree to any assessment tools previously given to [Student] but, that if there were new assessments not given to [Student] before, she required information as to what those were so that she could consider them. . . . [¶]  As of the

date of the filing of this proposed amendment, District has failed to conduct any of the assessments [Student]'s parents agreed to in December 2017.

The evidence did not establish that there was any communication from any Parent on December 13, 2017, regarding consent to Upland assessing Student.  While there was email correspondence between Mother and Upland on December 13, 2017, it all related to attempts to schedule an annual IEP team meeting and to review the private assessment by Dr. Stephey.

Mother sent a letter to Upland exactly one year earlier, dated December 13, 2016, which held some of the content Student's allegations incorrectly attributed to the nonexistent communication on December 13, 2017.  But much of the allegation in Student's second amended complaint was not supported by the evidence even assuming Student meant to refer in her second amended complaint in Student's First Case to the December 13, 2016 correspondence.

On December 13, 2016, Mother did not give written consent to an assessment plan Upland presented her.  Instead, as detailed in Issue 17 below, Mother created her own document by doctoring up an assessment plan Upland presented about completely different areas of evaluation.  Mother pretended to consent to a limited type of assessment Upland had never proposed – exclusively a 30-minute observation at Lindamood-Bell – and then insisted she had consented because she signed something that looked like Upland's form, asserting that what she created was valid and obligated Upland to conduct only an observation of Student without any other component of the mandatory triennial evaluation.  Further, the content Student alleged was in a December 13, 2017 letter in fact was first stated in Mother's letter to Upland on July 21, 2017, not her letter dated December 13, 2016.

89

Student failed to prove Upland denied Student a FAPE by failing to timely complete assessments to which Parent consented on December 13, 2017.

## ISSUE 12:  REQUEST FOR DUE PROCESS HEARING TO OBTAIN OAH AUTHORIZATION TO CONDUCT ASSESSMENTS TO WHICH UPLAND CONTENDED PARENTS DID NOT PROVIDE CONSENT IN DECEMBER 2017

Student contends "it was incumbent upon [Upland] to obtain . . . vital assessments" when it believed Mother had failed or refused to consent to its triennial evaluation.  Student claims Upland should have filed a due process complaint in the 2017-2018 school year to obtain assessments it believed were necessary to offer Student a FAPE.  The second amended complaint in Student's First Case alleged, nonsensically, "District has alleged that [Student's] parent failed to consent to a proposed assessment plan for [Student] in 2017.  Despite that claim, District has only now filed that issue."  Student's claim in this regard is incomprehensible.

Upland contends it was not required by law to file for due process to use the consent override procedures to conduct its proposed assessments.

As stated in Issue 11 above, there was no evidence Mother consented to assessments in December 2017.  Student's issue as pleaded in her second amended complaint in Student's First Case did not specify when in 2017 the purported consent or lack of consent occurred, and Student's Issue 12 was framed to concern December 2017 based on information from and discussion with Student's attorney during the June 15, 2020 prehearing conference.

Student alleges Upland denied her a FAPE by failing to file a due process hearing complaint to override the lack of Parents' consent to assess.  Student's allegation

overlooks three important points, at least two of which she was well-aware of at the time of filing.

First, the law does not require a school district to file a request for due process hearing to override a lack of parental consent to reassess a Student who has previously been found eligible for special education.  Specifically, "[i]f the parent refuses to consent to the reevaluation, the public agency may, but is not required to, pursue reevaluation by using the consent override procedures described in paragraph (a)(3) of this section." (34 C.F.R. § 300.300(c)(1)(ii); see Ed. Code, § 56501, subd. (a)(3) [school district may initiate due process hearing procedures if parent refuses to consent to an assessment.].) Student does not have a claim against Upland for failing to file a request for due process hearing it had no obligation to and was explicitly excused from bringing.

Further, Mother admitted Student was a homeschooled student.  While Upland was not aware of that fact during the time Upland was trying to obtain Mother's consent to the triennial evaluation assessment plan, it is how Student was being educated from the start of the 2016-2017 school year through the date Mother gave Student a high school diploma, August 31, 2019.  In view of Student's actual status as a homeschooled Student, Upland could not use a request for due process hearing to obtain an order authorizing it to reassess Student.  Under title 34 Code of Federal Regulations part 300.300(c)(4)(i), "[i]f a parent of a child who is home schooled or placed in a private school by the parents at their own expense does not provide consent for the initial evaluation or the reevaluation, the public agency may not use the consent override procedures (described in paragraphs (a)(3) and (c)(1) of this section)."  Certainly Student has no claim against Upland for failing to do something it was legally prohibited from doing.

Second, Student's claim ignores that Upland did file a request for due process hearing to obtain authorization to reassess Student under the September 30, 2016 triennial evaluation assessment plan.  On September 8, 2017, Upland filed with OAH Case Number 2017090290, which was later consolidated with a case Student had filed before Upland's case.  Both Student and Upland withdrew their cases on May 1, 2018.

At the time Student stated this issue in Student's First Case, in her original complaint filed August 13, 2019, she was aware of both these reasons, and that Upland could not have denied her a FAPE by allegedly failing to file a request for due process hearing to obtain authorization to assess her.

And third, as detailed in Issue 17, below, Student was no longer eligible for special education and related services after June 30, 2017.  Student's Issue 12, raised in the Student's First Case and constrained by the statute of limitations applicable to the August 13, 2019 filing date, can only seek redress for any alleged failure of Upland to file a request for due process hearing on or after August 13, 2017.  At that time, Student was no longer eligible for special education and related services, and Upland had no obligation to reassess her or to try to obtain Parents' consent or administrative authorization to reassess her.

Student failed to prove Upland denied her a FAPE by failing to file a request for due process hearing to obtain OAH authorization to conduct assessments to which Upland contended Parents did not provide consent in December 2017.

## ISSUE 13:  PRIOR WRITTEN NOTICE IN RESPONSE TO PARENT'S JUNE 6, 2018 REQUEST FOR INDEPENDENT EDUCATIONAL EVALUATION

Student contends Upland denied Student a FAPE by failing to respond to Mother's June 6, 2018 request for independent educational evaluations.  For clarity, factually, on June 6, 2018, Mother only requested "Independent Neuropsychological Assessment by Dr. Timothy Gunn," and no other independent educational evaluations.

Upland contends it had previously responded to Mother's earlier requests for an independent evaluation by Dr. Gunn and was not required to respond again to a parent's letters with a prior written notice after it had already denied the request.

Mother wrote to Upland on June 6, 2018, and once again requested an independent neuropsychological evaluation by Dr. Gunn "because [she] [was] in disagreement with the District's assessments."  Upland had already denied this request by letters in October 2016 and July 2017 and was not obligated to reiterate its position.

Most importantly, Upland had already provided Student an independent neuropsychological evaluation by Dr. Markel in October 2014 after Mother disagreed with Upland's 2014 triennial psychoeducational assessment.

Additionally, for all the reasons Upland had already told Mother she had no right to an independent evaluation at public expense in the letter dated October 27, 2016, Student still did not have any right to an independent educational evaluation at public expense.  At the time of Mother's request on June 6, 2018, Upland had not conducted any assessments within the prior two years with which Mother could disagree.  (*G.J. v. Muscogee County School Dist.* (11th Cir. 2012) 668 F.3d 1258, 1266 ("[T]he statutory provisions for a publicly funded independent educational evaluation never kicked in because no reevaluation ever occurred.  The right to a publicly funded independent educational evaluation does not obtain until there is a reevaluation with which the parents disagree.").)

Upland sent Mother another letter on July 31, 2017, stated to be "District's notice of proposed and/or refused actions pursuant to Title 20 of the United States Code section 1415(b)(3), and Title 34 of the Code of Federal Regulations, section 300.503." That July 31, 2017 prior written notice responded to Mother's July 21, 2017 request for independent neuropsychological evaluation by Dr. Gunn, and Mother's other requests for assessment.

Mother's June 6, 2018 letter requested the independent neuropsychological evaluation by Dr. Gunn, specific test instruments, and areas of assessment cut and pasted from her July 21, 2017 letter to Upland.  On June 25, 2018, Upland replied to Mother's June 6, 2018 repetitive requests for an independent neuropsychological evaluation by Dr. Gunn, specific test instruments, and areas of assessment to which Upland had previously responded on July 31, 2017.  Upland specifically responded to Mother's requests for assessment and again sent Mother the September 30, 2016 triennial evaluation assessment plan and October 27, 2016 supplemental assessment plan for the evaluation areas Mother had requested, and the authorization form for exchange of information with the private school Student attended.  However, Upland did not again specifically respond to Mother's repeated request for an independent neuropsychological evaluation by Dr. Gunn.  It was not required to do so.

Upland did not deny Student a FAPE by failing to provide in its June 25, 2018 correspondence or any later communication a prior written notice regarding Mother's June 6, 2018 request for an independent evaluation by Dr. Gunn. Mother had repeatedly been informed in October 2016 and July 2017 that Upland was denying her request first for an independent administration of the Test of Variables of Attention by Dr. Gunn, then for a full independent neuropsychological evaluation by Dr. Gunn, and the basis for that denial.  No circumstances had changed as, due to Mother's

intransigence in preventing testing, Upland had not conducted any new assessments in the meantime with which Mother could have disagreed.  The lack of a specific response to Mother's June 6, 2018 request for an independent neuropsychological evaluation by Dr. Gunn, with no new intervening change of circumstances, did not significantly impede Mother's opportunity to participate in the decisionmaking process.  Nor did it cause Student a deprivation of educational benefits.  And it did not impede Student's right to a FAPE.

Student failed to prove Upland denied her a FAPE by failing to provide Mother prior written notice in response to Mother's June 6, 2018 request for an independent evaluation by Dr. Gunn.

## ISSUE 14:  PRIOR WRITTEN NOTICE IN RESPONSE TO PARENT'S JULY 26, 2018 REQUEST FOR INDEPENDENT EDUCATIONAL EVALUATIONS

Student contends Upland denied Student a FAPE by failing to respond to Mother's July 26, 2018 request for independent educational evaluations.  For clarity, factually, on July 26, 2018, Mother only requested "Independent Neuropsychological Assessment by Dr. Timothy Gunn," and no other independent educational evaluations.

Upland contends it had previously responded to Mother's earlier requests for an independent evaluation by Dr. Gunn and was not required to respond again to a parent's letters with a prior written notice after it had already denied the request.

Although Mother wrote to Upland on July 26, 2018, and once again requested an independent neuropsychological evaluation by Dr. Gunn "because [she] [was] in disagreement with the District's assessments," for all the reasons stated in Issues 5 and 13, above, Student did not have any right to an independent educational evaluation at public expense.  At the time of Mother's request on July 26, 2018, Upland had not

95

conducted any assessments within the prior two years with which Mother could disagree.  In fact, Mother explicitly acknowledged this in her July 26, 2018 letter, stating for the first time, "I believe [Student] needs a re-evaluation as she has not been assessed by your district since 2014."  And, as stated earlier, Upland had already provided Student an independent neuropsychological evaluation by Dr. Markel in October 2014 after Mother disagreed with Upland's 2014 triennial psychoeducational assessment.

The evidentiary record did not contain any written response from Upland to Mother's July 26, 2018 letter.  However, the content of Mother's letter was nearly identical to the letters she sent on July 21, 2017, and June 6, 2018.  Similarly, Mother had disagreed with Upland's assessments and requested Upland pay for Dr. Gunn to administer the Test of Variables of Attention.  On October 27, 2016, Upland had sent Mother a letter as a prior written notice of its refusal to fund that independent evaluation.  On July 31, 2017, Upland had sent Mother a letter stated to be "District's notice of proposed and/or refused actions pursuant to Title 20 of the United States Code section 1415(b)(3), and Title 34 of the Code of Federal Regulations, section 300.503."  That prior written notice responded to Mother's July 21, 2017 request for independent neuropsychological evaluation by Dr. Gunn, so Upland was not required to send another letter.

Upland did not deny Student a FAPE by failing to provide a prior written notice regarding Mother's July 26, 2018 redundant request for an independent evaluation by Dr. Gunn.  Mother had repeatedly been informed in October 2016 and again in July 2017 that Upland was denying her request first for an independent administration of the Test of Variables of Attention by Dr. Gunn, then for a full independent neuropsychological evaluation by Dr. Gunn, and the basis for those denials.  No circumstances had changed as, due to Mother's intransigence in preventing testing,

Upland had not conducted any new assessments in the meantime with which Mother could have disagreed.  The lack of a specific response to Mother's July 26, 2018 request, with no new intervening change of circumstances, did not significantly impede Mother's opportunity to participate in the decisionmaking process.  Nor did it cause Student a deprivation of educational benefits.  And it did not impede Student's right to a FAPE.

Student failed to prove Upland denied her a FAPE by failing to provide Mother prior written notice in response to Mother's July 26, 2018 request for an independent evaluation by Dr. Gunn.

## ISSUE 15:  TIMELY ASSESSMENT IN RESPONSE TO PARENT'S JULY 26, 2018 REQUEST

Student contends Upland failed to timely assess Student in response to Mother's request for assessment on July 26, 2018, specifically with the Sensory Integration Praxis Test, Visual Motor Integration Test, Test of Visual Perceptual Skills, and a "Vision Therapy Assessment; Interactive Metronome Assessment; [and] Magnocellular Assessment."

Upland contends the September 30 and October 19, 2016 triennial evaluation assessment plan, and the October 27, 2016 supplemental assessment plan, proposed assessing Student in the areas of visual motor integration, visual perceptual skills, and assistive technology.  Additionally, Upland argues sensory integration praxis is not a specific domain of suspected disability to assess, as defined in federal regulation. However, Upland's September 30 and October 19, 2016 triennial evaluation assessment plan included assessment in motor development by an occupational therapist, and sensory processing and integration could be considered as part of that assessment. Upland contends it did not deny Student a FAPE.

97

On July 26, 2018, Mother for the third time asked Upland for "Sensory Integration Praxis Test; Visual Motor Integration Test; Test of Visual Perceptual Skills; Vision Therapy Assessment; Interactive Metronome Assessment; [and] Magnocellular Assessment." Mother made these exact same requests on July 21, 2017, and June 6, 2018. Upland had already responded in writing on July 31, 2017, and June 25, 2018, to these two earlier requests, and by again providing Mother assessment plans for a triennial evaluation and additional assessments Mother requested on October 20, 2016. There was no evidence that Mother ever signed these assessment plans or otherwise consented to these proposed assessments.

Mother stated in her July 26, 2018 letter that she believed Student needed a re-evaluation by Upland. Yet the only reason a triennial re-evaluation had not occurred after 2014 was because Mother had since September 30, 2016, unreasonably refused to consent to Upland conducting a comprehensive reassessment of Student.

Upland did not deny Student a FAPE by failing to timely assess Student in response to Mother's July 26, 2018 request for assessments. On June 25, 2018, Upland gave Mother an assessment plan for a comprehensive triennial evaluation and evaluation of other areas Mother had previously requested, and in the intervening month, Mother had not consented to Upland assessing Student. Until Mother consented to the assessments Upland offered, Upland could not proceed. Mother's repetition of her prior request for the same assessments in these limited areas did not confer a new obligation on Upland to again provide Mother an assessment plan, or to undertake assessments without consent.

Student failed to prove Upland denied her a FAPE by failing to timely assess Student after Mother's July 26, 2018 request for specific test instruments and assessments in specific evaluation areas.

ISSUE 16:  STUDENT'S STATUS AS A PARENTALLY PLACED PRIVATE
SCHOOL STUDENT FOR THE 2017-2018 AND 2018-2019 SCHOOL YEARS
WHO WAS NOT ENTITLED TO A FAPE FROM UPLAND

Upland contends during the 2017-2018 and 2018-2018 school years, Student was
a parentally placed private school student.  It also asserts that Mother, despite her
repeated letters requesting an offer of FAPE, had no interest in or desire for Student to
attend a public school.  Upland argues it therefore was not required to make a FAPE
available to Student during those school years.

Student contends Mother placed Student in private school, the homeschool
program Mother called Resurrection Academy, in disagreement with Upland's
October 31, 2016 IEP and due to the absence of further FAPE offers from Upland during
the 2017-2018 and 2018-2019 school years.  Student asserts Upland had a duty to
provide a FAPE, failed to fulfill its responsibilities, and that Student is entitled to
reimbursement for the private program and services Mother arranged for the 2017-2018
and 2018-2019 school years.

It is noteworthy that since first grade, Mother sent Student to private parochial
school, except a brief attempt at education through a charter school, which was actually
an online program that kept Student at home and away from typical peers.  From 2011
through 2019, Mother's private religious homeschool, Resurrection Academy, prevented
Student from being educated with typical peers, or in fact, with any peers at all.  While
Mother attended the October 31, 2016 IEP team meeting and went to Upland High
twice in spring 2017 to tour the campus, Mother's participation in the IEP team meeting
was similar to that of other parents who have been denied reimbursement for private
placement due to their failure to cooperate with the school district.  (*Patricia P. v. Board*

*of Education of Oak Park* (7th Cir. 2000) 203 F.3d 462, 468-469 ["[P]arents who, because of their failure to cooperate, do not allow a school a reasonable opportunity to evaluate their disabled child, forfeit their claim for reimbursement for a unilateral private placements" (citing *Schoenfeld v. Parkway School Dist.* (8th Cir. 1998) 138 F.3d 379, 382; *Tucker v. Calloway County Board of Education* (6th Cir. 1998) 136 F.3d 495, 503-505; and *Ash v. Lake Oswego School Dist.* (9th Cir. 1992) 980 F.2d 585, 589)]; see *Lazerson v. Capistrano Unified School Dist.* (C.D. Cal. March 25, 2011, No. SACV 09-958 DOC (ANx)) 2011 WL 1212155, **7-8; [Parents' failure to express continued interest in working with the school district to create an IEP for student, along with their failure to cooperate in school district's desire to assess student caused the breakdown in the evaluation process and absolved the school district of any denial of FAPE.].)

   Like the parents in *Ashland School Dist. v. Parents of Student E.H.* (9th Cir. 2009) 587 F.3d 1175, 1183, Mother "participated in the [October 2016] IEP process not to help [Upland] provide [her] child with a FAPE, but merely as a prelude to seeking reimbursement" for the private placement Mother preferred.  Mother's "participation in this process was not genuine, but rather was done solely as a prerequisite to seeking reimbursement."  (*Id.* at p. 1186.)

   Upland pleaded Issues 16, 17, and 18 as claims in the alternative.  Upland seeks a determination that it was not obligated to offer Student a FAPE during the 2017-2018 and 2018-2019 school years for either of two reasons: Student was a parentally placed private school student not entitled to a FAPE from Upland, or Parents' failure to consent to Upland conducting a comprehensive triennial reevaluation resulted

in Student losing eligibility for special education and related services.  Alternatively, if it is not successful on either Issues 16 or 17, Upland seeks a determination that, as alleged in Issue 18, it did in fact afford Student a FAPE during the 2017-2018 and 2018-2019 school years by making available to Student an extension of the October 31, 2016 IEP throughout those two school years.

As stated below in Issue 17, Student was no longer eligible for special education and related services after June 30, 2017 because Parents refused to allow Upland to evaluate Student.  Upland was not obligated to offer or provide Student a FAPE, to convene IEP team meetings, or otherwise afford Student most of the rights available to students with disabilities under the IDEA and related state law.  Therefore, because Upland is determined to have not been liable to Student for a FAPE after June 30, 2017, it is unnecessary to evaluate Upland's claim in the alternative that Student was not entitled to a FAPE during the 2017-2018 and 2018-2019 school years because she was a parentally placed private school student.

## ISSUE 17:  STUDENT'S ENTITLEMENT TO A FAPE FROM UPLAND DURING 2017-2018 AND 2018-2019 SCHOOL YEARS AFTER PARENTS DID NOT CONSENT TO SEPTEMBER 30, 2016, AND OCTOBER 27, 2016 ASSESSMENT PLANS

Upland contends because Parents did not consent to Upland's triennial reevaluation, Upland was not obligated to offer Student a FAPE in the 2017-2018 and 2018-2019 school years.  Upland had an October 24, 2016 supplemental assessment plan document in its own file, which was admitted into evidence.  It was identical to the document dated October 27, 2016, which Upland sent to Mother on October 27, 2016. Upland's complaint referred to the assessment plan for assistive technology and central

auditory processing disorder as the October 24, 2016 assessment plan.  Issue 17 was framed in the June 15, 2020 Order Following Prehearing Conference based on the language in Upland's complaint.  The statement of Issue 17 in the Issues list at the beginning of this Decision, and its phrasing in the Legal Conclusions section, below, align with the June 15, 2020 Order Following Prehearing Conference.  This Decision itself only refers to the document Upland sent Mother, bearing the date October 27, 2016.

Student contends Mother consented to Upland assessing Student using instruments it previously used and to observing Student at Lindamood-Bell, and that was legally sufficient to obligate Upland to assess Student and continue to offer her a FAPE during the 2017-2018 and 2018-2019 school years.

It is well settled that parents who want their children to receive special education services must allow reassessment by the school district, with assessors of its choice. (*Johnson v. Duneland School Corp.* (7th Cir. 1996) 92 F.3d 554, 558 ("Every circuit court to address the issue has held that 34 C.F.R. § 300.534(b) grants schools a right to conduct a three-year reevaluation.  These courts reason that because the school is required to provide the child with an education, it ought to have the right to conduct its own evaluation of the student and the school cannot be forced to rely solely on an independent evaluation conducted at the parents' behest.  *Andress v. Cleveland Independent School District,* 64 F.3d 176 (5th Cir.1995) [(*Andress*)] ('If a student's parents want him to receive special education under IDEA, they must allow the school itself to reevaluate the student and they cannot force the school to rely solely on an independent evaluation.') . . . ; *Gregory K. v. Longview School Dist.,* 811 F.2d 1307, 1315 (9th Cir.1987) ('If the parents want [the student] to receive special education under the Act, they are obliged to permit such testing.'); *Dubois v. Connecticut State Bd. of Educ.,* 727 F.2d 44, 48 (2d Cir.1984) ('[T]he school system may insist on evaluation by qualified

professionals who are satisfactory to the school officials.'); *Vander Malle v. Ambach,* 673 F.2d 49, 53 (2d Cir.1982) (School officials are 'entitled to have [the student] examined by a qualified physician of their choosing.').  We agree with the reasoning of these courts.").)

A student whose parent does not consent to a comprehensive reevaluation at least once every three years loses eligibility for special education and related services upon expiration of the last triennial evaluation.  (*Andress, supra*, 64 F.3d at p. 179 ["A handicapped student must be reevaluated every three years to determine his continuing eligibility for special education under IDEA.  A parent who desires for her child to receive special education must allow the school district to reevaluate the child using its own personnel; there is no exception to this rule.  [The student]'s parents refused to allow the school district to reevaluate him.  Therefore, [the student] was not eligible for special education after March 1988, when his reevaluation was due."].)

It is also well settled that parents may not place conditions on a school district's ability to assess.  Federal courts have held that a parent who insists on placing conditions on assessments may be regarded as having refused consent.  For example, in *G.J. v. Muscogee County School Dist.* (M.D. Ga. 2010) 704 F.Supp.2d 1299, the parents purported to agree to a reassessment.  However, they attached conditions to their approval, including requiring particular assessors, meetings with the parents before and after the assessments, and limitations on the use of the assessments.  The District Court deemed this a refusal to consent, noting, "With such restrictions, Plaintiffs' purported consent is not consent at all."  (*Id.*, 704 F.Supp.2d at p. 1309.)  In affirming, the Eleventh Circuit found the parents' conditions "vitiated any rights the school district had under the IDEA for the reevaluation process . . . ."  (*G.J. v. Muscogee County School Dist.*, *supra*, 668 F.3d at p. 1264.)

Similarly, in *R.A. v. West Contra Costa Unified School Dist.* (N.D. Cal., Aug. 17, 2015, Case No. 14-cv-0931-PJH) 2015 WL 4914795 [nonpub. opn.], affirmed by *R.A. by and through Habash v. West Contra Costa Unified School Dist.* (9th Cir. 2017) 696 Fed.Appx. 171 (*R.A.*)), a parent approved an assessment plan on the modest condition that she be allowed to observe the assessment when conducted.  The District Court found that condition vitiated the mother's consent: "The request to observe the assessment amounted to the imposition of improper conditions or restrictions on the assessments, which the District had no obligation to accept or accommodate."  (*Id.* at *3.)

In *Dubois v. Connecticut State Board of Education* (2d Cir.1984) 727 F.2d 44, 49, fn. 5, the Second Circuit concluded the absence of data in the administrative record to support a finding the student was disabled was "attributable solely to [the parent's] intransigence in preventing testing.  Indeed, despite [the parent's] conclusory assertions that she did not deny permission for evaluation of [the student] and did not refuse to cooperate, her brief on appeal virtually concedes that she prevented testing, by stating that she was merely insisting on a voice in the selection of the evaluators and on convenient scheduling."

The "selection of particular testing or evaluation instruments is left to the discretion of State and local educational authorities."  (*Letter to Anonymous* (OSEP September 17, 1993).)

## SEPTEMBER 2016 AND OCTOBER 19, 2016 ASSESSMENT PLANS

Upland first provided Mother an assessment plan for a comprehensive triennial evaluation on September 30, 2016.  By law, Mother had 15 days to consider the assessment plan and consent.  As of October 19, 2016, Mother had not responded, so

Upland contacted Mother about the assessment plan, authorization for release of information between Upland and the private school Student attended, and the IEP team meeting invitations Upland earlier sent.  Upland included an assessment plan identical to the September 30, 2016 assessment plan, but dated October 19, 2016.

On October 20, 2016, Mother responded in writing stating she was "in disagreement with the district's assessments" and requesting three independent evaluations: the Test of Variables of Attention administered by Dr. Gunn, assistive technology by Cottier, and central auditory processing.  Upland denied Mother's request for independent evaluations on October 27, 2016, and provided an additional assessment plan for two new areas of assessment Mother requested, for evaluation of central auditory processing disorder to be conducted by an audiologist and the need for assistive technology to be conducted by a speech-language pathologist.  On October 27, 2016, Upland provided Mother another copy of the September 30 and October 19, 2016 assessment plan for a triennial evaluation, and a separate assessment plan for the two new areas Mother requested on October 20, 2016.

By the IEP team meeting on October 31, 2016, Mother had not signed consent to the September 30 and October 19, 2016 triennial evaluation assessment plan.  Upland again provided Mother the triennial assessment plan and advised her the triennial evaluation was due by June 30, 2017.  This due date was explicitly noted on the front page of the IEP, and also in the IEP team meeting notes, which were carefully reviewed with and by Mother and her advocate at the IEP team meeting.

During the IEP team meeting, Mother offered to have Upland staff observe Student while she received services at Lindamood-Bell and told Upland to contact Mother to coordinate an observation during the two weeks Student had left at Lindamood-Bell.  On the evening of Thursday, November 10, 2016, Mother emailed

105

Upland to say she had made arrangements at Lindamood-Bell for Upland staff to observe Student at Lindamood-Bell on November 16, 2016 any time between 12:30 and 2:30 p.m., for 30 minutes.  Later that same evening, Upland acknowledged Mother's email and committed to investigate if Upland staff were available on the date and time Mother stated.  On the morning of Monday, November 14, 2016, Upland informed Mother its staff were not available on November 16, 2016, due to other meetings.

On November 18, 2016, Upland wrote Mother responding in writing to requests Mother made during the October 31, 2016 IEP team meeting for three independent evaluations: the Test of Variables of Attention administered by Dr. Gunn, assistive technology by Cottier, and central auditory processing.  Upland summarized the status regarding the triennial evaluation assessment plan and additional assessment plan, that Upland had provided them to Mother before and again at the IEP team meeting and Mother still had not yet consented.  Upland enclosed additional copies of the September 30, 2016 triennial evaluation assessment plan, the October 27, 2016 supplemental assessment plan for the two new areas of evaluation Mother requested, and the authorization for exchange of information form to allow Upland to communicate with the private school Student attended.  Upland requested Mother sign and return the forms so Upland could begin the assessments.

On the evening of Friday, November 18, 2016, Mother emailed Upland to propose Upland staff observe Student at Lindamood-Bell on Wednesday, November 23, 2016, either during one specific 30-minute window in the late morning, or one specific 30-minute window in the early afternoon.  On the afternoon of Monday, November 21, 2016, Upland replied to Mother that Upland was on Thanksgiving break all week.  Upland informed Mother it would conduct an observation after Mother consented to the assessment plan.  Upland requested Mother review the assessment

plans and release of information form as soon as possible, emphasizing that Upland
would "start the assessments, which include observations[,] after you consent to the
assessment plan."

Mother did not consent to Upland assessing Student.  On the evening of
Monday, December 12, 2016, Mother emailed Upland stating she had arranged another
observation opportunity at Lindamood-Bell on Thursday, December 15, 2016, during a
2.25 hour window of time in the middle of the day.  Mother wrote, "I am consenting to
the observation provided that it be used for [Student]'s IEP development."  This
statement was not consent for Upland to assess Student as required for her triennial
evaluation and was ineffective to obligate Upland to proceed with assessing Student.
Nor did Mother's statement obligate Upland to conduct the only part of an assessment
Mother wanted Upland to do, which was to observe Student for 30 minutes while she
was at the Lindamood-Bell center.

On Tuesday, December 13, 2016, Upland replied to Mother and informed her, "as
previously stated, the assessors will complete their observations after you consent to the
assessment plan.  Please review the assessment plans and release of information as
soon as possible.  [Upland] will start the assessments, which include observations[,] after
you consent to the assessment plan."

A half hour later on December 13, 2016, Mother replied to Upland with a letter
"reiterating . . . my consent to a thirty (30) minute observation by district staff
(two maximum so as not to disrupt [Student]'s instruction) at the Lindamood-Bell clinic

107

in Rancho Cucamonga."  She also repeated that she was "consenting to the observation provided that it be used for [Student]'s IEP development.  Please explain how the upcoming information will be used for [Student]'s IEP."  Mother did not sign consent to the assessment plans Upland had explained were required before the observation component of assessment would occur.

Mother's December 13, 2016 letter to Upland asserted the assessment plan Upland repeatedly gave Mother did "not provide [her] with sufficient information to allow [her] to meaningfully participate in the assessment process and make informed decisions about [her] child's assessments."  She pointed to the fact that the document had "vague words such as 'may include but are not limited to.'"

## ASSESSMENT PLAN MOTHER FABRICATED IN DECEMBER 2016

Mother concluded her December 13, 2016 letter by stating, "Attached please find a signed assessment plan."  Mother enclosed with her December 13, 2016 letter an assessment plan she doctored up using the October 27, 2016 assessment plan Upland gave Mother for the additional assessments Mother requested regarding central auditory processing disorder and assistive technology.  Mother covered over the reason Upland stated for the October 27, 2016 assessment plan, "CAPD and AT," with the words "observation at Lindamood-Bell."  Mother covered over the evaluation area Upland stated, "CAPD and AT assessment," with the words "Observation at Lindamood-Bell Rancho Cucamonga clinic, 30 min."  Mother attempted to cover over the "examiner title" Upland had listed, of audiologist and speech-language pathologist, but it was still faintly visible on the copy of the document Mother returned to Upland.  Mother signed "consent" on her fabricated form and dated the document December 13, 2016.  Her document additionally noted "consent as specified in letter Dated 12/13/16," and "District does not have parent consent to disclose any information, including

108

information divulged during the course of an IEP meeting, related to [Student] to third parties, including but not limited to" the West End Special Education Local Plan Area.

In Student's second amended complaint, she falsely alleged Upland's email dated November 21, 2016, contained "[a]nother assessment plan . . . and the parent timely returned that plan."  In fact, Mother concocted a document resembling an Upland assessment plan with a very limited scope and returned it, not the assessment plan Upland gave Mother.  Student further alleged Mother "provided the District with an emailed consent to observations, [and] the parent signed the District's form on December 13th and faxed that document to the District."  This was false.

Student's pretense was discovered during the testimony of Upland's Director of Special Education Anthony Farenga in the due process hearing.  Student's attorney initially denied Mother fabricated the form, but ultimately acknowledged the document was in fact created by Mother in December 2016, and that she made it by covering over and replacing parts of Upland's October 27, 2016 assessment plan for the central auditory processing disorder and assistive technology assessments.

Upland was entitled to conduct a triennial evaluation of Student in all areas of suspected disability, including administering standardized testing in numerous evaluation areas, not limited to one 30-minute observation at a location Mother preferred.  Student's closing argument unpersuasively urges that Mother's self-generated document, carving out one tiny component of the total comprehensive triennial evaluation Upland proposed, constituted consent and obligated Upland, with no other information about Student, to go observe Student not in her actual school program at Resurrection Academy, but at Lindamood-Bell, because that is what Mother wanted.  The totality of the evidence established Upland did not think observing Student at Lindamood-Bell was sufficient, or even important – let alone "the most

important thing" – in order to learn about Student the necessary array of information required by and only available through a comprehensive triennial evaluation.

On March 13 and 20, 2017, Mother met Upland High's Assistant Principal of Curriculum and Instruction Sara Domonoske at Upland High to view the campus and classrooms.  Mother never consented to Upland's offer of placement and services at the October 31, 2016 IEP team meeting or to Upland's triennial evaluation.

## EXPIRATION OF JUNE 30, 2017 TRIENNIAL EVALUATION DUE DATE

Mother wrote to Upland on June 30, 2017, the final day by which Student's triennial evaluation was due.  The letter explicitly stated she did not consent to the October 31, 2016 IEP, and made no mention of the assessments Upland proposed since September 30, 2016.

Mother failed to consent to Upland's September 30 or October 19, and October 27, 2016 assessment plans, or to authorizations for exchange of information provided with the assessment plans.  Upland did not have authority to proceed with assessments it was legally required to conduct by June 30, 2017.

Therefore, Student was no longer eligible for special education and related services after June 30, 2017, when her reevaluation was due.  (*Andress*, *supra*, 64 F.3d at p. 179.)  And, given Mother's failure to permit the Upland to assess Student, Upland no longer had a duty to offer or provide Student a FAPE, to convene IEP team meetings, or otherwise afford Student most of the rights available to Students with disabilities under the IDEA and related state law.  Parents' failure to consent afforded Upland a complete defense to almost any claim Student might raise that Upland denied her a FAPE after June 30, 2017, and in the 2017-2018 school year or thereafter.

These circumstances did not change between July 1 and August 21, 2017, the first day of the 2017-2018 school year.  Upland received Mother's June 30, 2017 letter on July 7, 2017, and replied on July 10, 2017.  Upland provided Mother some information she had requested regarding the SAT scores of Upland students with IEPs, the percentage of Upland students with IEPs who attend college after graduation, and the percentage of Upland students with IEPs who complete the high school course requirements for direct admission to a California State University or University of California campus.  None of this information was actually necessary to Mother's consideration of the October 31, 2016 IEP Upland offered Student.  Upland also responded to a question Mother had about the English Language Arts curriculum Upland was in the process of selecting, which also was not actually necessary to Mother's consideration of the October 31, 2016 IEP.

Upland's July 10, 2017 letter continued to offer to assess Student, although it was no longer legally obligated to based on Mother's failure to allow the triennial evaluation before the June 30, 2017 deadline.  Upland reiterated the evaluation areas it had proposed, including the areas Mother specifically requested.  Upland again provided Mother the September 30 and October 19, 2016 prior written notice form and assessment plan, and an authorization for release of information form so Upland could receive information from the private school.  Upland requested Mother sign and return the plan and form and then Upland would commence the proposed assessments.

## MOTHER'S PURPORTED CONSENT TO ASSESSMENT ON JULY 21, 2017

On July 21, 2017, Mother sent Upland a letter it received on July 24, 2017. Mother stated, "I . . . do consent to have my child assessed for special education. However, the assessment plan you sent me does not provide me with sufficient information to allow me to meaningfully participate in the assessment process and make informed decisions about my child's assessments."

Despite Mother's words, "I do consent," her letter did not constitute valid consent to the evaluations because of the conditions she placed on the assessment. Her letter also asserted that the prior written notice and assessment plan did not give her "a clear picture of the assessment process." She wanted to know "specifics as to the types of tests your district plans to conduct," why there was a social-emotional status assessment proposed because she asserted one had not been done in past assessments, and what health data Upland planned to gather because Mother might already have information she could provide.

Mother stated, "I would consent to any of the tests administered to my child by your district in the past. If you should determine that additional assessments are needed, please inform me in writing. I wish to be informed, prior to the assessments, about the specific tests the district is proposing." Mother then detailed five pieces of information she wanted Upland to provide, which had already been provided by the legally sufficient prior written notice dated October 19, 2016, and the triennial evaluation assessment plan dated September 30 and October 19, 2016, Upland repeatedly gave Mother.

Mother requested that Upland use for four specific assessment instruments, assess in three additional areas of assessment, and asked for an independent neuropsychological assessment by Dr. Gunn "because I am in disagreement with the District's assessments."  She asked for the assessments to be at the district office, and that she be allowed to stay in the same room or in close proximity to Student, supposedly because of Student's "separation anxiety."  She added that Upland had agreed to that in the past.

Curiously, in her second amended complaint in Student's First Case, Student alleged Upland "created a number of assessment plans for evaluation of [Student]. Those plans were consented to by the parent, and signed and returned in December 2016.  As District continued to fail to assess based on those consented-to assessment plan [sic], it repeatedly re-sent the assessment plans to the parent on . . .  July 10, 2017 . . . ; July 31, 2017 . . . ; and August 24, 2017."  Patently, if Mother had in December 2016 signed and returned the assessment plans Upland gave Mother other than the doctored one she created, Mother would not have been writing to Upland in July 2017 complaining that the language of those assessment plans was insufficient and feigning to not have information Upland had repeatedly provided her.

Mother did not sign the triennial evaluation assessment plan, and her July 21, 2017 letter was not consent for Upland to assess pursuant to the plan.  Mother denied she had sufficient information to provide consent, requested information she already had been given but did not like, requested to control the instruments Upland could use in conducting its assessment by limiting them to instruments previously used and requiring further approval from Mother for any different instruments.  She also requested three specific instruments be used, requested three additional areas be evaluated, stated she disagreed with Upland's assessments and wanted an independent

evaluation in the area of neuropsychology by Dr. Gunn.  Significantly, she wanted to be in the room when Upland assessed Student.  Any one of these items alone would negate any consent purportedly given, and collectively, they amounted to a series of conditions that signified Mother did not consent to Upland assessing Student under the triennial evaluation assessment plan.  Any pretense of consent was vitiated by the many controls Mother attempted to impose on the assessment process.

Only July 31, 2017, Upland wrote to Mother denying her requests and conditions related to the triennial evaluation assessment plan.  Upland informed Mother it had the right and the obligation to assess Student as it deemed appropriate and Upland assessors would use their professional discretion to select test instruments to ensure the assessments were accurate and comprehensive.  Upland explained a student's performance on one test might lead to the need for another test instrument.  Upland gave Mother the specific citation to the Education Code regarding the absence of a requirement that a school district specify the test instruments it will use, and federal court and administrative decisions stating non-district personnel are not allowed to dictate what instruments a district must use or not use when conducting an assessment. Upland told Mother that although she stated in her letter that she consented to Upland's assessments, "the demands and conditions you place on the assessments operate as a rejection of the assessment plans."  Upland again gave Mother the triennial evaluation assessment plan and the assessment plan for the assistive technology and central auditory processing disorder assessments Mother requested in October 2016 and asked her to sign and return them so Upland could start the assessments.

On August 8, 2017, Mother wrote Upland and again said she did consent to Upland assessing Student, disputing Upland's assertion that she imposed terms and conditions on the evaluation.  Mother stated she was "simply seeking additional

114

information as the assessment plan you sent me does not provide me with sufficient information to allow me to meaningfully participate in the assessment process and make informed decisions about my child's assessments."  She repeated all her demands from the July 21, 2017 letter.  In other words, Mother believed she lacked adequate information to consent, and did not consent.  Mother disagreed she was imposing specific assessment conditions, but repeated her request to stay in the room during the assessment or in near proximity.  And she did not sign the assessment plans, the release of information form, or write in her letter a statement that fairly could be understood as unqualified consent for Upland to assess Student.  Mother did not consent before the start of the 2017-2018 school year.

## UPLAND ATTEMPTED TO RESPOND TO MOTHER'S CONCERNS

On August 24, 2017, Upland wrote to Mother responding to her comments and requests.  Upland stated it would administer formal assessment instruments at the district office, but also needed to conduct observations of Student in a setting or settings where she received instruction and would therefore need to do the observation portion of Student's assessment outside the district office.  Upland informed Mother it would allow each assessor to determine whether Mother could be in the room or knowingly nearby.  Each assessor would determine whether other individuals being present or nearby could affect the validity of his or her assessments.  Upland's position was not unreasonable, because its experience during the 2014 triennial evaluation showed that Mother might use her presence in the room to disrupt the administration of an instrument, prevent Upland from obtaining data required to complete the assessment tool, or deprive Upland of comprehensive data, or prevent Upland from properly scoring data by complying with the procedures published by the producer of such assessments, the same as the normed sample.

115

Upland provided Mother a list of 33 individually named test instruments it might, but was not required to, use.  Upland noted the list was not exhaustive and assessors could determine, during the course of the evaluation, that other assessments were necessary.  Upland stated it also planned to review records and conduct interviews and observations.

Upland told Mother it proposed the triennial evaluation to obtain necessary current information related to Student's educational needs to ensure Upland offered her a FAPE.  Upland responded to other questions Mother had posed, despite sufficient information having already been – repeatedly – provided.  Upland reminded Mother it had not assessed Student since "April 2014" and had not had the opportunity to work with her because she was privately placed since first grade.  Upland explained it had assessed Student's social-emotional status during the 2014 triennial evaluation, and also Mother had raised concerns about Student's anxiety, self-advocacy skills, and peer relationships, necessitating evaluation in that area.  Upland stated in the area of health data, it planned to gather Student's medical history, current health status, and vision and hearing testing results.  Upland welcomed any health data Mother was willing to provide Upland.  Upland denied Mother's request to be notified in advance of any additional assessment tools assessors deemed necessary.  Upland reiterated state law and federal and administrative decisions that did not require Upland to provide that information and additionally explained that because Upland would have only 60 days to complete its triennial evaluation after Mother consented, it would not be practical or efficient to require each assessor to request separate consent any time one decided another test instrument was needed that had not been previously conducted or identified.

116

The evidence established that Upland reiterated that Mother's demands and conditions on the assessments operated as a rejection of the assessment plans. Although Mother had stated that she "would consent" to any test instruments Upland used in the past, Upland did not propose only using test instruments it had administered before.  If Mother's statement was consent, rather than a hypothetical proposal of what she would do, that consent was to something different than what Upland proposed.  Mother's statement did not constitute consent to Upland's triennial evaluation assessment plan or the October 27, 2016 supplemental assessment plan.

Upland again sent Mother the triennial evaluation assessment plan and supplemental assessment plan dated October 27, 2016.  Upland requested Mother sign consent and return the plans.  Mother did not consent.

At hearing, Student argued Mother never used the words "demand" or "insist," making her conditions for consent requirements, claiming she had therefore consented to Upland assessing Student.  The absence of magic words does not change the effect of Mother's correspondence regarding Upland's assessment plans.  Mother did not provide full, unrestricted consent.  Even in in her second amended complaint in Student's First Case, Student alleged, "if there were new assessments not given to [Student] before, [Mother] required information as to what those were so that she could consider them."  (Emphasis added.)  Mother never consented to Upland's assessment plans, either on the assessment plan forms themselves or in other written communication.  Mother repeatedly wrote to Upland about the assessments and

demanded to be provided information to which she was not entitled and wanted Upland to agree to her being in the assessment room or right outside before she would consent.  Whether Mother's conduct is characterized as a failure to consent or a refusal to allow Upland to conduct a mandatory triennial evaluation, the legal consequence was the same.  Upland did not have authority to proceed with the assessments it proposed.

Mother and Upland corresponded after August 24, 2017, about many other things, but the evidence did not contain additional communication about the triennial reassessment to which Mother failed to consent.

On September 8, 2017, Upland filed a request for due process hearing to obtain an order authorizing Upland to assess Student without parental consent, in Case Number 2017090290.  Upland's case was consolidated with an earlier due process hearing request Student had filed, and both parties withdrew their cases on May 1, 2018.  The evidence did not reflect that either Parent consented to Upland assessing Student after Upland's September 8, 2017 due process hearing request.

## MOTHER'S JUNE 6, 2018 REQUEST FOR ASSESSMENT

Consistent with Mother's opinion that her qualified and conditional consent was adequate, Mother wrote to Upland on Wednesday, June 6, 2018, offering to "make [Student] available for assessments" the following Monday, Wednesday, and Friday for two hours each day, 11:30 a.m. to 1:00 p.m. the first day, 11:00 a.m. to 1:00 p.m. the second day, and 1:00 p.m. to 3:00 p.m. the third day.  However, she also repeated what she first stated in her July 21, 2017 letter, that she "continue[d] to consent to any of the tests administered to my child by your district in the past.  If you should determine that additional assessments are needed, please inform me in writing.  I wish to be informed, prior to the assessments, about the specific tests the district is proposing."  She

repeated additional requests and conditions from the July 21, 2017 letter, to which Upland had already thoroughly responded.  She also never signed the assessment plans Upland gave her.  This offer was not genuine and insufficient to constitute Mother's consent to a comprehensive triennial evaluation of Student.

On June 25, 2018, Upland wrote to Mother acknowledging Mother's continued conditional, qualified, consent to assessments and reiterating that Mother did not have the right to place conditions on the evaluation process.  Upland stated it was ready, willing, and able to assess Student as soon as it received Mother's unconditional consent.  Upland again gave Mother the assessment plans and forms to authorize release of information with the private school.

Mother replied on Thursday, July 26, 2018, denying that her consent was "conditional" but repeating that the assessment plan form did not provide her sufficient information and she was "simply seeking additional information to allow [her] to meaningfully participate in the assessment process and make informed decisions about [her] child's assessments."  She denied dictating testing instruments to the district, despite her written list of specific instruments she wanted Upland to use.  And she stated she "remain[ed] open to any proposal the district would wish to make.  I am simply requesting to be informed."  She repeated the same language from her prior letters about consenting to tests Upland administered in the past and asking for a written response to specific questions Upland had repeatedly answered in writing.

Mother again stated she was "making [Student] available for assessments" the following Monday, Wednesday, and Friday, again for two hours each day, but with two different two-hour windows as options for Upland on both Monday and Friday. However, Mother did not provide the necessary unqualified consent to assess, either on the assessment plan form(s) or in a letter.

119

Mother wrote to Upland again on May 14, 2019, near the end of the
2018-2019 school year, stating again her "consent to a thirty (30) minute observation by
district staff (two maximum so as not to disrupt [Student]'s instruction) at the
Lindamood-Bell clinic in Upland."  However, Student was actually no longer receiving
services from Lindamood-Bell as of 2017.  Mother also "reiterate[d] [her] consent for
assessments and previous requests for Independent Evaluations."  The "reiteration" was
not a new, full, unconditional consent to the triennial evaluation Upland had proposed
three years earlier, and repeatedly since then.  Mother's letter was a reference to and
carried with it all the prior caveats, limitations, and requirements Mother had previously
stated, which vitiated any purported consent.

In sum, Student's eligibility for special education and related services expired on
June 30, 2017, because Mother did not consent to Upland's triennial reassessment by
that date.  Mother continued to deny Upland the ability to assess Student after
June 30, 2017, despite her letters purporting to consent but at the same time voicing
objections, and demanding conditions and controls.  Under well-settled law, all of
Mother's letters amounted to a lack of consent.  (*R.A., supra*, 2015 WL 4914795 at *3
["The request to observe the assessment amounted to the imposition of improper
conditions or restrictions on the assessments, which the District had no obligation to
accept or accommodate."].)  Mother's lack of consent to assess further relieved Upland
of its obligation to offer or provide Student a FAPE, convene IEP team meetings for
Student, or treat Student as eligible for special education and related services at any
time after June 30, 2017.  (*Andress, supra*, 64 F.3d  at p. 179; *Gregory K. v. Longview
School Dist., supra*, 811 F.2d 1307, 1315.)

Upland proved Parents refused to consent to the September 30, 2016 triennial assessment plan, as repeatedly presented to Parents on many dates both before and after Student's triennial evaluation was due.  Despite repeated opportunities in 2016, 2017, and 2018, as well as in 2019, Mother did not provide the requisite consent. Student therefore lost her eligibility for special education and related services under the IDEA and state law after June 30, 2017.  Student was not entitled to a FAPE from Upland during the 2017-2018 and 2018-2019 school years.

## ISSUE 18:  ADEQUACY AND AVAILABILITY OF OCTOBER 31, 2016 IEP IN 2017-2018 AND 2018-2019 SCHOOL YEARS THROUGH FINAL DATE OF STUDENT'S POTENTIAL ELIGIBILITY FOR SPECIAL EDUCATION AND RELATED SERVICES

Upland contends that in the event Upland was legally obligated to make a FAPE available to Student during the 2017-2018 and 2018-2019 school years, it did so through the ongoing availability of the appropriate offer stated in the October 31, 2016 IEP.

Student contends Mother had consented to Upland's triennial evaluation, and that Mother only kept Student in private school because the October 31, 2016 IEP did not offer Student a FAPE, and Upland was required to continue to make annual offers of FAPE to Student.

As stated above in Issue 17, Student was no longer eligible for special education and related services after June 30, 2017.  Upland was not obligated to offer or provide Student a FAPE, to convene IEP team meetings, or otherwise afford Student most of the rights available to students with disabilities under the IDEA and related state law. Therefore, because Upland is determined to have not been liable to Student for a FAPE after June 30, 2017, it is unnecessary to determine whether the October 31, 2016 IEP constituted a FAPE, and if continued to be available to Student after June 30, 2017.

## CONCLUSIONS AND PREVAILING PARTY

As required by California Education Code section 56507, subdivision (d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided.

Issue 1:  Upland did not significantly impede Parent's opportunity to participate in the educational decisionmaking process by failing to explain to Parent why Upland wanted to do additional assessments under an October 19, 2016 assessment plan after having conducted a triennial reassessment in 2015.  Upland prevailed on Issue 1.

Issue 2:  Student's claim that Upland denied Student a FAPE by failing to provide Parent prior written notice in response to Parent's October 19, 2016 request for independent educational evaluations was dismissed as outside the statute of limitations. Upland prevailed on Issue 2.

Issue 3:  Students' claims that Upland denied Student a FAPE in the October 31, 2016 IEP by:

b.      Failing to include present levels of performance in all areas of unique need;

c.      Failing to develop appropriate goals based on present levels of performance;

e.      Failing to place Student in the appropriate grade level; and

g.      Failing to develop an appropriate post-secondary transition plan

were dismissed as outside the statute of limitations.  Upland prevailed on Issues 3b, 3c, 3e, and 3g.

Upland did not deny Student a FAPE in the October 31, 2016 IEP by:

a.      Failing to consider areas of need in which Student had not been assessed, specifically post-secondary transition, central auditory processing, attention, and the need for assistive technology;

d.      Significantly impeding Parent's opportunity to participate in the educational decisionmaking process by failing to discuss or consider private services Student was receiving from Lindamood Bell, tutoring, and speech therapy; and

f.      Failing to offer appropriate placement, the least restrictive environment, for the 2016-2017 regular school year and 2017 extended school year.

Upland prevailed on Issues 3a, 3d, and 3f.

Issue 4:  Student's claim that Upland denied Student a FAPE by failing to provide Parent prior written notice in response to Parent's October 31, 2016 request for independent educational evaluations was dismissed as outside the statute of limitations. Upland prevailed on Issue 4.

Issue 5:  Upland did not deny Student a FAPE by failing to timely respond to Parent's October 31, 2016 request for independent educational evaluations, either by funding them or filing to establish Upland's own assessments were appropriate, in the areas of:

123

a.      Neuropsychology;

b.      Assistive technology; and

c.      Central auditory processing.

Upland prevailed on Issue 5.

Issue 6:  Student's claim that Upland denied Student a FAPE by failing to timely assess Student, after Parent's October 31, 2016 request, in all areas of suspected disability, specifically:

a.      Sensory integration praxis;

b.      Visual motor integration;

c.      Visual perceptual skills;

d.      Magnocellular needs;

e.      The need for vision therapy;

f.      The need for an interactive metronome; and

g.      The need for assistive technology

was dismissed as outside the statute of limitations.  Upland prevailed on Issue 6.

Issue 7:  Student's claim that Upland denied Student a FAPE by failing to provide Parent legally compliant prior written notice of Upland's November 18, 2016 decision not to provide Student Kurzweil as assistive technology after Upland offered it to Student in the October 31, 2016 IEP was dismissed as outside the statute of limitations. Upland prevailed on Issue 7.

Issue 8:  Student's claim that Upland denied Student a FAPE by failing until January 2020 to file a request for a due process hearing to obtain a determination from

124

OAH that the October 31, 2016 IEP offered Student a FAPE, after Parent did not consent

was dismissed as outside the statute of limitations.  Upland prevailed on Issue 8.

Issue 9:  Upland did not deny Student a FAPE by failing, before August 21, 2017,

and thereafter, to convene an annual meeting to develop an IEP for the 2017-2018

school year and 2018 extended school year.  Upland prevailed on Issue 9.

Issue 10:  Upland did not deny Student a FAPE by failing to convene an IEP team

meeting before August 21, 2017, and thereafter, to review independent assessments by

Dr. Stephey and Lindamood-Bell.  Upland prevailed on Issue 10.

Issue 11:  Upland did not deny Student a FAPE by failing to timely complete

assessments to which Parent consented on December 13, 2017.  Upland prevailed on

Issue 11.

Issue 12:  Upland did not deny Student a FAPE by failing to file a request for a

due process hearing to obtain OAH authorization to conduct assessments to which

Upland contended Parents did not provide consent in December 2017.  Upland

prevailed on Issue 12.

Issue 13:  Upland did not deny Student a FAPE by failing to provide Parent prior

written notice in response to Parent's June 6, 2018 request for independent educational

evaluations.  Upland prevailed on Issue 13.

Issue 14:  Upland did not deny Student a FAPE by failing to provide Parent prior

written notice in response to Parent's July 26, 2018 request for independent educational

evaluations.  Upland prevailed on Issue 14.

Issue 15:  Upland did not deny Student a FAPE by failing to timely assess Student,

after Parent's July 26, 2018 request, in all areas of suspected disability, specifically:

125

a.      Sensory integration praxis;

b.      Visual motor integration;

c.      Visual perceptual skills;

d.      Magnocellular needs;

e.      The need for vision therapy;

f.      The need for an interactive metronome; and

g.      The need for assistive technology.

Upland prevailed on Issue 15.

Issue 16:  Upland's claim that Student was a parentally placed private school student for the 2017-2018 and 2018-2019 school years and, therefore, not entitled to a FAPE from Upland, was not decided as the outcome of Issue 17 determined the legal question.  Neither Student nor Upland prevailed on Issue 16.

Issue 17:  Student was not entitled to a FAPE from Upland during the 2017-2018 and 2018 2019 school years after Parents refused to consent to the September 30, 2016, and October 24, 2016 assessment plans.  Upland prevailed on Issue 17.

Issue 18:  Upland's claim that if Upland was obligated to have an IEP in place for Student during the 2017-2018 and 2018-2019 school years, the October 31, 2016 IEP constituted a FAPE, and continued to be in effect/available to Student through the final date of Student's eligibility for special education and related services, was not decided as the outcome of Issue 17 determined the legal question.  Neither Student nor Upland prevailed on Issue 18.

126

ORDER

1. All Student's requests for relief are denied.

2. Student was not eligible for special education and related services after
   June 30, 2017, and was not entitled to a FAPE from Upland thereafter.

RIGHT TO APPEAL THIS DECISION

This is a final administrative decision, and all parties are bound by it.  Pursuant to
Education Code section 56505, subdivision (k), any party may appeal this Decision to a
court of competent jurisdiction within 90 days of receipt.

*Kara Hatfield*

Kara Hatfield

Administrative Law Judge

Office of Administrative Hearings

Exhibit 3

1 | FAGEN FRIEDMAN & FULFROST, LLP
Christopher J. Fernandes, SBN 204844
2 | cfernandes@f3law.com
Joshua M. Walden, SBN 325296
3 | jwalden@f3law.com
1525 Faraday Avenue, Suite 300
4 | Carlsbad, California 92008
Phone: 760-304-6000
5 | Fax: 760-304-6011

6 | Attorneys for Upland Unified School District

7

8 | **BEFORE THE STATE OF CALIFORNIA**

9 | **OFFICE OF ADMINISTRATIVE HEARINGS**

10

11 | SARAH LOOF,

12 |        Petitioner,

13 |     vs.

14 | UPLAND UNIFIED SCHOOL DISTRICT,

15 |        Respondent.

16

17

CASE NO. 2020090375

**UPLAND UNIFIED SCHOOL DISTRICT'S MOTION REQUESTING JUDICIAL NOTICE AND APPLICATION OF COLLATERAL ESTOPPEL**

**Due Process Hearing:**
Date:     January 12, 13 and 14, 2021
Time:     9:30 a.m.
Place:   *Via* Video Conferencing

18 | I.    **INTRODUCTION**

19 |       The Upland Unified School District ("District") respectfully requests that the California

20 | Office of Administrative Hearings ("OAH") take judicial notice of the prior OAH case involving

21 | Student and the District, *Student v. Upland Unified School District*, OAH Case Nos. 2019080542,

22 | 2020040245, and 2020010465.  Additionally, the District respectfully requests that OAH apply the

23 | doctrine of collateral estoppel to the factual and legal conclusions in the prior OAH decision,

24 | *Student v. Upland Unified School District,* OAH Case Nos. 2019080542, 2020040245, and

25 | 2020010465, particularly OAH's determination that Student was not eligible for special education

26 | and related services after June 30, 2017, and was not entitled to a FAPE from the District

27 | thereafter.  The District respectfully requests that OAH apply the doctrine of collateral estoppel so

28 | that the parties do not need to relitigate the factual and legal conclusions in that case.

1

OAH Case No. 2020090375

UPLAND UNIFIED SCHOOL DISTRICT'S MOTION REQUESTING JUDICIAL NOTICE AND APPLICATION OF COLLATERAL ESTOPPEL

Fagen Friedman & Fulfrost, LLP
1525 Faraday Avenue, Suite 300
Carlsbad, California 92008
Main 760-304-6000 • Fax 760-304-6011

## II.   PROCEDURAL BACKGROUND

Student is a 23-year-old female who previously qualified for special education and related services under the primary eligibility category of specific learning disability and the secondary eligibility category of speech language impairment.

On August 25, 26, and 27, September 1, 2, 3, 15, 17, 22, 24 and 25, the parties participated in a video conference due process hearing before OAH regarding Student's issues as follows:[1]

1.   Whether the District significantly impeded Parent's opportunity to participate in the educational decision-making process by failing to explain to Parent why the District wanted to do additional assessments under an October 19, 2016 assessment plan after having conducted a triennial reassessment in 2015;

2.   Whether the District denied Student a free, appropriate public education ("FAPE") by failing to provide Parent with a prior written notice in response to Parent's October 19, 2016 request for independent educational evaluations ("IEEs");

3.   Whether the District denied Student a FAPE in the October 31, 2016 IEP by:

   a.   Failing to consider areas of need in which Student had not been assessed, specifically post-secondary transition, central auditory processing, attention, and the need for assistive technology;

   b.   Failing to include present levels of performance in all areas of unique need;

   c.   Failing to develop appropriate goals based on present levels of performance;

   d.   Significantly impeding Parent's opportunity to participate in the educational decision making process by failing to discuss or consider private services Student was receiving from Lindamood-Bell, tutoring, and speech therapy;

   e.   Failing to place Student in the appropriate grade level;

   f.   Failing to offer appropriate placement, the least restrictive environment, for the 2016-2017 regular school year and the 2017 extended school year; and

   g.   Failing to develop an appropriate post-secondary transition plan.

4.   Whether the District denied Student a FAPE by failing to provide Parent with a prior written notice in response to her October 31, 2016 request for IEEs;

5.   Whether the District denied Student a FAPE by failing to timely respond to Parent's October 31, 2016 request for IEEs, either by funding them or filing to establish the District's own assessments were appropriate, in the areas of:

   a.   Neuropsychology;

---

[1] The following hearing days were dark: September 16 and 23, 2020.

Fagen Friedman & Fulfrost, LLP
1525 Faraday Avenue, Suite 300
Carlsbad, California 92008
Main 760-304-6000 • Fax 760-304-6011

**Fagen Friedman & Fulfrost, LLP**
1525 Faraday Avenue, Suite 300
Carlsbad, California 92008
Main 760-304-6000 • Fax 760-304-6011

b.      Assistive technology; and

c.      Central auditory processing.

6.      Whether the District denied Student a FAPE by failing to timely assess Student, after Parent's October 31, 2016 request, in all areas of suspected disability, specifically:

a.      Sensory integration praxis;

b.      Visual motor integration;

c.      Visual perceptual skills;

d.      Magnocellular needs;

e.      The need for vision therapy;

f.      The need for an interactive metronome; and

g.      The need for assistive technology.

7.      Whether the District denied Student a FAPE by failing to provide Parent a legally compliance prior written notice of District's November 18, 2016 decision not to provide Student with Kurzweil 3000 as assistive technology after the District offered it to Student in the October 31, 2016 IEP;

8.      Whether the District denied Student a FAPE by failing until January 2020 to file a request for a due process hearing to obtain a determination from OAH that the October 31, 2016 IEP offered Student a FAPE after Parent did not consent;

9.      Whether the District denied Student a FAPE by failing before August 21, 2017, and thereafter, to convene an annual IEP meeting to develop an IEP for the 2017-2018 regular school year and 2018 extended school year;

10.     Whether the District denied Student a FAPE by failing to convene an IEP meeting before August 21, 2017, and thereafter, to review independent assessments by Dr. Stephey and Lindamood-Bell;

11.     Whether the District denied Student a FAPE by failing to timely complete assessments to which Parent consented on December 13, 2017;

12.     Whether the District denied Student a FAPE by failing to file a request for a due process hearing to obtain OAH authorization to conduct assessments to which the District contended Parents did not provide consent in December 2017;

13.     Whether the District denied Student a FAPE by failing to provide Parent a prior written notice in response to Parent's June 6, 2018 request for IEEs;

14.     Whether the District denied Student a FAPE by failing to provide Parent a prior written notice in response to Parent's July 26, 2018 request for IEEs;

15.     Whether the District denied Student a FAPE by failing to timely assess Student, after Parent's July 26, 2018 request, in all areas of suspected disability, specifically:

3                                    Case No. 2020090375

a.   Sensory integration praxis;

b.   Visual motor integration;

c.   Visual perceptual skills;

d.   Magnocellular needs;

e.   The need for vision therapy;

f.   The need for an interactive metronome; and

g.   The need for assistive technology.

In addition, the parties participated in a video conference due process hearing before OAH regarding District's issues as follows:

16.   Whether Student was a parentally placed private school student for the 2017-2018 and 2018-2019 school years and, therefore, was not entitled to a FAPE from the District;

17.   Whether Student was entitled to a FAPE from the District during the 2017-2018 and 2018-2019 school years after Parents refused to consent to the September 30 and October 24, 2016 assessment plans; and

18.   If the District was obligated to have an IEP in place for Student during the 2017-2018 and 2018-2019 school years, whether the October 31, 2016 IEP constituted a FAPE and continued to be in effect/available to Student through the final date of Student's eligibility for special education and related services.

On September 11, 2020, Student filed a request for a due process hearing ("Complaint") with OAH.  OAH designated the case as OAH Case No. 2020090375.

Student raised the following issues against the District:

1.   Whether the District denied Student a FAPE failing to timely convene an annual IEP meeting for the 2018-2019 school year and the 2019 extended school year;

2.   Whether the District denied Student a FAPE by failing to have an annual IEP and offer of FAPE in place for Student for the 2018-2019 school year and for the 2019 extended school year;

3.   Whether the District denied Student a FAPE by failing to timely fund or file pursuant to 34 C.F.R. § 300.502 in response to Parent's request for IEEs

4.   Whether the District denied Student a FAPE by failing to timely file a due process complaint during the 2018-2019 school year when it believed that Parents failed to consent to the proposed assessment plan;

Fagen Friedman & Fulfrost, LLP

1525 Faraday Avenue, Suite 300
Carlsbad, California 92008
Main 760-304-6000 • Fax 760-304-6011

UPLAND UNIFIED SCHOOL DISTRICT'S MOTION REQUESTING JUDICIAL NOTICE AND APPLICATION OF COLLATERAL ESTOPPEL

**Fagen Friedman & Fulfrost, LLP**
1525 Faraday Avenue, Suite 300
Carlsbad, California 92008
Main 760-304-6000 • Fax 760-304-6011

6.    Whether the District denied Student a FAPE by failing to convene an IEP meeting within 30 days of Parent request;[2]

7.    Whether the District denied Student a FAPE by failing to allow Parent meaningful participation in the IEP process when it failed to provide her with the District's written offer of FAPE and IEP for the 2018-2019 school year;

8.    Whether the District denied Student a FAPE by failing to offer and/or provide appropriate transition assessment and services by:

a.    Failing to develop appropriate, measurable, post-secondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills; and

b.    Failing to offer transition services to assist Student in reaching post-secondary goals, vocational education goals, integrated employment goals (including supported employment), continuing and adult education, adult services, independent living, and community participation;

9.    Whether the District's denial of a FAPE for Student resulted in denials of her rights under Section 504 of the Rehabilitation Act ("Section 504"), the Americans with Disabilities Act ("ADA"), California Government Code § 11135, the California Civil Code §§ 54 and 54.1, and the Unruh Act;[3] and

10.   Whether the District denied Student a FAPE by failing to conduct assessments requested by Parents and convene an IEP meeting within 60 days of Parents' request.

As proposed resolutions, Student requested that OAH find that:

1.    The District failed to timely complete the 2018-2019 annual IEP for Student;

2.    The District failed to timely make an offer of FAPE to Student for the 2018-2019 school year and 2019 extended school year;

3.    Student is entitled to compensatory education in the form of Lindamood-Bell services or a non-public agency;

4.    Student is entitled to independent educational evaluations at the District's expense in the areas of transition, assistive technology, central auditory processing, vision therapy, and neuropsychology and any other identified areas of need;

---

[2] The Complaint contained issues # 1 through 4 and 6 through 10, as numbered in the Complaint. (Complaint, pp. 23-25.)  However, it appears that the Complaint was missing an issue # 5.

[3] On September 21, 2020, in the District's response to Student's Complaint, the District respectfully requested that Student withdraw issue # 9, as numbered above, in the Complaint because OAH did not have jurisdiction to adjudicate claims raised under the above-referenced statutes.  (*See* 20 U.S.C. § 1415(b)(9); 34 C.F.R. § 300.507; Educ. Code § 56501(a).)  Further, OAH has previously dismissed an identical issue in *Student v. Upland Unified School District,* OAH Case Nos. 2019080542, 2020040245, and 2020010465.  (*Student v. Upland Unified School District* (OAH 2020), Order Granting Motion to Dismiss Issue for Lack of Jurisdiction.)  The District respectfully requests that OAH dismiss Student's issue # 9.

**Fagen Friedman & Fulfrost, LLP**
1525 Faraday Avenue, Suite 300
Carlsbad, California 92008
Main 760-304-6000 • Fax 760-304-6011

5. The administrative law judge provide whatever remedies are appropriate.

In the Complaint, Student referenced the requests, dated June 6 and July 26, 2018, for an IEE in the area of neuropsychology by Dr. Timothy Gunn. The Complaint did not reference any other requests for IEEs during the 2018-2019 school year.

On October 20, 2020, OAH issued a Supplement to the September 15, 2020 Scheduling Order Regarding the Prehearing Conference Statements and Prehearing Conference. In the Supplement, OAH ordered the parties to "include any relevant information and the party's opinion about the issue of the dates for the due process hearing in this case in relation to the pending Decision in the consolidated matters for the other OAH cases between the parties, OAH Case Numbers 2019080542/2020040245/2020010465."

On October 21, 2020, the District filed a motion to continue the due process hearing, in part, because of the pending decision in OAH Case Nos. 2019080542, 2020040245, and 2020010465 and the outcome of which might impact the availability of claims or defenses in the present matter. Later that day, OAH granted the motion to continue the due process hearing and continued the due process hearing for January 12, 13, and 14, 2021. (Order Granting Request for Continuance and Setting Prehearing Conference and Due Process Hearing.)

On November 24, 2020, OAH issued a decision in OAH Case Nos. 2019080542, 2020040245, and 2020010465. OAH found that the District prevailed on each issue heard and decided with the exception for issues # 16 and 18, as numbered above, for which neither Student nor the District prevailed. (*Student v. Upland Unified Sch. Dist.* (OAH 2020) Case Nos. 2019080542, 2020040245, and 2020010465.) Specifically, OAH determined that the District prevailed, in relevant part, on the following issues:

5. Issue # 5: The District did not deny Student a FAPE by failing to timely respond to Parent's October 31, 2016 request for IEEs, either by funding them or filing to establish the District's own assessments were appropriate, in the areas of:

   a. Neuropsychology;

   b. Assistive technology; and

   c. Central auditory processing.

12.   Issue # 12: The District did not deny Student a FAPE by failing to file a request for a due process hearing to obtain OAH authorization to conduct assessments to which the District contended Parents did not provide consent in December 2017;

13.   Issue # 13: The District did not deny Student a FAPE by failing to provide Parent prior written notice in response to Parent's June 6, 2018 request for IEEs;

14.   Issue # 14: The District did not deny Student a FAPE by failing to provide Parent prior written notice in response to Parent's July 26, 2018 request for IEEs; and

17.   Issue # 17: Student was not entitled to a FAPE from the District during the 2017-2018 and *2018-2019 school years* after Parents refused to consent to the September 30, 2016 and October 24, 2016 assessment plans.  (Emphasis added.)

OAH denied all of Student's requests for relief and determined that Student was not eligible for special education and related services after June 30, 2017, and was not entitled to a FAPE from the District thereafter.  (*Id.*)

In the decision, OAH determined that, "[i]n October 2016[,] [the District] 'funded' the [IEE] Mother requested after disagreeing with [the District's] psychoeducational assessment and, consequently, [the District] had no obligation later to 'file' a request for due process hearing to prove the legal adequacy of its own assessment."  (*Id.*)

With regard to the June 6, 2018 request for an IEE, OAH determined the following:

Mother wrote to [the District] on June 6, 2018, and once again requested an independent neuropsychological evaluation by Dr. Gunn "because [she] [was] in disagreement with the District's assessments." [The District] had already denied this request by letters in October 2016 and July 2017 and was not obligated to reiterate its position.

Most importantly, [the District] had already provided Student an independent neuropsychological evaluation by Dr. Markel in October 2014 after Mother disagreed with [the District's] 2014 triennial psychoeducational assessment.

Additionally, for all the [the District] had already told Mother she had no right to an independent evaluation at public expense in the letter dated October 27, 2016, *Student did not have any right to an [IEE] at public expense*.  At the time of Mother's request on June 6, 2018, [the District] had not conducted any assessments within the prior two years with which Mother could disagree.  (*Id.* (Emphasis added.))

With regard to the July 26, 2018 request for an IEE, OAH determined the following:

Although Mother wrote to [the District] on July 26, 2018, and once again requested an independent neuropsychological evaluation by Dr. Gunn "because [she] [was] in disagreement with the District's assessments," . . . *Student did not have any right to an [IEE] at public expense*.  At the time of Mother's request on July 26, 2018, [the District had not conducted any assessments within the prior two years with which

7

Case No. 2020090375

UPLAND UNIFIED SCHOOL DISTRICT'S MOTION REQUESTING JUDICIAL NOTICE AND APPLICATION OF COLLATERAL ESTOPPEL

Fagen Friedman & Fulfrost, LLP
1525 Faraday Avenue, Suite 300
Carlsbad, California 92008
Main 760-304-6000 • Fax 760-304-6011

**Fagen Friedman & Fulfrost, LLP**
1525 Faraday Avenue, Suite 300
Carlsbad, California 92008
Main 760-304-6000 • Fax 760-304-6011

1

2

Mother could disagree.  In fact, Mother explicitly acknowledged this in her July 26, 2018 letter, stating for the first time, "I believe [Student] needs a re-evaluation as she has not been assessed by your district since 2014."  And, as stated earlier, [the District] had already provided Student an independent neuropsychological evaluation by Dr. Markel in October 2014 after Mother disagreed with [the District's] triennial psychoeducational assessment.  (*Id.* (Emphasis added).)

3

4

5

6

On December 15, 2020, the District filed the instant motion requesting judicial notice and the application of collateral estoppel ("Motion").

7

## III.  LEGAL ARGUMENT

8

9

10

11

12

13

Judicial notice of the November 24, 2020 OAH decision in *Student v. Upland Unified School District,* OAH Case Nos. 2019080542, 2020040245, and 2020010465 is warranted and appropriate.  As explained below, many of the factual findings and legal conclusions in the November 24, 2020 OAH decision remain applicable to Student's current issues, and "must act as a starting point for the case at hand." (*See Capistrano Unified Sch. Dist.* (OAH 2019) 119 LRP 32339.)

14

15

16

17

18

19

20

In addition, the factual determinations and legal conclusions that OAH made in the November 24, 2020 OAH decision are subject to collateral estoppel.  Student should not be able to relitigate whether she was eligible for special education and related services after June 30, 2017, and was entitled to a FAPE from the District thereafter.  Student had the opportunity to do so through the due process hearing in OAH Case Nos. 2019080542, 2020040245, and 2020010465, but, as OAH found, the District prevailed on that issue.  Moreover, the parties should not be required to relitigate the facts that served as the basis of the November 24, 2020 OAH decision.

21

22

### A.    Judicial Notice of the November 24, 2020 OAH Decision Is Warranted and Appropriate.

23

24

25

26

OAH may take official notice of its decisions and orders under Evidence Code section 452, subdivision (d) and (h).[4]  A court may take judicial notice of official acts of the judicial departments of any state and records of any court of any state.  (Evid. Code §§ 452 (c), (d).)  Evidence Code, section 452, subdivision (h) allows the taking of judicial notice of "[f]acts and

27

28

[4] Judicial notice is also called official notice when taken by an administrative tribunal.  (*See* Gov. Code § 11515.)

8

Case No. 2020090375

1   propositions that are not reasonably subject to dispute and are capable of immediate and accurate

2   determination by resort to sources of reasonably indisputable accuracy." (*See Tahoe Truckee*

3   *Unif. Sch. Dist.* (OAH 2019) 119 LRP 7806.)

4          OAH decisions are a matter of public record, are not reasonably subject to dispute, and are

5   capable of immediate and accurate determination by resort to sources of reasonably indisputable

6   accuracy. (*See e.g.,* https://www.dgs.ca.gov/OAH/Case-Types/Special-

7   Education/Services/Decisions; https://dgscloud.box.com/s/05yxfqlaa08743v0kic30pmvzphsys2i.)

8          OAH routinely grants requests for judicial notice of prior OAH decisions involving the

9   same parties and has taken notice of findings of fact made within those prior OAH decisions. (*Id.*;

10   *see also Chaffey Joint Union High Sch. Dist.* (OAH 2020) Order Granting Motion to Take Judicial

11   Notice and Apply Collateral Estoppel, OAH Case No. 2020010595; *Antioch Unified Sch. Dist.*

12   (OAH 2018) Order Granting Motion for Official Notice and Granting In Part and Denying In Part

13   Motion to Dismiss, OAH Case No. 2018050914; *Santa Rita Union Elementary Sch. Dist.* (OAH

14   2013) 113 LRP 23314; *San Dieguito Union High Sch. Dist.* (OAH 2013) 113 LRP 43077.)

15          The District requests that OAH take judicial notice of the November 24, 2020 OAH

16   decision involving Student and the District. A true and correct copy of the OAH Decision, dated

17   November 24, 2020, *Student v. Upland Unified Sch. Dist.* (OAH 2020) Case Nos. 2019080542,

18   2020040245, and 2020010465, is attached to this motion. (*See* Ex. 1.) The November 24, 2020

19   OAH decision involves the same parties as the instant matter. (Ex. 1.) As outlined in more detail

20   below, the November 24, 2020 OAH decision is relevant to the legal arguments presented in the

21   instant motion requesting application of collateral estoppel. It is also relevant to the issues in

22   Student's Complaint and the District's defenses at hearing.

23          For example, Student raises issues in the instant complaint that are a continuation of the

24   previous contentions between the parties. (*See* Complaint.) Student's own complaint references

25   events occurring during the 2016-2017, 2017-2018, and 2018-2019 school years, all of which

26   OAH addressed in its November 24, 2020 OAH decision. (*See e.g.,* Complaint, pp. 7-23.)

27   / / /

28   / / /

Fagen Friedman & Fulfrost, LLP
1525 Faraday Avenue, Suite 300
Carlsbad, California 92008
Main 760-304-6000 • Fax 760-304-6011

**B.** **The Doctrine of Collateral Estoppel Applies to the Factual Determinations and Legal Conclusions in the November 24, 2020 OAH Decision.**

The doctrine of collateral estoppel bars Student from relitigating all of the issues in the Complaint.  Under the doctrine of collateral estoppel, or issue preclusion, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude re-litigating the issue on a different cause of action involving a party to the first case.  (*See Capistrano Unified Sch. Dist.* (OAH 2019) 119 LRP 32339, citing *Lucido v. Superior Court* (1990) 51 Cal. 3d 335, 341 and *Migra v. Warren City Sch. Dist. Bd. of Ed.* (1984) 465 U.S. 75, 77.)  The collateral estoppel doctrine is "grounded on the premise that 'once an issue has been resolved in a prior proceeding, there is no further fact-finding function to be performed.'"  (*Smith v. Harrington, et al.* (N.D. Cal. 2015) 65 IDELR 95, *citing Murray v. Alaska Airlines, Inc.* (2010) 50 Cal. 4th 860, 864, *quoting Parklane Hosiery Co. v. Shore* (1979) 439, U.S. 322, 336.)  The doctrine serves many purposes, including relieving parties of the cost and vexation of multiple lawsuits, conserving judicial resources, and, by preventing inconsistent decisions, encouraging reliance on adjudication.  (*Allen v. McCurry* (1980) 449 U.S. 90, 94; *see* 7 Witkin, Cal. Procedure (4th ed. 1997) Judgments § 280 *et seq.*)

The doctrine of collateral estoppel applies to determinations made in administrative settings.  (*See Pacific Lumber Co. v. State Resources Control Bd.* (2006) 37 Cal.4th 921, 944, *citing People v. Sims* (1982) 32 Cal. 3d 468, 479; *Hollywood Circle, Inc. v. Department of Alcoholic Beverage Control* (1961) 55 Cal. 2d 728, 732.)  The United States Supreme Court has held that "collateral estoppel may be applied to decisions made by administrative agencies '[when] an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate."  (*United States v. Utah Constr. Co.* (1966) 384 U.S. 394, 422.)  Likewise, OAH has made clear that the doctrine of collateral estoppel applies to special education due process hearings in California.  (*See e.g., Alta Loma School District* (OAH 2020), Order Granting and Denying in Parts Alta Loma School District's Motion to Dismiss Issues, OAH Case No. 2019091099; *Capistrano Unified Sch. Dist.* (OAH 2019), *supra*; *Panama-Buena Vista Unified Sch. Dist.* (2015) 115 LRP 55025; *Santa Rita*

Fagen Friedman & Fulfrost, LLP
1525 Faraday Avenue, Suite 300
Carlsbad, California 92008
Main 760-304-6000 • Fax 760-304-6011

Case No. 2020090375

UPLAND UNIFIED SCHOOL DISTRICT'S MOTION REQUESTING JUDICIAL NOTICE AND APPLICATION OF COLLATERAL ESTOPPEL

**Fagen Friedman & Fulfrost, LLP**
1525 Faraday Avenue, Suite 300
Carlsbad, California 92008
Main 760-304-6000 • Fax 760-304-6011

1   *Union Elem. Sch. District* (2013) 113 LRP 23314; *Los Angeles Unified Sch. Dist.* (2007) 107 LRP

2   57039.)

3       Collateral estoppel prevents parties from disputing factual determinations from prior OAH

4   decisions. (*See Cupertino Union Sch. Dist.,* (OAH 2012) Case No. 2012020850, *quoting, A.B. v.*

5   *Clarke County School Dist.* (M.D.Ga., June 8, 2009, No. 3:08–CV–86 (CDL)) 2009 WL 1606544,

6   p. 8.) Parties are also precluded from relitigating issues already heard and decided in previous due

7   process proceedings. (*Capistrano Unified Sch. Dist.,supra,* p. 81.)

8       In California, the following five threshold requirements must be satisfied for collateral

9   estoppel (or issue preclusion) to apply:

10      1.   The issue to be precluded must be identical to that decided in the prior proceeding;

11      2.   The issue must have been actually litigated at that time;

12      3.   The issue must have been necessarily decided;

13      4.   The decision in the prior proceeding must be final and on the merits; and

14      5.   The party against whom preclusion is sought must be in privity with the party to the
             former proceeding.

15

16   (*Id.*; *People v. Garcia* (2006) 39 Cal. 4th 1070; *Garden Grove Unified Sch. Dist.* (OAH 2012) 112

17   LRP 41919.) Further, OAH has previously determined that parents are precluded from litigating

18   issues that are a continuance of any issues which they already litigated at a prior due process

19   hearing. (*See Capistrano Unified Sch. Dist., supra.*)

20      Here, all of the requirements for collateral estoppel apply with regard to Student's

21   Complaint. Consequently, Student's Complaint is barred by the doctrine of collateral estoppel.

22   First, in the Complaint, Student raised substantively identical issues to the issues decided by OAH

23   in the November 24, 2020 OAH decision. Thus, the issues to be precluded are substantively

24   identical and are a continuation of the issues that OAH decided in the November 24, 2020 OAH

25   decision.

26      OAH has previously determined that the defenses decided in a prior decision can preclude

27   consideration of those issues again in a subsequent matter. (*Garden Grove Unified Sch. Dist.*

28   (OAH 2012) 112 LRP 41919.) In *Garden Grove Unified School District* (OAH 2012), *supra,* the

11

**Fagen Friedman & Fulfrost, LLP**
1525 Faraday Avenue, Suite 300
Carlsbad, California 92008
Main 760-304-6000 • Fax 760-304-6011

1    student alleged, among other things, that the school district failed to have "appropriate

2    credentialed staff" at the June 18, 2009 IEP meeting.  The school district contended that it

3    attempted to have the staff from the Reading and Language Center at the IEP meetings, but was

4    thwarted by the staff's conduct.  OAH determined that the district's defense regarding the Reading

5    and Language Center's unreasonable conduct has already been litigated and decided in a prior

6    OAH decision.  In determining that the school district's defense had already been ruled valid,

7    OAH determined that there was no need to make any new factual findings on this issue, stating

8    that "[a]ny new Factual Findings in this regard would defeat the policies behind collateral

9    estoppel, by raising the specter of inconsistent judicial findings and would force the [d]istrict to

10   relitigate an issue that was already decided."

11          Here, OAH has already determined that the District prevailed on its issue regarding

12   whether Student was entitled to a FAPE from District during the 2017-2018 and 2018-2019 school

13   years after Parents refused to consent to the September 30 and October 24, 2016 assessment plans.

14   (Ex. 1.)  OAH denied all of Student's requests for relief and determined that Student was not

15   eligible for special education and related services after June 30, 2017, and was not entitled to a

16   FAPE from the District thereafter.  (*Id.*)  Similar to *Garden Grove Unified School District, supra,*

17   OAH already determined that the District prevailed on its issue, which served as a defense to all

18   Student's claims with regard to the 2017-2018 and 2018-2019 school years.  Any new factual

19   findings in a subsequent due process hearing would raise "the specter of inconsistent judicial

20   findings and would force the District relitigate an issue that was already decided."  (*Id.*)  Further,

21   applying collateral estoppel would conserve judicial resources to relitigate the issues in the

22   November 24, 2020 OAH decision, and, by preventing inconsistent decisions, encourage reliance

23   on OAH's adjudication.

24          The administrative law judge in OAH Case Nos. Case Nos. 2019080542, 2020040245, and

25   2020010465 reviewed extensive evidence and testimony regarding Parent's lack of consent to the

26   District's proposed assessments.  (Ex. 1.)  Based on that evidence and testimony, the

27   administrative law judge determined that Student was not eligible for special education and related

28   services after June 30, 2017, and was not entitled to a FAPE from the District thereafter.  (*Id.*)

**Fagen Friedman & Fulfrost, LLP**
1525 Faraday Avenue, Suite 300
Carlsbad, California 92008
Main 760-304-6000 • Fax 760-304-6011

1  Student should not be able to relitigate whether she was entitled to a FAPE during the 2018-19

2  school year.  The parties should not have to put on evidence and testimony of all of the facts that

3  served as the basis for the November 24, 2020 OAH decision.  OAH already heard testimony,

4  received documentary evidence, and made factual and legal determinations related to the 2018-

5  2018 school year in the November 24, 2020 OAH decision.  Student should not have a second

6  opportunity to relitigate those facts and legal conclusions, which, at the administrative level, took

7  multiple days of evidence and testimony.

8         Further, OAH has already ruled on the District's defense to Student's third issue in the

9  Complaint.  In the November 24, 2020 OAH decision, OAH determined that, "[i]n October

10  2016[,] [the District] 'funded' the [IEE] Mother requested after disagreeing with [the District's]

11  psychoeducational assessment and, consequently, [the District] had no obligation later to 'file' a

12  request for due process hearing to prove the legal adequacy of its own assessment."  (Ex. 1.)  In

13  the Complaint, Student alleged that the District denied Student a FAPE by failing to timely fund or

14  file pursuant to 34 C.F.R. § 300.502 in response to Parent's request for IEEs.  As noted above,

15  OAH already issued findings related to that issue in the November 24, 2020 OAH decision.

16  Consequently, Student's issue # 3, as numbered above, is precluded because OAH determined that

17  the District had no obligation to file a request for a due process hearing.

18         Additionally, the second threshold of collateral estoppel of whether the issue to be

19  precluded was actually litigated and third requirement that the issue must have been necessarily

20  decided are also met here.  OAH rendered a final decision in its November 24, 2020 OAH

21  decision.  The November 24, 2020 OAH decision reflects that the parties actually and fully

22  litigated the issue of whether Student was entitled to a FAPE from the District during the 2017-

23  2018 and 2018-2019 school years after Parents refused to consent to the September 30 and

24  October 24, 2016 assessment plans.  In the November 24, 2020 OAH decision, OAH determined

25  that the District prevailed on that issue.  Further, OAH determined that Student was not entitled to

26  a FAPE from the District "after June 30, 2017, and in the 2017-2018 school year or thereafter,"

27  because "Parent's failure to consent operated as a complete defense to Student's claims that [the

28  District] denied her a FAPE after June 30, 2017, and in the 2017-[20]18 school year or thereafter."

UPLAND UNIFIED SCHOOL DISTRICT'S MOTION REQUESTING JUDICIAL NOTICE AND
APPLICATION OF COLLATERAL ESTOPPEL

Fagen Friedman & Fulfrost, LLP
1525 Faraday Avenue, Suite 300
Carlsbad, California 92008
Main 760-304-6000 • Fax 760-304-6011

1 (Ex. 1.)  Since Student's issues to be precluded were actually litigated before OAH and were

2 necessarily decided in the November 24, 2020 OAH decision, Student is precluded from

3 relitigating claims related to the 2018-2019 school year in the Complaint.

4        The fourth threshold requirement of collateral estoppel is that the decision in the prior

5 proceeding must be final and on the merits.  (*Id.*)  Here, the November 24, 2020 OAH decision is

6 final and binding on all parties.  (*See* Educ. Code § 56505.)  Pursuant to the November 24, 4040

7 OAH decision, OAH already determined that Student was not entitled to a FAPE from the District

8 after June 30, 2017, and in the 2017-2018 and 2018-2019 school years because Parents failed to

9 consent to the September 30 and October 24, 2016 assessment plans.  The factual determinations

10 and legal conclusions necessary to that decision are subject to collateral estoppel in the instant

11 matter barring Student from raising factual or legal contentions related to the 2018-2019 school

12 year in the Complaint.

13        The fifth threshold requirement of collateral estoppel is that the party against whom

14 preclusion is sought must be in privity with the party to the former proceeding.  (*People v. Garcia*

15 (2006) 39 Cal. 4th 1070.)  That requirement is met here.  Specifically, the District and Student are

16 the same parties in the November 24, 2020 OAH Decision and in the Complaint.

17        Consequently, the requirements of collateral estoppel have been met as they relate to

18 Student's Complaint.  Therefore, Student is collaterally estopped from relitigating the issues in his

19 Complaint.  Accordingly, the District respectfully requests that OAH dismiss Student's Complaint

20 with prejudice.

21 / / /

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

Case No. 2020090375

UPLAND UNIFIED SCHOOL DISTRICT'S MOTION REQUESTING JUDICIAL NOTICE AND
APPLICATION OF COLLATERAL ESTOPPEL

IV.     **CONCLUSION**

Based on the foregoing, the District respectfully requests that OAH take judicial notice of the November 24, 2020 OAH decision.  Additionally, the District respectfully requests that OAH apply the doctrine of collateral estoppel to the extent that Student's Complaint contests factual and legal determinations already decided in *Student v. Upland Unified Sch. Dist.* (OAH 2020) Case Nos. 2019080542, 2020040245, and 2020010465 and raises contentions related to whether that Student was entitled to a FAPE from the District after June 30, 2017, and in the 2017-2018 and 2018-19 school years.  Accordingly, the District respectfully requests that OAH dismiss Student's Complaint with prejudice.

DATED:  December 15, 2020                    FAGEN FRIEDMAN & FULFROST, LLP


By: _____
Christopher J. Fernandes
Joshua M. Walden
Attorneys for Upland Unified School District

368-346/6014784.1

**Fagen Friedman & Fulfrost, LLP**
1525 Faraday Avenue, Suite 300
Carlsbad, California 92008
Main 760-304-6000 • Fax 760-304-6011

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF SAN DIEGO**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Diego, State of California.  My business address is 1525 Faraday Avenue, Suite 300, Carlsbad, CA 92008.

On December 15, 2020, I served true copies of the foregoing document described as **UPLAND UNIFIED SCHOOL DISTRICT'S MOTION REQUESTING JUDICIAL NOTICE AND APPLICATION OF COLLATERAL ESTOPPEL** on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

☐   **BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with Fagen Friedman & Fulfrost, LLP's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.  I am a resident or employed in the county where the mailing occurred.  The envelope was placed in the mail at Carlsbad, California.

☐   **BY FAX TRANSMISSION:**  I faxed a copy of the document(s) to the persons at the fax numbers listed in the Service List.  The telephone number of the sending facsimile machine was 760-304-6011.  No error was reported by the fax machine that I used.  A record of the fax transmission was properly issued by the sending fax machine.

☒   **BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address dgutierrez@f3law.com to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐   **BY OVERNIGHT DELIVERY:**  I enclosed said document(s) in an envelope or package provided by the overnight service carrier and addressed to the persons at the addresses listed in the Service List.  I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight service carrier or delivered such document(s) to a courier or driver authorized by the overnight service carrier to receive documents.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on December 15, 2020, at Carlsbad, California.

Doris Gutierrez

**Fagen Friedman & Fulfrost, LLP**
1525 Faraday Avenue, Suite 300
Carlsbad, California 92008
Main: 760-304-6000 • Fax: 760-304-6011

**SERVICE LIST**

OFFICE OF ADMINISTRATIVE HEARINGS          Via Secure File Transfer
SPECIAL EDUCATION DIVISION
2349 Gateway Oaks Drive, Suite 200
Sacramento, CA  95833
916-263-0880
916-376-6319 Fax

Rene and Rita Loof                                      Via Email
2324 W. Orange Drive
Upland, CA  91784

Email: rml93@verizon.net

368-309/4799439.1

Fagen Friedman & Fulfrost, LLP
1525 Faraday Avenue, Suite 300
Carlsbad, California 92008
Main: 760-304-6000 • Fax: 760-304-6011

Exhibit 4

BEFORE THE STATE OF CALIFORNIA

OFFICE OF ADMINISTRATIVE HEARINGS

| | | |
|---|---|---|
| STUDENT, | ) | Case No. 2020090375 |
| | ) | |
| Petitioner, | ) | STUDENT'S OPPOSITION |
| | ) | TO DISTRICT'S |
| v. | ) | APPLICATION FOR |
| | ) | |
| UPLAND UNIFIED SCHOOL DISTRICT, | ) | COLLATERAL ESTOPPEL |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |
| | ) | |

_____

## Introduction

Student opposes District's Motion for Collateral Estoppel because it does not meet the requirements that must be satisfied in order for collateral estoppel (or issue preclusion) to apply. Namely:

(1) The issues raised by Student in OAH Case No. 2020090375 (present case) are not identical to those in *Student v. Upland Unified School District,* OAH Case Nos. 2019080542, 2020040245, and 2020010465 (prior case)

(2) The issues raised by Student in the present case have not been litigated

(3) The issues raised by Student in the present case have not been necessarily decided and

(4) The decision rendered in the prior proceeding is not final as it is appealable and Student has until February 22, 2021 to appeal the prior decision.

According to the District's Motion (Dist. Mot. Page 11 lines 8-15) "In California, the following five threshold requirements must be satisfied for collateral estoppel (or issue preclusion) to apply:

1. The issue to be precluded must be identical to that decided in the prior proceeding;

2. The issue must have been actually litigated at that time;

3. The issue must have been necessarily decided;

4. The decision in the prior proceeding must be final and on the merits; and

5. The party against whom preclusion is sought must be in privity with the party to the former proceeding."

For the reasons stated below, Student requests that OAH deny the District's Motion because granting said Motion would deprive Student of her rights to Due Process as related to the 2018-2019 school year.

The issues raised by Student in OAH Case No. 2020090375 are not identical to those in *Student v. Upland Unified School District,* OAH Case Nos. 2019080542, 2020040245, and 2020010465

The District takes the position that issues related to the 2018-2019 school year in the present case are identical to those in the prior case. However, Student raised no issue related to the 2018-2019 school year in the prior case. In the prior case, the district raised the following issues:

Issue # 16. Whether Student was a parentally placed private school student for the 2017-2018 and 2018-2019 school years and, therefore, was not entitled to a FAPE from the District;

Issue # 17. Whether Student was entitled to a FAPE from the District during the 2017-2018 and 2018-2019 school years after Parents refused to consent to the September 30 and October 24, 2016 assessment plans; and

Issue # 18. If the District was obligated to have an IEP in place for Student during the 2017-2018 and 2018-2019 school years, whether the October 31, 2016 IEP constituted a FAPE and continued to be in effect/available to Student through the final date of Student's eligibility for special education and related services.

In OAH No. 2020090375 Student raised the following issues:

Issue No. 1—Failure to timely convene an annual IEP meeting for the 2018-2019 school year and Extended School Year.

Issue No. 2—Failure to have an annual FAPE offer in place for the 18-19 school year and Extended School Year.

Issue No. 3—Failure to timely fund or file pursuant to 34 C.F.R. 300.502 for the Independent Evaluation Request by parent.

Issue No. 4-- Whether the District failed to timely file a due process hearing complaint in 2018-19 when it believed the parent allegedly failed to consent to the proposed assessment plan for Sarah.

Issue No.6—Failure to convene an IEP meeting within 30 days of parent request.

Issue No. 7-- Failure to allow parent meaningful participation in the IEP process when it failed to

provide to her District's written offer of FAPE and IEP for the 2018-19 school Year.

Issue No. 8—Failure to offer and/or provide appropriate Transition Assessments and Services.

    a) Failure to develop appropriate, measurable, post-secondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills.

    b) Failure to offer transition services to assist Sarah in reaching post-secondary goals, vocational education goals, integrated employment goals (including supported employment), continuing and adult education, adult services, independent living, and community participation.

Issue No. 9-- Whether the District's denial of FAPE for Sarah resulted in denials of her rights under Section 504, ADA, California Government Code § 11135, the California Civil Code §§ 54 and 54.1, and the Unruh Act.

Issue No. 10— Whether the District failed to conduct assessments requested by parents and convene an IEP meeting within 60 days of parent request.

As it is evident by a simple side by side comparison of the issues raised by District in the prior case and those raised by Student in the present case; the issues are not "identical" with respect to the 2018-

2019 school year.  The District's Motion seems to hinge on the premise that its last and only offer of October 31, 2016, constituted an everlasting offer of a Free Appropriate Public Education (FAPE) which lasted into the 2018-2019 school year.  Student's issues in the present case are exclusively related to the 2018-2019 school year.  None of the issues raised by Student in the prior case were related to the 2018-2019 school year.  Assuming that the issues in the prior case are the same as those raised in the present case would yield an absurd result and establish a new OAH precedent.  If OAH were to grant the District's Motion it would essentially be saying that the actions of a Parent in 2016 somehow preclude a Student from raising any issues related to the District's actions or lack thereof, two years later.

District's Issue #17 in the prior case, involved Parents consent "to the September 30 and October 24, 2016 assessment plans" which is different from Student's issues in the present case as they are separate and distinct from the 2016 assessment plans.  The district also conflates the issue of whether or not the 2016 IEP constituted a FAPE with the duty of the district to conduct assessments and make an offer of FAPE.  The latter was not raised by Student in the prior case as it relates to the 2018-2019 school year.

The facts and circumstances surrounding these issues in 2018-2019 were quite different.  As an example, whereas the District issued assessment plans to Student in 2016, there were never any assessment plans whatsoever issued in 2018-2019.  The ALJ's decision did not analyze whether or not the District provided an assessment plan to Student in 2018-2019. Additionally, Student's eligibility for special education services was not at issue, Student did not graduate from high school

until the age of 22.  District's issues focused on Student being a privately placed and did not provide any evidence that Student was found to be ineligible as an individual with a disability.

District argues that Student raised "substantively identical" issues to the issues decided by OAH in the November 24, 2020 OAH decision. But the standard in the law is that the issues have to be "identical" not merely "substantively identical".  The District is making up a new legal standard in its Motion. Clearly Student's issues are not "identical".  Furthermore, the District takes a position that the issues in the prior case are a "continuation of the issues that OAH decided in the November 24, 2020".  This would mean that events that took place during a certain school year would be etched in stone, depriving students on due process rights in subsequent years and in perpetuity.

### Issues Not Litigated

The District's Motion seems to hinge on the premise that its last and only offer of October 31, 2016, constituted an everlasting offer of a Free Appropriate Public Education (FAPE) which lasted into the 2018-2019 school year.  The issues raised by Student were not litigated as they were not raised until Student filed the present case with OAH. Student certainly did not litigate issues it had not raised, nor were we allowed to do so under OAH rules.  The facts and circumstances surrounding these issues were quite different.  As an example, whereas the District issued assessment plans to Student in 2016, there were never any assessment plans whatsoever issued in 2018-2019.  This would be a new issue for OAH to analyze and hear evidence on.

The District wants OAH to apply the doctrine of collateral estoppel to the factual and legal conclusions in the prior OAH decision, *Student v. Upland Unified School District,* OAH Case Nos. 2019080542, 2020040245, and 2020010465, particularly OAH's determination that Student was not eligible for special education and related services after June 30, 2017, and was not entitled to a FAPE from the District thereafter. The factual determinations and legal conclusions that OAH made in the November 24, 2020 OAH decision are not subject to collateral estoppel. Whether or not the Student was entitled to the provision of a FAPE is a different question as to whether or not the district should have at least provided an assessment plan, conducted assessments and held an IEP meeting.  The question of whether or not the district's last IEP dated October 31, 2016 was valid for the 2018-2019 school year has not been addressed and Student has not litigated said issue.

The District contends that Student raises issues in the instant complaint that are a continuation of the previous contentions between the parties. But Student never presented a case related to the 2018-2019 school year.  Therefore the November 24, 2020 OAH decision could not have addressed issues that were never litigated because they were never raised.

The collateral estoppel doctrine is "grounded on the premise that 'once an issue has been resolved in a prior proceeding, there is no further fact-finding function to be performed.'" (*Smith v. Harrington, et al.* (N.D. Cal. 2015) 65 IDELR 95, *citing Murray v. Alaska Airlines, Inc.* (2010) 50 Cal. 4th 860, 864, *quoting Parklane Hosiery Co. v. Shore* (1979) 439, U.S. 322, 336.). But, in this case, there is definitely further fact-finding that needs to be done as related to the 2018-2019 school year.  The California Supreme Court says that 'Collateral estoppel precludes relitigation of issues argued and decided in prior proceedings.' (Lucido v. Superior Court (1990) 51 Cal.3d 335, 341 [272 Cal. Rptr.

767, 795 P.2d 1223].).  The issues raised in the present case were never argued by Student nor were they argued by the District.

Unlike res judicata, which can apply to any claim that the parties had an opportunity to litigate, collateral estoppel applies only when the issue was actually litigated.  None of the issues presented by Student in this case have been "actually" litigated because for purposes of issue preclusion, an issue was "actually litigated" only if it was raised, contested, and submitted for determination in a prior adjudication.  Since Student nor District has raised these issues in the prior case, they could not have possible been actually litigated.  Courts have clearly laid out that "actually litigated" and a "full and fair opportunity" to litigate as separate requirements, each of which must be met for issue preclusion to apply (See Oyeniran, 672 F.3d at 806).  The District's claim that Student had the opportunity to raise the 2018-2019 issues in the prior case and therefore is barred from presenting the issues in this case, is contrary to law.

<u>Issues Not Decided</u>

The District's Motion seems to hinge on the premise that its last and only offer of October 31, 2016, constituted an everlasting offer of a Free Appropriate Public Education (FAPE) which lasted into the 2018-2019 school year.  This issue was not litigated; rather the ALJ reached the erroneous conclusion that somehow Student waived her rights to FAPE when the Parent allegedly did not consent to an assessment plan that was offered in 2016.

There was no decision rendered by OAH as to whether Student was a parentally placed private school

student for the 2018-2019 school years and, therefore, was not entitled to a FAPE from the District. There was no decision rendered as to whether the October 31, 2016 IEP constituted a FAPE for the 2018-2019 school year and continued to be in effect until Student's graduation date of August 2019. Similarly, The ALJ's decision did not analyze whether or not the District provided an assessment plan to Student in 2018-2019.

For issues to be decided, they had to be "actually and necessarily determined," (Montana, 440 U.S. at 153), i.e., those that were raised, contested, and submitted for determination.  None of the issues in the present case were raised to OAH by Student or District. They were never contested and they were not submitted for determination until the filing of this case on September 11, 2020. As an example, in 2018 Student and District entered into a settlement agreement.  Student was prohibited from introducing any evidence related to said settlement agreement because it was not related to the issues in the prior case.   OAH has heard no evidence whatsoever related to the settlement agreement and thus, could not have possible rendered any decision related to these events.  In filings to the federal Court, the District argued that Student had not exhausted its administrative remedies regarding the settlement agreement.  The District now seems to take a different position by attempting to prevent Student from exhausting her administrative remedies.

### The Decision in the Prior Proceeding is Not Final

Orders and decisions rendered in special education due process hearing proceedings may be cited as persuasive but not binding authority by parties and hearing officers in subsequent proceedings. (Cal. Code Regs., tit. 5, § 3085.). Even if we assume that ALJ Hatfield's decision was correct, it is not final. The OAH decision is subject to review until February 22, 2021 and thus it is not final.  The

decision got various facts wrong including but not limited to the ALJ determining that, "[i]n October 2016[,] [the District] 'funded' the [IEE] Mother requested after disagreeing with [the District's] psychoeducational assessment and, consequently, [the District] had no obligation later to 'file' a request for due process hearing to prove the legal adequacy of its own assessment." There was no evidence presented at hearing to support the proposition that the district funded an IEE funded in 2016.  The only assessment funded by district outside its own assessors was that of Nancy Markel which took place in 2014.  It is dubious whether this assessment can even be called an IEE as it was a decision reached at the IEP meeting because the district's assessors could not complete the assessments in a timely manner.  The California Department of Education found the district out of compliance for failing to conduct assessments within the required timelines.

The facts and circumstances in this case are different from the prior case. For example, unlike in 2016, the district never sent the Parent any assessment plan in 2018.  Assuming that Parent's actions during one school year somehow resulted in forfeiting the child's rights in perpetuity would be incorrect and a miscarriage of justice.

<u>CLOSING</u>

The purpose of the Individuals with Disabilities Education Act (20 U.S.C. § 1400 et. seq.) is to 'ensure that all children with disabilities have available to them a free appropriate public education,' and to protect the rights of those children and their parents. (20 U.S.C. § 1400(d)(1)(A), (B), and (C); see also Ed. Code, § 56000.) A party has the right to present a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." (20 U.S.C. § 1415(b)(6); Ed. Code, § 56501, subd.

(a) [party has a right to present a complaint regarding matters involving proposal or refusal to initiate or change the identification, assessment, or educational placement of a child; the provision of a free appropriate public education to a child; the refusal of a parent or guardian to consent to an assessment of a child; or a disagreement between a parent or guardian and the public education agency as to the availability of a program appropriate for a child, including the question of financial responsibility].) The jurisdiction of OAH is limited to these matters. (Wyner v. Manhattan Beach Unified School. Dist. (9th Cir. 2000) 223 F.3d 1026, 1028-1029.)

On May 18, 2020 Administrative Law Judge Kara Hatfield denied a Motion to Dismiss in the prior case (see attached).  The same rationale can be applied here.  The District's attempt to apply collateral estoppel to the Student's case amounts to asking OAH to rule on the merits on the present case and would essentially function as a Motion for Summary Judgement which is not provided for in special education law as ALJ Hatfield's order pointed out.

Although OAH will grant motions to dismiss allegations that are facially outside of OAH jurisdiction such as, civil rights claims, section 504 claims, enforcement of settlement agreements, or incorrect parties, special education law does not provide for a summary judgment procedure. Here, with respect to the claims Student stated in OAH Case No. 2020090375, Upland's motion is not limited to matters that are facially outside of OAH jurisdiction, but instead seeks a ruling on the merits. Accordingly, the motion to apply collateral estoppel should be denied.

There has been no hearing regarding the issues Student raised in the present case. Without specific findings of fact about the lack of assessment plans, notices, assessments, reports, communications, IEP meetings, and actions of the District in the 2018-2019 timeframe there are no findings which may

be collateral estopped; nor barred by issue preclusion. Granting the District's Motion would prevent Student from exhausting her administrative remedies.

Consequently, the requirements of collateral estoppel have not been met as they relate to Student's Complaint. Therefore, Student is not collaterally estopped from litigating the issues in the present Complaint. Accordingly, Student respectfully requests that OAH deny the District's Motion to apply collateral estoppel.

By: Rita M Loof          December 22,2020

Exhibit 5

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

IN THE MATTER OF:

PARENT ON BEHALF OF STUDENT,

v.

UPLAND UNIFIED SCHOOL DISTRICT.

OAH CASE NUMBER 2020090375

ORDER GRANTING REQUEST FOR OFFICIAL NOTICE OF THE NOVEMBER 24, 2020 DECISION AND GRANTING MOTION TO DISMISS ISSUES BARRED BY THE DOCTRINE OF COLLATERAL ESTOPPEL; ORDER DISMISSING NON-IDEA CLAIMS; ORDER GRANTING MOTION TO AMEND COMPLAINT AND DISMISSING ISSUES BARRED BY COLLATERAL ESTOPPEL AND NON-IDEA CLAIMS

DECEMBER 30, 2020

On September 11, 2020, Parent on behalf of Student filed a Request for Due Process Hearing, called a complaint, with the Office of Administrative Hearings, naming Upland Unified School District.

On November 24, 2020, OAH issued a Decision, referred to as the November 24, 2020 Decision, in the consolidated cases in OAH case numbers 2019080542, 2020040245, and 2020010465, involving Student and Upland Unified.

On December 15, 2020, Upland Unified moved for official notice of the November 24, 2020 Decision and sought application of the doctrine of collateral estoppel to bar Student's claims in this matter.

On December 22, 2020, Student filed an opposition, contending that the issues in the instant matter are different, were not litigated, and not addressed in the November 24, 2020 Decision.  Therefore, Student argues the doctrine of collateral estoppel does not apply to bar her claims.

On December 23, 2020, Upland Unified filed a reply to Student's opposition and Student filed a response on December 28, 2020.  In addition, Student filed an exhibit, a response by Upland Unified dated January 17, 2020, filed in the United States District Court, Central District of California, to support her opposition.

## DOCTRINE OF COLLATERAL ESTOPPEL

Federal and state courts have traditionally adhered to the doctrine of collateral estoppel.  (*Allen v. McCurry* (1980) 449 U.S. 90, 94 [101 S.Ct. 411, 66 L.Ed.2d 308] (*Allen*); see 7 Witkin, California Procedure (4th Ed.) Judgement § 280 et seq.).  Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action

involving a party to the first case.  (*Ibid.*; *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341 (*Lucido*); see also *Migra v. Warren City School Dist. Bd. of Ed.* (1984) 465 U.S. 75, 77, n. 1 [104 S.Ct. 892, 79 L.Ed.2d 56] [federal courts use the term "issue preclusion" to describe the doctrine of collateral estoppel].)  Collateral estoppel requires that the issue presented for adjudication be the same one that was litigated and decided in the prior action, that there be a final judgment on the merits in the prior action, and that the party against whom the plea is asserted was a party to the prior action.  (*Lucido*, *supra*, 51 Cal.3d at p. 341.)

The doctrine of collateral estoppel serves many purposes, including relieving parties of the cost and vexation of multiple lawsuits, conserving judicial resources, and, by preventing inconsistent decisions, encouraging reliance on adjudication.  (*Allen*, *supra*, 449 U.S. at p. 94; see *University of Tennessee v. Elliott* (1986) 478 U.S. 788, 798 [106 S.Ct. 3220, 92 L.Ed.2d 635].)  While collateral estoppel is a judicial doctrine, it is also applied to determinations made in administrative settings.  (See *Pacific Lumber Co. v. State Resources Control Board* (2006) 37 Cal.4th 921, 944, citing *People v. Sims* (1982) 32 Cal.3d 468, 479; *Hollywood Circle, Inc. v. Department of Alcoholic Beverage Control* (1961) 55 Cal.2d 728, 732.)

However, the Individuals with Disabilities Education Act, also known as the IDEA, contains a section that modifies the general analysis regarding collateral estoppel.  The IDEA specifically states that nothing in the Act shall be construed to preclude a parent from filing a separate due process complaint on an issue separate from a due process complaint already filed.  (20 U.S.C. § 1415(o); 34 C.F.R. § 300.513(c) (2006); Ed Code, § 56509.)  Therefore, although parties are precluded from relitigating issues already heard in previous due process proceedings, parents are not precluded from filing a new

due process complaint on issues that could have been raised and heard in the first case but were not.

A party aggrieved by the findings and decisions in a due process hearing may appeal to a competent court of jurisdiction within 90 days of receipt of the hearing decision.  (Ed. Code, § 56505, subd. (k).)

## DISCUSSION

Student raises 9 issues in her complaint, eight of which were decided by the November 24, 2020 Decision.  Student did not identify an Issue 5 in her complaint.

Student's Issues 1, 2, 6, 7, and 8, allege denials of a free appropriate public education, referred to as a FAPE, for violations on the part of Upland Unified for failing to convene individualized education program, called an IEP, team meetings, and to provide Student an annual offer of FAPE with transition assessment and services for the 2018-2019 school year and extended school year.

In August and September 2020, OAH held a due process hearing involving Student and Upland Unified.  The hearing for the consolidated cases involved several issues related to claims from the 2016-2017 school year through the 2018-2019 school year.  Issue 17 of the consolidated due process hearing was raised by Upland Unified to determine if Student was entitled to a FAPE from Upland Unified during the 2017-2018 and 2018-2019 school years after Parent refused to consent to the September 30, 2016, and October 24, 2016 assessment plans.

Student and Upland Unified were afforded an opportunity to litigate Issue 17, with both parties offering testimony and documentary evidence to support their contentions.  OAH's November 24, 2020 Decision determined Student was no longer

eligible for special education and related services after June 30, 2017, due to Parent's failure to consent to Upland Unified's triennial assessments. Furthermore, OAH found that Upland Unified had no further duty after June 30, 2017, to offer or provide Student a FAPE, to convene IEP team meetings, or otherwise afford Student most of the rights available to students with disabilities under the IDEA and related state law. The November 24, 2020 Decision further concluded that Parent's failure to consent afforded Upland Unified a complete defense to almost any claim Student might raise that Upland Unified denied her a FAPE after June 30, 2017, and in the 2017-2018 school year or thereafter.

The doctrine of collateral estoppel applies to Student's Issues 1, 2, 6, 7, and 8. For Student to prevail on these issues, she would need to establish that Upland Unified had a duty to provide Student a FAPE during the 2018-2019 school year. That question was answered in the November 24, 2020 Decision. Upland Unified's defense that it was not obligated to provide Student a FAPE for the 2018-2019 school year was litigated between the parties and OAH issued a final judgment finding that Student was not entitled to a FAPE from Upland Unified after June 30, 2017. Accordingly, Student's Issues 1, 2, 6, 7, and 8, are barred by the doctrine of collateral estoppel and therefore, dismissed.

Student's Issue 3 alleges a failure on the part of Upland Unified to timely fund or file for a due process hearing in response to Parent's request for an independent evaluation. The complaint discusses requests made by Parent in June and July of 2018 for an independent evaluation. However, a final determination of Issue 3 was also addressed by November 24, 2020 Decision. OAH concluded under Issues 13 and 14 of the November 24, 2020 Decision, that Student had no right to an independent educational evaluation at public expense, finding that at the time of Parent's June and

5

July 2018 requests for an independent educational evaluation, Upland Unified had not conducted any assessments within the prior two years with which Parent could disagree. (*G.J. v. Muscogee County School Dist.* (11th Cir. 2012) 668 F.3d 1258, 1266.) Accordingly, OAH held that Upland Unified had no obligation to fund an independent educational evaluation or file for due process hearing as there was no assessment to defend.  Student and Upland Unified were afforded an opportunity to litigate Issues 13 and 14, with both parties offering testimony and documentary evidence to support their contentions.  Therefore, Student's Issue 3 is barred by the doctrine of collateral estoppel and therefore, dismissed.

Student's Issue 4 claims that Upland Unified failed to timely file a due process hearing request during the 2018-2019 school year when Parent failed to allegedly consent to the proposed assessment of Student.  Issue 4 is the same issue identified as Issue 12 in the November 24, 2020 Decision.  On November 24, 2020, OAH concluded that Upland Unified had no obligation to reassess Student or try to obtain Parent's consent or administrative authorization to reassess her on or after August 13, 2017, as Student was no longer eligible for special education and related services.  Student and Upland Unified were afforded an opportunity to litigate Issue 12, with both parties offering testimony and documentary evidence to support their contentions.  Therefore, Student's Issue 4 is barred by the doctrine of collateral estoppel and therefore, dismissed.

As to Student's Issue 10, it contends Upland Unified failed to conduct assessments requested by Parent and to convene an IEP team meeting within 60 days of Parent's request.  The complaint's only reference to requests for assessments in 2018 or 2019 involved Parent's requests made in June and July of 2018.  Issue 9 was addressed in the November 24, 2020 Decision, identified as Issue 15.  OAH found that Upland

6

Unified did not deny Student a FAPE by failing to timely assess her in response to Parent's July 26, 2018 request for assessments.  Student and Upland Unified were afforded an opportunity to litigate Issue 15, with both parties offering testimony and documentary evidence to support their contentions.  Accordingly, Student's Issue 10 is barred by the doctrine of collateral estoppel, and hence, dismissed.

## NON-IDEA CLAIMS

OAH does not have jurisdiction to decide claims based on Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 701 et seq.), Section 1983 of Title 42 United States Code, the Americans with Disability Act (42 U.S.C. §§ 1201, et seq.), or the Unruh Civil Rights Act (Civ. Code, § 51).

Student's Issue 9 raises alleged violations based on Section 504 of the Rehabilitation Act of 1973, the Americans with Disability Act, the Unruh Civil Rights Act, and other state civil rights laws.  OAH does not have jurisdiction to resolve these claims.  Accordingly, Issue 9 is dismissed.

## AMENDED COMPLAINT

On December 24, 2020, Parent on behalf of Student filed a motion to amend her complaint and an amended complaint.  Upland Unified filed a non-opposition on December 28, 2020.

An amended complaint may be filed when either (a) the other party consents in writing and is given the opportunity to resolve the complaint through a resolution session, or (b) the hearing officer grants permission, provided the hearing officer may grant such permission at any time more than five (5) days prior to the due process

hearing.  (20 U.S.C. §1415(c)(2)(E)(i).)  The filing of an amended complaint restarts the applicable timelines for the due process hearing.  (20 U.S.C. §1415(c)(2)(E)(ii).)

Student's amended complaint raises the same issues in the initial complaint filed on September 11, 2020, with the addition of Issues 6(a), 10, 11(a), 11(b), and 12. However, Issue 6(a), which alleges a failure to convene an IEP team meeting within 30 days of Parent's request, specifically in the "2019-2019" school year is barred by the doctrine of collateral estoppel for the same reasons Issue 6 of the initial complaint is barred, as discussed above.  Student's motion to amend her complaint to add Issues 10, 11(a), 11(b), and 12 is timely and is granted.  However, the remaining issues in the amended complaint, including Issue 6(a), are barred by the doctrine of collateral estoppel or outside OAH's jurisdiction, and are therefore, dismissed.  The amended complaint did not identify an Issue 5.

This Order makes no determination as to whether Issues 10, 11(a), 11(b), and 12, are barred by the doctrine of collateral estoppel, or by any other judicial doctrine, or by federal or state law.  If Upland Unified seeks to bar Student's claims under Issues 10, 11(a), 11(b), or 12, it may file a separate motion to dismiss these issues, and Student will be permitted to respond to any such motion.

ORDER

1. Upland Unified's request for official notice of the November 24, 2020 Decision is granted.  Upland Unified's motion to dismiss issues barred by the doctrine of collateral estoppel is granted.  Student's Issues 1, 2, 3, 4, 6, 7, 8, and 10 in the September 11, 2020 complaint are dismissed.

2. Student's Issue 9 in the September 11, 2020 complaint is outside OAH's jurisdiction and therefore, dismissed.

3. Student's motion to amend her complaint is granted. Issues 1, 2, 3, 4, 6(a), 7, 8, 9, and 13 in the amended complaint are dismissed. The matter will proceed on the remaining issues, specifically, Issues 10, 11(a), 11(b), and 12. The amended complaint shall be deemed filed on the date of this order. All applicable timelines shall be reset as of the date of this order. OAH will issue a scheduling order with the new dates.

IT IS SO ORDERED.

*Rommel P. Cruz*

Rommel P. Cruz

Administrative Law Judge

Office of Administrative Hearings

Exhibit 6

ACCO,(KKx),DISCOVERY,MANADR,RELATED-G

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA (Eastern Division - Riverside)
# CIVIL DOCKET FOR CASE #: 5:21-cv-00326-JGB-KK

Sarah Loof et al v. Upland Unified School District
Assigned to: Judge Jesus G. Bernal
Referred to: Magistrate Judge Kenly Kiya Kato
Related Case: 5:18-cv-02122-JGB-KK
Cause: 20:1400 Civil Rights of Handicapped Child

Date Filed: 02/22/2021
Jury Demand: None
Nature of Suit: 446 Civil Rights:
Americans with Disabilities - Other
Jurisdiction: Federal Question

**Plaintiff**

**Sarah Loof**                     represented by    **Tania L Whiteleather**
                                                     Law Offices Tania Whiteleather
                                                     Inc
                                                     5445 East Del Amo Boulevard
                                                     Suite 207
                                                     Lakewood, CA 90712
                                                     562-866-8755
                                                     Fax: 562-866-6875
                                                     Email: tlwhiteleather@gmail.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rita Loof**                      represented by    **Tania L Whiteleather**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Upland Unified School District**  represented by   **Christopher J Fernandes**
*A Local Educational Agency*                         Fagen Friedman and Fulfrost LLP
                                                     15252 Faraday Avenue Suite 300
                                                     Carlsbad, CA 92008
                                                     760-304-6000
                                                     Fax: 760-304-6011

Email: cfernandes@f3law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua Walden**
Fagen Friedman and Fulfrost LLP
1525 Faraday Avenue Suite 300
Carlsbad, CA 92008
760-304-6000
Fax: 760-304-6011
Email: jwalden@f3law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shiva E Stein**
Fagen Friedman and Fulfrost LLP
1525 Faraday Avenue Suite 300
Carlsbad, CA 92008
760-304-6000
Fax: 760-304-6011
Email: sstein@f3law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/22/2021 | 1 | COMPLAINT Receipt No: ACACDC-30644953 - Fee: $402, filed by Plaintiffs SARAH LOOF. (Attachments: # 1 Supplement Decision Part 1, # 2 Supplement Decision Part 2, # 3 Supplement Decision Part 3, # 4 Supplement Decision Part 4, # 5 Supplement Decision Part 5) (Attorney Tania L Whiteleather added to party SARAH LOOF(pty:pla)) (Whiteleather, Tania) (Entered: 02/22/2021) |
| 02/22/2021 | 2 | CIVIL COVER SHEET filed by Plaintiff SARAH LOOF. (Whiteleather, Tania) (Entered: 02/22/2021) |
| 02/22/2021 | 3 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening), 1 filed by Plaintiff SARAH LOOF. (Whiteleather, Tania) (Entered: 02/22/2021) |
| 02/22/2021 | 4 | NOTICE of Interested Parties filed by Plaintiff SARAH LOOF, (Whiteleather, Tania) (Entered: 02/22/2021) |
| 02/22/2021 | 5 | NOTICE OF ERRATA filed by Plaintiff SARAH LOOF. correcting |

| | | Complaint (Attorney Civil Case Opening), 1 (Attachments: # 1 Exhibit One)(Whiteleather, Tania) (Entered: 02/22/2021) |
|---|---|---|
| 02/24/2021 | 6 | NOTICE RE INTRA-DISTRICT TRANSFER by Clerk of Court due to incorrect intra-district venue selected by the filer. Case is transferred to the Eastern Division. Case has been assigned to Judge John W. Holcomb for all further proceedings. Any matters that may be referred to a Magistrate Judge are assigned to Sheri Pym. New Case Number 5:20-cv-0326 JWH (SPx). (ghap) (Entered: 02/24/2021) |
| 02/24/2021 | 7 | NOTICE OF ASSIGNMENT to District Judge John W. Holcomb and Magistrate Judge Sheri Pym. (ghap) (Entered: 02/24/2021) |
| 02/24/2021 | 8 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (ghap) (Entered: 02/24/2021) |
| 02/24/2021 | 9 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening), 1 as to Defendant Upland Unified School District. (ghap) (Entered: 02/24/2021) |
| 03/05/2021 | 10 | ORDER RE TRANSFER PURSUANT TO GENERAL ORDER 21-01- Related Case- filed. Related Case No: 5:18-cv-02122-JGB(KKx). Case transferred from Judge John W. Holcomb and Magistrate Judge Sheri Pym to Judge Jesus G. Bernal and Magistrate Judge Kenly Kiya Kato for all further proceedings. The case number will now reflect the initials of the transferee Judge 5:21-cv-00326-JGB(KKx). Signed by Judge Jesus G. Bernal (ap) (Entered: 03/08/2021) |
| 03/09/2021 | 11 | STANDING ORDER upon filing of the complaint by Judge Jesus G. Bernal. (ima) (Entered: 03/09/2021) |
| 06/09/2021 | 12 | ANSWER to Complaint (Attorney Civil Case Opening), 1 filed by Defendant Upland Unified School District.(Attorney Shiva E Stein added to party Upland Unified School District(pty:dft))(Stein, Shiva) (Entered: 06/09/2021) |
| 06/09/2021 | 13 | CERTIFICATE of Interested Parties filed by Defendant Upland Unified School District, identifying Sara Loof, Rita Loof, Upland Unified School District. (Stein, Shiva) (Entered: 06/09/2021) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/16/2021 10:22:06 | | |
| **PACER** | jwalden1992 | **Client** | 368-361 |

| **Login:** | | **Code:** | |
|---|---|---|---|
| **Description:** | Docket Report | **Search Criteria:** | 5:21-cv-00326-JGB-KK End date: 7/16/2021 |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |